1  Brian E. Pastuszenski (*pro hac vice*)
   *bpastuszenski@goodwinprocter.com*
2  John B. Daukas (*pro hac vice*)
   *jdaukas@goodwinprocter.com*
3  Brian C. Devine (State Bar No. 222240)
   *bdevine@goodwinprocter.com*
4  **GOODWIN PROCTER LLP**
   53 State Street
5  Boston, Massachusetts  02109
   Telephone:  617-570-1000
6  Facsimile:   617-523-1231

7  Daniel J. Tyukody (State Bar No. 123323)
   *dtyukody@goodwinprocter.com*
8  **GOODWIN PROCTER LLP**
   601 S. Figueroa Street, 41st Floor
9  Los Angeles, CA  90017
   Telephone:  213-426-2500
10 Facsimile:  213-623-1673

11 *Attorneys for Defendants*
   Countrywide Financial Corp., Countrywide
12 Home Loans, Inc., Countrywide Capital
   Markets, LLC, Countrywide Securities
13 Corp., CWABS, Inc., CWALT, Inc., and
   CWMBS, Inc.

14

15             **UNITED STATES DISTRICT COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**

16

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORP. MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 11-ML-02265-MRP (MANx) **MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF COUNTRYWIDE DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** Date:            September 18, 2012 Time:            11:00 a.m. Courtroom:    12 Judge:          Hon. Mariana R. Pfaelzer |
| FEDERAL HOUSING FINANCE AGENCY, as conservator for THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORP., Plaintiff, v. COUNTRYWIDE FINANCIAL CORPORATION, *et al.*, Defendants. | Case No. 12-CV-01059-MRP (MANx) |

17
18
19
20
21
22
23
24
25
26
27
28

1

**<u>TABLE OF CONTENTS</u>**

PRELIMINARY STATEMENT ...................................................................1

BACKGROUND ........................................................................................7

ARGUMENT ...........................................................................................12

I.     COUNTS I-VII ARE TIME-BARRED ...........................................12

    A.   The 1933 Act's Limitations And Repose Periods Have Expired .........12

    B.   The Virginia Securities Act's Repose Period Has Expired ..................15

    C.   The District of Columbia Securities Act's Limitations And Repose Periods Have Expired ................................................................15

II.    THE HERA "EXTENDER STATUTE" DOES NOT APPLY ......................16

    A.   The Extender Statute Does Not Apply To Statutes Of Repose ............18

        1.   Statutes of Repose Are Fundamentally Different From Statutes Of Limitations ................................................................19

        2.   The Plain Language Of The Extender Statute Confirms That It Does Not Apply To Statutes Of Repose ..........................22

        3.   Excluding Statutes of Repose Is Consistent With The Apparent Purpose Of The Extender Statute ................................29

        4.   Applying The Extender Statute To Statutes Of Repose Would Conflict With The Text And Purpose Of Repose Periods ................................................................................31

    B.   The Extender Statute Does Not Apply To Federal Law Claims ............34

        1.   The Plain Language Of The Extender Statute Shows That It Applies Only To State Law Claims ..........................................35

        2.   Applying The Extender Statute To Federal Law Claims Would Lead To Absurd Results ....................................................38

        3.   Limiting The Extender Statute To State Law Claims Preserves The Policy Choices Made By Congress .....................40

    C.   The Extender Statute Applies Only To Tort And Contract Claims ................................................................................41

    D.   *FHFA v. UBS* Is Not Persuasive And Not Binding ................................43

    E.   Even If The Extender Statute Applied, Which It Does Not, FHFA Concedes That Many Claims Are Nevertheless Time-Barred ................................................................................46

III.   *AMERICAN PIPE* TOLLING DOES NOT APPLY........................................46

IV.   THE FANNIE MAE TOLLING AGREEMENT DOES NOT SAVE ITS UNTIMELY CLAIMS ................................................................49

CONCLUSION ....................................................................................................50

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Aguirre v. L.A. Unified Sch. Dist.*
  461 F.3d 1114 (9th Cir. 2006) ..................................................26, 28

*Albillo-De Leon v. Gonzales*
  410 F.3d 1090 (9th Cir. 2005) ...........................................20, 24, 27

*Allstate Ins. Co. v. Countrywide Fin. Corp.*
  824 F. Supp. 2d 1164 (C.D. Cal. 2011) ......................................13, 47

*Am. Elec. Power Co., Inc. v. Connecticut*
  131 S. Ct. 2527 (2011) ..........................................................36

*American Pipe & Constr. Co. v. Utah*
  414 U.S. 538 (1974) ..........................................................6,47, 48

*Balam-Chuc v. Mukasey*
  547 F.3d 1044 (9th Cir. 2008) .......................................20, 21,25, 27

*Ball v. Rodgers*
  492 F.3d 1094 (9th Cir. 2007) ....................................................39-40

*Basic Inc. v. Levinson*
  485 U.S. 224 (1988) ..........................................................43

*Bates v. United States*
  522 U.S. 23 .....................................................................37

*BedRoc Ltd., LLC v. United States*
  541 U.S. 176 (2004) ..........................................................29

*Boise Cascade Corp. v. U.S. E.P.A.*
  942 F.2d 1427 (9th Cir. 1991) ..................................................39

*Burlington N. & Santa Fe Ry. v. Poole Chem. Co.*
  419 F.3d 355 (5th Cir. 2005) ........................................20, 23, 26, 44

*Cada v. Baxter Healthcare Corp.*
  920 F.2d 446 (7th Cir. 1990) ..................................................30

*Cal. State Legislative Bd., United Transp. Union v. Dep't of Transp.*
  400 F.3d 760 (9th Cir. 2005) ............................................................... 45

*Caviness v. DeRand Res. Corp.*
  983 F.2d 1295 (4th Cir. 1993) ............................................................. 15

*CBP Res., Inc. v. SGS Control Servs., Inc.*
  394 F. Supp. 2d 733 (M.D.N.C. 2005) ................................................ 42

*City of L.A. v. U.S. Dep't of Commerce*
  307 F.3d 859 (9th Cir. 2002) ............................................................... 39

*Close v. Thomas*
  653 F.3d 970 (9th Cir. 2011) ............................................................... 29

*Compton Unified Sch. Dist. v. Addison*
  598 F.3d 1181 (9th Cir. 2010) ............................................................. 40

*Coppinger-Martin v. Solis*
  627 F.3d 745 (9th Cir. 2010) ............................................................... 30

*Cors v. Langham*
  683 F. Supp. 1056 (E.D. Va. 1988) ..................................................... 15

*Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Can.*
  764 F. Supp. 2d 155 (D.D.C. 2011) ..................................................... 42

*Davis v. Birr, Wilson & Co., Inc.*
  839 F.2d 1369 (9th Cir. 1988) (Aldisert, J., concurring) ............... 27, 34

*Deirmenjian v. Deutsche Bank, A.G.*
  2010 WL 3034060 (C.D. Cal. July 30, 2010) .................................25-26

*Dexia Holdings, Inc. v. Countrywide Fin. Corp.*
  2012 WL 1798997 (C.D. Cal. Feb. 17, 2012) ...................................... 47

*Dobbs v. Anthem Blue Cross & Blue Shield*
  600 F.3d 1275 (10th Cir. 2010) ........................................................... 28

*Ernst & Ernst v. Hochfelder*
  425 U.S. 185 (1976) ............................................................................. 43

*Estate of Kennedy v. Bell Helicopter Textron, Inc.*
  283 F.3d 1107 (9th Cir. 2002) ................................................... 21, 27, 30

*Evans v. Walter Industries, Inc.*
    579 F. Supp. 2d 1349 (N.D. Ala. 2008) ............................................................ 23

*Fed. Hous. Fin. Agency v. UBS Ams., Inc.*
    2012 WL 1570856 (S.D.N.Y. May 4, 2012) ..................................... 6, 43, 44, 45

*Fields v. Legacy Health Sys.*
    413 F.3d 943 (9th Cir. 2005) ................................................... 20, 21, 25, 27

*Firebaugh Canal Co. v. United States*
    203 F.3d 568 (9th Cir. 2000) ................................................................. 33

*Garcia v. Brockway*
    526 F.3d 456 (9th Cir. 2008) (en banc) ................................................ 29-30, 39

*Goad v. Celotex Corp.*
    831 F.2d 508 (4th Cir. 1987) ................................................... 21, 27, 30

*Goldstein v. Malcolm G. Fries & Assocs., Inc.*
    72 F. Supp. 2d 620 (E.D. Va. 1999) ........................................................ 15

*Good Samaritan Hosp. v. Shalala*
    508 U.S. 402 (1993) .......................................................................... 22

*Hite v. Leeds Weld Equity Partners IV, L.P.*
    429 F. Supp. 2d 110 (D.D.C. 2006) ...................................................... 15-16

*In re Commercial Fin. Servs., Inc.*
    294 B.R. 164 (N.D. Okla. Bankr. 2003) .................................................... 50

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*
    No. 11-ML-02265-MRP, slip op. (C.D. Cal. Mar. 9, 2012) ........................ 13, 47

*In re Craftmatic Sec. Litig.*
    890 F.2d 628 (3d Cir. 1990) .................................................................. 43

*In re Egebjerg*
    574 F.3d 1045 (9th Cir. 2009) ........................................................ 26, 27

*In re Exxon Mobil Corp. Sec. Litig.*
    500 F.3d 189 (3d Cir. 2007) ........................................... 21, 25, 27, 30

*In re Fed. Nat. Mortg. Ass'n Sec., Deriv., ERISA Litig.*
    725 F. Supp. 2d 142 (D.D.C. 2010) ........................................................ 29

*In re Lehman Bros. Sec. & ERISA Litig.*
    800 F. Supp. 2d 477 (S.D.N.Y. 2011) ........................................................ 19, 26

*In re Meruelo Maddux Props., Inc.*
    667 F.3d 1072 (9th Cir. 2012) ................................................................... 22, 23

*In re Morgan Stanley Info. Fund Sec. Litig.*
    592 F.3d 347 (2d Cir. 2010) ............................................................................ 33

*In re Silverman*
    616 F.3d 1001 (9th Cir. 2010) ................................................................... 22, 40

*Jimenez v.Quarterman*
    555 U.S. 113 (2009) ......................................................................................... 22

*Jodek Charitable Trust, R.A. v. Vertical Net Inc.*
    412 F. Supp. 2d 469 (E.D. Pa. 2006) .............................................................. 42

*Johnson v. Aljian*
    490 F.3d 778 (9th Cir. 2007) ............................................................. 20, 21, 27

*Kirk v. Rockwell Int'l Corp.*
    578 F.2d 814 (9th Cir. 1978) .......................................................................... 35

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*
    501 U.S. 350 (1991) ....................................................................... 21,27 , 28, 30

*Lewis v. Russell*
    2012 WL 201877 (E.D. Cal. Jan. 23, 2012) ................................................... 25

*Lyon v. Agusta S.P.A.*
    252 F.3d 1078 (9th Cir. 2001) .......................................................... 20-21, 27, 30

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*
    597 F.3d 84 (2d Cir. 2010) ............................................................... 19, 21, 30

*Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*
    792 F.2d 341 (3d Cir. 1986) ............................................................................ 42

*Mangum v. Action Collection Service, Inc.*
    575 F.3d 935 (9th Cir. 2009) .......................................................................... 29

*McCann v. Hy-Vee, Inc.*
    663 F.3d 926 (7th Cir. 2011) ........................................................... 21, 24, 34

*McDonald v. Sun Oil Co.*
 548 F.3d 774 (9th Cir. 2008) ...................................................................... 26, 27

*McOmie-Gray v. Bank of Am. Home Loans*
 667 F.3d 1325 (9th Cir. 2012) ................................................................... 20, 49

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*
 2011 WL 4389689 (C.D. Cal. May 5, 2011)................................................. 47

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*
 722 F. Supp. 2d 1157 (C.D. Cal. 2010).................................................*passim*

*Merck & Co. v. Reynolds*
 130 S. Ct. 1784 (2010) ................................................................................. 28

*Midstate Horticultural Co. v. Pa. R.R. Co.*
 320 U.S. 356 (1943) ..................................................................................... 50

*Mohamad v. Palestinian Auth.*
 132 S. Ct. 1702 (2012) ................................................................................. 29

*Morton v. Mancari*
 417 U.S. 535 (1974) .................................................................................32-33

*Munoz v. Ashcroft*
 339 F.3d 950 (9th Cir. 2003) ................................................................... 21, 27

*Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*
 No. 11-CV-6521-GW, slip op. (C.D. Cal. Mar. 15, 2012)......................... 18, 22

*Nat'l Credit Union Admin. Bd. v. RBS Securities, Inc.*
 No. 11-CV-5887-GW, slip op. (C.D. Cal. Dec. 19, 2011).................... 18, 22, 26

*Nat'l Credit Union Admin. Bd. v. RBS Securities, Inc.*
 No. 11-CV-5887-GW, slip op. (C.D. Cal. Jan. 30, 2012).......................... 18, 22

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*
 551 U.S. 644 (2007) ..................................................................................... 32

*Nat'l Labor Relations Bd. v. Kolkka*
 170 F.3d 937 (9th Cir. 1999) ........................................................................ 33

*Nelson v. Int'l Paint Co.*
 716 F.2d 640 (9th Cir. 1983) ........................................................................ 30

*Norris v. Wirtz*
   818 F.2d 1329 (7th Cir. 1987) ................................................................33-34, 41

*P. Stolz Family P'ship L.P. v. Daum*
   355 F.3d 92 (2d Cir. 2004) ...........................................................................*passim*

*Pincay v. Andrews*
   238 F.3d 1106 (9th Cir. 2001) .............................................................................40

*Pinkham v. Collyer Insulated Wire Co., Inc.*
   1994 WL 385375 (D.R.I. Mar. 22, 1994).......................................................20, 25

*Pinter v. Dahl*
   486 U.S. 622 (1988) ..............................................................................................43

*Posadas v. National City Bank of N.Y.*
   296 U.S. 497 (1936) ..............................................................................................33

*Resolution Trust Corp. v. Olson*
   768 F. Supp. 283 (D. Ariz. 1991) ....................................................................19, 26

*Rodriguez v. Holder*
   619 F.3d 1077 (9th Cir. 2010) ........................................................................32, 38

*Russell v. Merit Sys. Prot. Bd.*
   324 F. App'x 872 (Fed. Cir. 2008) (Dyk, J., separate opinion) .........................36

*Sch. Dist. No. 1J, Multnomah County v. AC & S, Inc.*
   5 F.3d 1255 (9th Cir. 1993) ............................................................................21, 27

*Silvers v. Sony Pictures Entm't, Inc.*
   402 F.3d 881 (9th Cir. 2005) ...............................................................................41

*Sosa v. Alvarez-Machain*
   542 U.S. 692 (2004) ..............................................................................................37

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*
   802 F. Supp. 2d 1125 (C.D. Cal. 2011).........................................................*passim*

*Stone & Webster Eng'g Corp. v. Duquesne Light Co.*
   79 F. Supp. 2d 1 (D. Mass. 2000).........................................................................50

*Underwood Cotton Co. v. Hyundai Merch. Marine (Am.), Inc.*
   288 F.3d 405 (9th Cir. 2002) ........................................................................*passim*

*United Fin. Cas. Co. v. Countrywide Fin. Corp.*
    No. 11-CV-04766-MRP, slip op. (C.D. Cal. Nov. 16, 2011).......................13, 47

*United States v. Berger*
    473 F.3d 1080 (9th Cir. 2007) ................................................................43

*United States v. Hunter*
    101 F.3d 82 (9th Cir. 1996) ....................................................................29

*United States v. Maes*
    546 F.3d 1066 (9th Cir. 2008) ................................................................33

*W. & S. Life Ins. Co. v. Countrywide Fin. Corp.*
    No. 11-CV-07166-MRP, slip op. (C.D. Cal. Mar. 9, 2012) ......................13, 47

*Wasco Prods., Inc. v. Southwall Techs., Inc.*
    435 F.3d 989 (9th Cir. 2006) ..................................................................48

*Wilson v. Saintine Exploration & Drilling Corp.*
    872 F.2d 1124 (2d Cir. 1989) ..................................................................43

**OTHER CASES**

*Burnett v. Sw. Bell Tel., L.P.*
    151 P.3d 837 (Kan. 2007)........................................................................42

*Kattar v. Demoulas*
    739 N.E.2d 246 (Mass. 2000)..................................................................42

**FEDERAL STATUTES**

12 U.S.C. § 4617(a)(1) ................................................................................36

12 U.S.C. § 4617(a)(3)(B)(i) .......................................................................36

12 U.S.C. § 4617(b)(12) ..........................................................................16-17

12 U.S.C. § 4617(b)(12)(A)....................................................................22, 35

12 U.S.C. § 4617(b)(12)(A)(i) ...................................................................23

12 U.S.C. § 4617(b)(12)(A)(ii)..................................................................23

12 U.S.C. § 4617(b)(12)(B) .......................................................................24

12 U.S.C. § 4617(b)(12)(B)(ii)..................................................................................24

12 U.S.C. § 4617(b)(13) ................................................................................17-18, 38

12 U.S.C. § 4617(b)(13)(A)...........................................................................................23

12 U.S.C. § 4617(d)(8)(A) ............................................................................................37

12 U.S.C. § 4617(d)(8)(C)(i) .........................................................................................37

12 U.S.C. § 4617(d)(8)(E) ............................................................................................37

12 U.S.C. § 4617(e)(1) ..................................................................................................37

12 U.S.C. § 4617(i)(5) ...................................................................................................37

12 U.S.C. § 4617(i)(7)(A)(iii) .......................................................................................37

15 U.S.C. § 15b ..............................................................................................................40

15 U.S.C. § 77m .......................................................................................................12, 31

28 U.S.C. § 1658(a) .......................................................................................................40

42 U.S.C. § 9613(g) .......................................................................................................40

Housing and Economic Recovery Act of 2008 ("HERA"),
12 U.S.C. § 4617(b)(12) .................................................................................3, 16, 17, 22

Pub. L. No. 102-339 § 3(b), 106 Stat. 869 (Aug. 11, 1992)...................................28

Pub. L. No. 73-22, 48 Stat. 74 (1933) ....................................................................34

**OTHER STATUTES**

§§ 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code.......12

§§ 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code....................................12

§ 13.1-522(D) of the Virginia Code ........................................................................15

§ 31-5606.05(f) of the District of Columbia Securities Act....................................15

**OTHER AUTHORITIES**

151 Cong. Rec. 16751 (2005)...................................................................................28

78 Cong. Rec. 8668 (1934).........................................................................................34

H.R. 1468, 111th Cong. § 14 (2009)........................................................................28

H.R. 1608, 111th Cong. § 3 (2009)..........................................................................28

H.R. 2563, 111th Cong. § 2 (2009)..........................................................................28

H.R. 3000, 105th Cong. § 206(e)(3) (1997)............................................................28

H.R. 364, 112th Cong. § 313 (2011).......................................................................28

H.R. 3905, 105th Cong. § 502 (1998)......................................................................28

H.R. 4375, 105th Cong. § 2 (1998)..........................................................................28

H.R. 896, 112th Cong. § 14 (2011)..........................................................................28

H.R. 940, 107th Cong. § 2 (2001)............................................................................28

H.R. Rep. No. 103-651 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2068.................38

Hearing on H.R. 3509, 109th Cong. § 2 (2006) ......................................................28

N. Singer and J.D. Singer, *Sutherland Statutory Construction* § 53.1, at 382-
    84 (7th ed. 2000).................................................................................................33

S. 1415, 105th Cong. § 704(c)(1) (1998) ................................................................28

S. 2236, 105th Cong. § 107 (1998)..........................................................................28

S. 2546, 105th Cong. § 502 (1998)..........................................................................28

S. 5, 105th Cong. § 106 (1997)................................................................................28

S. 648, 105th Cong. § 106(b) (1997) .......................................................................28

S. 8, 105th Cong. § 506(i) (1998)............................................................................28

SEC Amicus Curiae Brief, *P. Stolz Family P'ship L.P. v. Daum*,
2003 WL 23469697 (2003) .....................................................................................34

# PRELIMINARY STATEMENT

Fannie Mae and Freddie Mac are government-sponsored, privately-owned enterprises that were formed to provide liquidity, stability and affordability to the U.S. housing markets. *See* RJN Ex. 11 (SEC Non-Prosecution Agreement with Fannie Mae), Ex. A, ¶ 1; RJN Ex. 12 (SEC Non-Prosecution Agreement with Freddie Mac), Ex. A, ¶ 1.  During the years leading to the collapse of the housing market and broader capital markets, Fannie and Freddie were the largest and most sophisticated purchasers—and sellers—of residential mortgage-backed securities in this country.  In 2006 alone, Fannie and Freddie together bought nearly $30 billion of MBS issued by Countrywide and other lenders.

In order to grow their market share and fulfill the government's goal of making home ownership available to a broader economic cross-section of the country, both Fannie and Freddie deliberately increased their purchase and securitization of higher risk loans and MBS backed by such loans—including loans to borrowers with lower FICO scores, loans with higher loan-to-value ratios, and loans originated on the basis of reduced or no documentation as to the borrower's income or assets.  Fannie and Freddie did this despite knowledge of the significantly increased risk of default associated with these loans and the MBS into which they were securitized.  For example, Fannie disclosed in its 2004 Form 10-K that "[d]ue to the current competitive dynamics of the mortgage market, we have recently increased our purchase and securitization of mortgage loans that pose a higher credit risk. . . .  We have also increased the proportion of reduced documentation loans that we purchase . . . .  The increase in our exposure to credit risk resulting from the increase in these loans . . . may cause us to experience increased delinquencies and credit losses."  RJN Ex. 1 at 43.  Fannie Mae likewise disclosed in its 2005 Form 10-K that its decision to "increas[e] our investment in higher-risk mortgages and products" "could increase our credit losses."  RJN Ex. 2 at 123.  Freddie Mac made similar disclosures.[1]

---

[1] *See, e.g.*, RJN Ex. 8 (Freddie Mac 2005 Annual Report) at 3:

1   These decisions to increase exposure to credit and market risk have been

2   investigated at length by Congress, the Financial Crisis Inquiry Commission

3   ("FCIC"), and the SEC, and ultimately led to both entities being placed into

4   conservatorship under the oversight of the Federal Housing Finance Agency

5   ("FHFA"), in the wake of what FHFA itself has characterized as "a series of ill-

6   advised and poorly executed decisions and other serious misjudgments."  RJN Ex. 13

7   (Letter from FHFA to Freddie Mac) at 1.  The last word that reasonably could be used

8   to describe Fannie Mae and Freddie Mac is "victim."  Yet that is exactly what FHFA

9   is alleging in this suit.

10   In the hopes of deflecting the blame for the losses these entities suffered as a

11   result of their strategy of taking on significantly increased credit and market risk,

12   FHFA filed this lawsuit against Countrywide and 16 substantially similar suits in

13   September 2011, accusing virtually every financial institution involved in the MBS

14   industry of misleading Fannie Mae and Freddie Mac regarding the credit quality of the

15   loans backing the MBS they purchased.  Given their unmatched sophistication in the

16   mortgage industry and their intimate knowledge about the characteristics and riskiness

17   of the loans backing the MBS they bought from Countrywide, these allegations could

18   not be further from the truth.  Indeed, in non-prosecution agreements ("NPAs")

19   executed with the SEC as part of enforcement actions against former Fannie and

20   Freddie management for allegedly concealing the true extent of the credit risk

21   associated with the loans and securities they had bought, Fannie and Freddie admitted

22   that they had a close relationship with Countrywide, from which they purchased

23

24   The dramatic increases in housing prices over the last few years have resulted in
      the origination of a greater proportion of alternative mortgage products,
25   including initial interest-only loans and option adjustable-rate mortgage loans, or
      Option ARMS.  We have historically purchased limited amounts of these
26   alternative products through our securitization programs.  However, recently we
      have increased our purchases of these products consistent with the increase in
27   their prevalence in the market.  We are continuing to explore ways in which we
      can become more involved with these products and we expect our participation
28   in these products to grow over the coming years.

billions of dollars in loans from 2006 to 2008, and had been intimately familiar with the "volatile" nature of Countrywide's loans and the underwriting practices it used to originate them.  RJN Ex. 12, Ex. A, ¶¶ 20-22, 62; RJN Ex. 11, Ex. A, ¶¶ 37-38.  Fannie and Freddie were not misled.  But at this threshold stage of the litigation, FHFA's claims must be dismissed because they were filed too late.

*FHFA's Claims Are Time-Barred*.  More specifically, FHFA's federal and state statutory securities claims (Counts I-VII) are time-barred and must be dismissed with prejudice.  Its claims under the Securities Act of 1933 are untimely under the Act's one-year limitations period and three-year repose period because Fannie Mae and Freddie Mac either discovered or reasonably should have discovered the alleged misstatements FHFA now complains about no later than early 2008, more than one year before filing this action in September 2011 and before Countrywide's tolling agreement with Fannie became effective in July 2009.  These claims are also untimely under the 1933 Act's three-year statute of repose because all of the MBS at issue were offered and sold more than three years prior to the filing of this action.  Its claims under the District of Columbia Securities Act are also subject to a one-year statute of limitations and three-year statute of repose, and are untimely for the same reasons its 1933 Act claims are untimely.  Likewise, FHFA's claims under the Virginia Securities Act are untimely under the applicable two-year statute of repose because all of Freddie Mac's MBS purchases occurred more than two years before filing this action.

*The Extender Statute Does Not Apply To Statutes Of Repose*.  Because its claims are stale, FHFA argues that the applicable limitations and repose periods were extended by the statute of limitations "extender" provision of the Housing and Economic Recovery Act of 2008 ("HERA"), 12 U.S.C. § 4617(b)(12).  But the extender statute does not save FHFA's untimely claims, for three reasons.  First, the HERA extender provision applies only to statutes of *limitations*, not statutes of *repose*.  The plain language of the HERA extender statute refers solely to "statutes of limitations," and makes no mention of "statutes of repose."  Moreover, the extender

provision expressly states that the limitations period that will apply to a particular case brought by FHFA will be the longer of the period provided under state law or the period specified in the statute beginning on the date the claim "accrues." "Accrual" is the language of limitations periods, defining when a period of limitations begins to run and typically tied to the plaintiff's knowledge or diligence or when the plaintiff is first able to file suit. Statutes of repose, however, have nothing to do with "accrual"— instead, they are typically triggered by an act of the *defendant* and begin to run regardless of whether the plaintiff is (or reasonably should be) aware of its claim or whether the claim otherwise has "accrued." This reading of the statute is reinforced by the fact that Congress is presumed to be aware of existing law and past judicial interpretations of relevant terms. Here, the distinction between statutes of limitations and statutes of repose was well-settled in the case law when HERA was enacted in 2008, and the reference to "statute of limitations" in the plain language of the extender statute should be given its customary meaning. If Congress had intended the term "statutes of limitations" to mean "statutes of limitations *and* statutes of repose," it would have said so expressly. In fact, Congress has drafted more than a dozen bills that make just such an express distinction between statutes of limitations and statutes of repose. Here it did not do so.

Although the plain language of the statute is dispositive and the Court need not (and should not) look beyond that language to the statute's apparent purpose or legislative history, the ostensible purpose of the extender provision is to give FHFA additional time to identify and evaluate potential claims. But statutes of repose are concerned with giving the defendant a clear date after which it no longer will be subject to claims, not fairness to the plaintiff, and they run without regard for the amount of time the plaintiff has to discover and evaluate its claims.

***The Extender Statute Does Not Apply To Federal Law Claims***. The extender statute also does not apply to federal law claims, including 1933 Act claims. Again, the plain text of the statute is clear. It provides that the applicable limitations period

shall be the longer of either three years (for tort claims) or six years (for contract claims), or "the period applicable under State law." This language assumes that there *is* a period "applicable under State law," but federal statutory claims like the 1933 Act are governed by their own federal limitations periods. State law periods are thus *inapplicable* to such federal claims. Moreover, the plain language of HERA permits the revival of "expired *state* causes of action" to the extent they are based on alleged fraud or intentional misconduct. (Emphasis added.) It would not make sense for Congress to revive *only* state law claims, but extend *both* federal *and* state law claims. Rather, the only logical, harmonious reading of the plain text is that both the extender and revival provisions apply *solely* to state law claims. Equally important, applying the extender statute to federal law claims would lead to absurd results. Among other things, such a reading of the statute would result in the *shortening*—not the extending—of many federal limitations periods. That would directly conflict with the ostensible purpose of the extender statute. Had Congress intended the extender provision to apply to federal law claims, it easily could have referenced "the period applicable under State *or Federal* law," but it chose not to—despite *eight* express references to "federal law" in other provisions of HERA. Under well-settled principles of statutory construction, the inclusion of "federal law" elsewhere in the statute but the exclusion of it in the extender provision indicates that the exclusion was intentional, and that Congress intended it to apply only to state law claims.

   ***The Extender Statute Does Not Apply To "Sui Generis" Statutory Claims***. By its express terms, the extender statute applies only to "tort" claims and "contract" claims. It does not apply to "*sui generis*" statutory claims like those asserted under the 1933 Act and the Virginia and District of Columbia Securities Acts. These laws are unique statutory schemes aimed at promoting disclosure in the securities markets, and the rights of action they provide are neither tort claims nor contract claims.

   The HERA statute of limitations extender statute thus does not save the federal and state statutory securities claims in Counts I-VII of the Amended Complaint, and

they must be dismissed as untimely.  And the recent decision in *Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 2012 WL 1570856 (S.D.N.Y. May 4, 2012), which found the HERA extender statute applicable to similar claims, does not warrant a different result.  *See infra*, at 43-46.[2]

***No Tolling Doctrine Applies***.  In its Amended Complaint, FHFA alleges that the statute of limitations for its 1933 Act claims was tolled due to the filing of the *Luther* case pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).  (It does not seek to invoke class action tolling as to any other claims.)  FHFA fails, however, to allege a sufficient factual basis for tolling.  Nor could it.  Any such tolling is plainly inapplicable under this Court's prior rulings, because the named plaintiffs in *Luther* did not purchase any of the same securities Fannie Mae and Freddie Mac allegedly bought.  Because the *Luther* plaintiffs lacked standing to sue over those securities, no tolling could have been triggered by any complaint in *Luther*.  In addition, the tolling agreement between Fannie Mae and the Countrywide Defendants that took effect on July 13, 2009 does not affect the timeliness of FHFA's claims.  This is because the one-year statute of limitations governing Fannie Mae's 1933 Act and District of Columbia Securities Act claims expired before the tolling agreement became effective, and the tolling agreement also did not apply to or suspend the running of the applicable statutes of repose, which also expired prior to the filing of this action.

For all these reasons, Counts I-VII of the Amended Complaint are time-barred and should be dismissed with prejudice.[3]

---

[2] Even if the extender statute did apply to Counts I-VII, which it does not, FHFA concedes that many claims under the 1933 Act and Virginia Securities Act nevertheless would be time-barred because they expired before the date on which FHFA was appointed as conservator of Fannie and Freddie.  *See* Amended Complaint ("AC") ¶¶ 401, 409, 451, 469 (limiting claims to MBS offered/purchased after certain dates); *infra*, at 46-47.

[3] The original Complaint in this action was filed on September 2, 2011.  On June 8, 2012, the Countrywide Defendants moved to dismiss Counts I-VII of the Complaint as time-barred.  Instead of opposing the motion, FHFA filed its Amended Complaint on June 29, 2012.  With only two exceptions, however, none of the new allegations in

## BACKGROUND

Fannie Mae and Freddie Mac's public policy objective of increasing home ownership caused them to be leaders in experimenting with relaxed underwriting standards.[4]  As part of this initiative, Fannie Mae deepened its relationship with Countrywide, which entered into an alliance agreement with Fannie Mae in 1999 to introduce a reduced documentation loan program that initially was called the "internet loan" and later named the "*Fast and Easy*" loan.[5]  Fannie and Freddie increasingly turned to this and other relaxed underwriting standard loans when their market share was threatened beginning around 2005.[6]  As it turned out, their timing could not have been worse.  As stated in the FCIC Report, "In 2005 and 2006, they decided to ramp up their purchase and guarantee of risky mortgages, just as the housing market was peaking."  RJN Ex. 5 at xxvi.

---

the Amended Complaint address the timeliness of FHFA's claims.  The two new allegations that are relevant to timeliness do not cure the staleness of the FHFA's claims, and in fact are identical to allegations that this Court has rejected in its statute of limitations rulings in other cases in the *Countrywide MBS MDL*.

[4] *See* RJN Ex. 5 at 489 ("Fannie Mae and Freddie Mac have been a substantial part of this 'revolution in affordable lending.'  During the mid-to-late 1990s, they added flexibility to their underwriting guidelines, introduced new low-down-payment products, and worked to expand the use of automated underwriting in evaluating the creditworthiness of loan applicants."); *id.* at 453 (Dissenting Statement of Peter J. Wallison: "This effort, probably stimulated by a desire to increase home ownership, ultimately became a set of regulations that required Fannie and Freddie to reduce the mortgage underwriting standards they used when acquiring loans from originators.").

[5] RJN Ex. 51 (SEC Complaint against Fannie Mae executives), ¶ 63.

[6] *See* RJN Ex. 5 at 102 ("In 2004, commercial banks, thrifts, and investment banks caught up with Fannie Mae and Freddie Mac in securitizing home loans.  By 2005 they had taken the lead. . . .  By 2005 and 2006, Wall Street was securitizing one-third more loans than Fannie and Freddie.  In just two years, private-label mortgage backed securities had grown more than 30%, reaching $1.15 trillion in 2006; 71% were subprime or Alt-A.").  The SEC's complaint against Freddie executives observes that the GSEs' market share declined from 60% in 2000, to 42% by 2005.  RJN Ex. 52, ¶ 43.  Fannie Mae's share of originations fell from 40% in 2004 to 20% in 2005 as a result of "private label competition."  *See* RJN Ex. 51, ¶ 152; *see also* RJN Ex. 3 (Fannie Mae 2006 Form 10-K) at 64 ("Originations of lower credit quality loans [and] loans with reduced documentation . . . increased. . . .  Competition from private-label issuers, which have been a significant source of funding for these mortgage products, reduced our market share and level of MBS issuances.  In 2006, we began to increase our participation in these product types where we concluded that it would be economically advantageous or that it would contribute to our mission objectives, a trend that has continued in 2007.").

1       Countrywide was both a major customer and a competitor of Fannie and Freddie

2 in this "ramp up."  A June 27, 2005 internal presentation to senior Fannie executives

3 noted Fannie's decline in market share and attributed it to Fannie's conscious decision

4 (at least up to that point) *not* to "Meet the Market" in light of "[g]rowing concern about

5 housing bubbles [and] borrowers taking on increased risks and higher debt."[7]  But this

6 same document also noted that that historical approach was "costing us business with

7 our largest customer [Countrywide]."[8]  Although "Meeting the Market" in order to

8 "[s]low down [Fannie's] decline in market share" would require its exposure to

9 "[h]igher credit losses" and "increased exposure to unknown risks,"[9] Fannie ultimately

10 did decide to "Meet the Market" as evidenced in its 2005 Form 10-K:

11       We have . . . *relaxed some of our underwriting criteria* to obtain goals-

12       qualifying mortgage loans and *increased our investments in higher-risk*

13       mortgage loan products that are more likely to serve the borrowers targeted

14       by HUD's goals and subgoals, which could increase our credit losses.

15 RJN Ex. 2 at 123 (emphasis added).[10]

16       Countrywide played a large role in Fannie and Freddie's efforts to increase its

17 market share, including Fannie's 2006 "'Say Yes' strategy to regain market share" that

18 involved loosening its automated underwriting standards to accept "larger volumes of

19 loans with lower FICO scores and higher LTVs than previously permitted."  RJN Ex.

20 

_____

21 [7] RJN Ex. 10 (Fannie Mae PowerPoint presentation) at 3.

22 [8] RJN Ex. 10 at 32.

   [9] RJN Ex. 10 at 8.

23 [10] *See also* RJN Ex. 3 at 128 ("We have also invested in highly rated private-label
mortgage-related securities that are backed by Alt-A or subprime mortgage loans.");

24 RJN Ex. 4 (Fannie Mae 2007 Form 10-K) at 92 ("We have invested in private-label
mortgage-related securities backed by Alt-A or subprime mortgage loans. . . ."); *id.* at

25 130 ("As of December 31, 2007, we held or guaranteed approximately $32.5 billion in
private-label mortgage-related securities backed by Alt-A loans and approximately

26 $41.4 billion in private-label mortgage-related securities backed by subprime loans.");
RJN Ex. 8 at 66 (discussing Freddie's holdings of interest-only and subprime

27 mortgage-related securities); RJN Ex. 9 (Freddie Mac 2006 Annual Report) at 60 ("At
December 31, 2006 and 2005, we held approximately $124 billion and $139 billion,

28 respectively, of non-agency mortgage-related securities backed by subprime loans").

51, ¶ 33.[11]  Fannie consistently referred to Countrywide in its Form 10-K reports filed with the SEC as its "top customer,"[12] and Countrywide's importance to Fannie was illustrated by the fact that Fannie's 2003 annual report to its shareholders featured a full-page color picture of Countrywide's Chairman and CEO, Angelo Mozilo.[13] According to the SEC, between December 2006 and August 2008, Fannie acquired $28.5 billion in loans from Countrywide's subprime lending division.  RJN Ex. 51, ¶ 127.[14]  Fannie's pursuit of Alt-A type loans was even more aggressive.  The SEC has said that Fannie Mae purchased $102.5 billion of *Fast and Easy* loans from Countrywide in 2006, $129 billion in 2007, and $133 billion in 2008, accounting for approximately 5% of Fannie Mae's overall single family home business.  RJN Ex. 51, ¶¶ 166-67.  And Fannie bulked up on these loans even though it knew the risks involved in doing so, as reflected in internal management presentations that concluded that "CHL [Countrywide] sells whatever it can through *Fast and Easy*." *Id.* ¶ 167.

---

[11] Freddie Mac had a similar program called "Touch More Loans" which the SEC describes as "[a]nother example of increased risk taking . . . .  Touch More Loans was designed to gain back lost market share by granting exceptions to Freddie Mac's existing credit policy to permit the acquisition and guarantee of riskier loans that were being originated in the marketplace."  RJN Ex. 52, ¶ 45.

[12] *See* RJN Ex. 1 at 11 ("Our top customer, Countrywide Financial Corporation (through its subsidiaries), accounted for approximately 26% of our single-family business volumes in 2004[.]"); RJN Ex. 2 at 9 ("Our top customer, Countrywide Financial Corporation (through its subsidiaries), accounted for approximately 25% of our single-family business volume 2005[.]"); RJN Ex. 3 at 4 ("Our top customer, Countrywide Financial Corporation (through its subsidiaries), accounted for approximately 26% of our single-family business volume in 2006[.]"); RJN Ex. 4 at 4 ("Our top customer, Countrywide Financial Corporation (through its subsidiaries), accounted for approximately 28% of our single-family business volume in 2007[.]"); *see also* RJN Ex. 12, Ex. A, ¶ 21 ("During the Relevant Period [3-23-07 to 8-6-08] one of Freddie Mac's largest customers was Countrywide.").

[13] RJN Ex. 7 (Fannie Mae 2003 Annual Report) at 16.

[14] RJN Ex. 11, Ex. A, ¶ 38 (describing loans acquired from Countrywide's "subprime division" by year:  2006 – $7.7 billion; 2007 – $13.2 billion; 2008 – $7.6 billion); *id.* ¶ 37 ("Throughout most of the Relevant Period, Fannie Mae's largest customer was Countrywide Financial Corporation.  Countrywide's retail subprime lending division was known as Full Spectrum Lending.").

1   Freddie Mac was also a major purchaser of *Fast and Easy* loans from Countrywide.[15]

2   As the FCIC Report concludes, "Fannie and Freddie . . . participated in the expansion

3   of risky mortgage lending and declining mortgage standards, adding significant

4   demand for less than prime loans."  RJN Ex. 5 at 230.

5       And Fannie's SEC filings openly acknowledged the risks involved in its efforts

6   to grow market share:

7   •   "[A] *significant portion* of mortgage loans made in recent years contain

8       *adjustable-rate terms* . . . [that] are expected to reset in 2007 and 2008

9       . . . [which] could lead to increased delinquencies or defaults.  In

10      addition, the *prevalence of loans made based on limited or no credit and*

11      *income documentation* also increases the likelihood of future increases in

12      delinquencies or defaults on mortgage loans."  RJN Ex. 2 at 47.

13  •   "The proportion of *higher risk mortgage loan*s that were originated in the

14      market between *2003 and mid-2006 increased significantly*.  As a result

15      our purchase and securitization of loans that pose a higher credit risk,

16      such as *negative-amortizing adjustable-rate mortgages* ('ARMs'),

17      *interest-only loans and subprime* mortgage loans, also increased . . . .

18      We expect to experience increased delinquencies and credit losses in

19      2007."  RJN Ex. 3 at 23.

20      When those risks materialized beginning in 2007, in what Fannie itself has

21  called the worst economic crisis since the Great Depression,[16] they threatened the very

22  _____

23  [15] RJN Ex. 12, Ex. A, ¶ 21 ("During the Relevant Period, one of Freddie Mac's largest customers was Countrywide"); *id.* ¶ 62 (deliberate non-inclusion of *Fast and Easy* loans in low-doc and no-doc exposure).

24  [16] In its motion to dismiss a securities class action filed against it, Fannie stated:

25      The market collapse was sweeping in its scope, extending throughout the United States and beyond, from subprime mortgages to traditional mortgages, and

26      catching essentially every major financial institution in its wake.  No government agency, no major financial institution, and none of the leading mortgage market

27      analysts predicted the severity of the collapse, which was unprecedented since the Great Depression.  It was, as the former Chairman of the Federal Reserve, Alan

28      Greenspan, aptly remarked, a 'once-in-a-century credit tsunami.'

survival of both Fannie and Freddie, and ultimately led to the appointment of FHFA as their conservator on September 6, 2008.  But as FHFA itself has acknowledged, these institutions knowingly took on those risks despite the clear warning signs.  In its memorandum supporting its appointment as conservator, FHFA observed that "[d]espite clear signs in the latter half of 2006 and 2007 of growing problems in the economy, management continued activity in riskier programs" and "Fannie Mae executives purchased private label securities backed by Alt-A or subprime loans during a time that credit quality in the sector was manifest and was deteriorating."  RJN Ex. 15 (memorandum to J. Lockhart re:  Fannie Mae conservatorship) at 14.

On September 2, 2011, nearly three years after reaching this conclusion, FHFA sued Countrywide and every other major financial institution from which Fannie and Freddie ever purchased MBS, in an effort to use the securities laws as a form of insurance against the credit and market risks Fannie and Freddie took with their eyes wide open.[17]  As the FCIC Report states:

> They relaxed their underwriting standards to purchase or guarantee riskier loans and related securities in order to meet stock market analysts' and investors' expectations for growth, to regain market share, and to ensure generous compensation for their executives and employees.[18]

---

RJN Ex. 53 (Fannie Mae motion to dismiss, *In re Fannie Mae 2008 Sec. Litig.*) at 1-2.

[17] What is more, the Amended Complaint nowhere mentions that all of the MBS at issue in this suit are included in the proposed $8.5 billion settlement between Countrywide and The Bank of New York Mellon (in its capacity as MBS trustee) relating to potential investor claims concerning the underwriting of the loans backing 530 Countrywide MBS offerings issued between 2004 and 2007.  The proposed settlement is subject to final court approval.  Upon approval, the $8.5 billion will be distributed in accordance with the relevant MBS trust waterfall provisions to current holders of MBS in those offerings—including Fannie and Freddie.  Every dollar that Fannie and Freddie receives through this settlement thus will reduce dollar for dollar the claimed damages FHFA seeks on their behalf in this suit.

[18] RJN Ex. 5 at xxvi.

**ARGUMENT**

Fannie and Freddie's conscious decision to expose themselves to the significantly increased credit and market risks associated with the riskier types of loans—and MBS backed by those loans—that they bought undermines FHFA's claims in the Amended Complaint.  At this threshold stage of the case, however, FHFA's claims fail for another reason:  they are stale.  Specifically, FHFA's claims under Sections 11, 12(a)(2) and 15 of the 1933 Act (Counts I-III), Sections 13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code (Counts IV-V), and Sections 31-5606.05(a)(1)(B) and 31-5606.05(c) of the District of Columbia Code (Counts VI-VII) are time-barred and must be dismissed.  For each of these claims, the applicable limitations and/or repose periods have expired and no basis for tolling exists.

**I.    COUNTS I-VII ARE TIME-BARRED.**

**A.    The 1933 Act's Limitations And Repose Periods Have Expired.**

Under Section 13 of the 1933 Act, Fannie Mae and Freddie Mac were required to assert their 1933 Act claims "within *one year* after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," *and* "[i]n no event . . . more than *three years* after the security was bona fide offered to the public [for Section 11 claims], or . . . the sale [for Section 12(a)(2) claims]."  15 U.S.C. § 77m (emphasis added).[19]  They failed to do so.  As a result, FHFA's 1933 Act claims are time-barred and must be dismissed with prejudice.

Statute of Limitations:  The one-year limitations period expired as to all MBS at issue.  This Court has held in several decisions that, for purposes of 1933 Act claims, a reasonable investor in Countrywide MBS "was clearly on notice of Countrywide's

---

[19] As this Court held in *Maine State I*, the relevant "offering" date to trigger the three-year repose period for Section 11 claims is the effective date of the shelf registration statement for shelf registrations before December 1, 2005, and the date of the prospectus supplement for issuers and underwriters for shelf registrations after December 1, 2005.  722 F. Supp. 2d at 1165 n.8.

[alleged] misrepresentations regarding underwriting standards *by late 2007 or early 2008*." *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1136-37 (C.D. Cal. 2011) (emphasis added); *accord Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1165 (C.D. Cal. 2010) ("*Maine State I*") ("[p]laintiffs discovered the basis of all of their [1933 Act] claims before June 12, 2008" when the *Washington State* complaint was filed).[20] Thus, with respect to the 62 MBS it purchased, Freddie Mac should have reasonably discovered the alleged untrue statements prior to September 2, 2010—*i.e.*, more than one year before the Complaint was filed. With respect to the 48 MBS it purchased, Fannie Mae reasonably should have discovered the alleged untrue statements prior to July 13, 2008—*i.e.*, more than one year before the effective date of the tolling agreement alleged in the Amended Complaint.[21] *See also* App. C (representative sample of complaints, news articles, court orders showing that investors in Countrywide MBS were on notice of the alleged misstatements by late 2007 or early 2008); RJN Exs. 16-50, 60-88 (publicly available complaints, articles and other materials demonstrating notice).

Moreover, the Amended Complaint itself alleges a wide variety of facts that were publicly available between 2007 and 2010, which buttress the Court's rulings in *Maine State*, *Stichting*, and other decisions as to when reasonable MBS investors should have discovered their 1933 Act claims. Those alleged facts include increased

---

[20] *Accord Stichting*, 802 F. Supp. 2d at 1136 (various "complaints and public press reports make clear that a reasonable investor would have been aware of problems with underwriting at Countrywide by early 2008"); *United Fin. Cas. Co. v. Countrywide Fin. Corp.*, No. 11-CV-04766-MRP (MANx), slip op. at 2-3 (C.D. Cal. Nov. 16, 2011) ("*Progressive*") (RJN Ex. 54) (same); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1178-80 (C.D. Cal. 2011) (plaintiffs should have discovered alleged misstatements before December 27, 2008); *In re Countrywide Fin. Corp. Mortgage-Backed Secs. Litig.*, No. 11-ML-02265-MRP (MANx), slip op. at 9, 11 (C.D. Cal. Mar. 9, 2012) ("*Omnibus Dismissal Order*") (RJN Ex. 57) (same); *W. & S. Life Ins. Co. v. Countrywide Fin. Corp.*, No. 11-CV-07166-MRP (MANx), slip op. at 10, 13, 20-21, 26 (C.D. Cal. Mar. 9, 2012) (RJN Ex. 58) (plaintiffs should have discovered alleged misstatements before April 27, 2009).

[21] Plaintiff alleges that the relevant statutes of limitations were tolled "from July 13, 2009 through August 30, 2011" by virtue of a tolling agreement entered into between Fannie Mae and various Countrywide entities. AC ¶¶ 412, 433, 449, 501, 517, 528, 538, 548.

1   delinquencies and defaults in the pooled loans, rating downgrades, government

2   investigations, private suits, press reports, as well as testimony and internal

3   Countrywide documents made public as part of court filings by the SEC in an

4   enforcement action.[22]  Under the Court's existing rulings as buttressed by these

5   additional alleged facts, Fannie Mae was on notice of the facts underlying its 1933 Act

6   claims as a matter of law before July 13, 2008, and Freddie Mac was on notice of

7   those same facts long before September 2, 2010.  As such, the 1933 Act's one-year

8   statute of limitations has plainly expired as to all MBS at issue.

9         <u>Statute of Repose</u>:  All 62 MBS purchased by Freddie Mac were "bona fide

10  offered to the public" before September 2, 2008—*i.e.*, more than three years before

11  the Complaint was filed.  *See* AC ¶¶ 51, 53, 257 & tbls. 3-4, 11; App. A (latest shelf

12  registration statement dated April 24, 2007; latest prospectus supplement dated July

13  2, 2007).  Similarly, all of Freddie Mac's purchases occurred before September 2,

14  2008.  *See* AC ¶ 257; App. A (latest purchase dated January 23, 2008).  Thus, the

15  three-year repose period expired as to all 62 MBS bought by Freddie Mac for

16  purposes of both Section 11 and Section 12(a)(2) prior to the filing of this action.

17        Likewise, all 48 MBS purchased by Fannie Mae were "bona fide offered to

18  the public" before September 2, 2008.  *See* AC ¶¶ 51, 53, 258 & tbls. 3-4, 12; App.

19  B (latest shelf registration statement dated April 24, 2007; latest prospectus

20  supplement dated November 1, 2007).  And all of Fannie Mae's purchases occurred

21  before September 2, 2008.  *See* AC ¶ 258; App. B (latest purchase dated October 30,

22  2007).  Thus, the three-year repose period expired as to all 48 MBS bought by

23  Fannie Mae for purposes of both Section 11 and Section 12(a)(2) prior to the filing

24  of this action.[23]

---

[22] *See, e.g.*, AC ¶¶ 86, 140, 143, 146, 148, 152, 155-57, 159-64, 166, 168-73, 178, 180-81, 185, 193-96, 203, 206, 208-09, 211-12, 214, 216, 219, 221-23, 226-27, 229-32, 235.

[23] As explained below in Section IV, the 1933 Act's repose period was not—and could not have been—tolled by the Fannie Mae tolling agreement alleged in the Amended Complaint.  *See infra*, at 49-50.  Hence, the alleged tolling agreement does

**B.**    **The Virginia Securities Act's Repose Period Has Expired.**

Under Section 13.1-522(D) of the Virginia Code, "[n]o suit shall be maintained to enforce any liability created under this section unless brought within *two years* after the transaction upon which it is based" (emphasis added).  This is a statute of repose—"an absolute cutoff" and "unqualified[]" limit of two years that is not subject to tolling due to a plaintiff's lack of knowledge concerning its claims. *Caviness v. DeRand Res. Corp.*, 983 F.2d 1295, 1305-06 (4th Cir. 1993).[24]  Here, all 62 MBS purchased by Freddie Mac were purchased no later than January 23, 2008. *See* AC ¶ 257; App. A.[25]  Thus, the Virginia Securities Act's two-year repose period expired no later than January 23, 2010, nearly two years before this action was filed on September 2, 2011.  Counts IV and V are therefore time-barred.

**C.**    **The District of Columbia Securities Act's Limitations And Repose Periods Have Expired.**

Under Section 31-5606.05(f) of the District of Columbia Securities Act, Fannie Mae was required to assert its District of Columbia Securities Act claims "after the earlier of *three years* after the contract of sale or purchase, or . . . within *one year* after the discovery of the untrue statement or omission or after the discovery should have been made by the exercise of reasonable diligence."[26]  This statute tracks Section 13 of the 1933 Act, providing a one-year limitations period

---

not impact the repose analysis.  Even if the tolling agreement did apply, however, the statute of repose nevertheless expired as to 18 of the 48 MBS purchased by Fannie Mae prior to the effective date of the tolling agreement.  *See* AC ¶¶ 51, 53, 258 & tbls. 3-4, 12; App. B (18 MBS offered/purchased prior to July 13, 2006).  In any event, FHFA's 1933 Act claims as to all 48 MBS purchased by Fannie Mae are time-barred by the one-year statute of limitations, even if some of them are not also time-barred by the three-year statute of repose.

[24] *Accord Goldstein v. Malcolm G. Fries & Assocs., Inc.*, 72 F. Supp. 2d 620, 627-28 (E.D. Va. 1999) (following *Caviness*); *Cors v. Langham*, 683 F. Supp. 1056, 1058 (E.D. Va. 1988) ("The Virginia statute . . . has apparently taken the deliberate step of providing a hard and fast period of limitations for its Securities law").

[25] FHFA only asserts Virginia Securities Act claims on behalf of Freddie Mac.  *See* AC ¶¶ 451, 469.

[26] FHFA only asserts District of Columbia Securities Act claims on behalf of Fannie Mae.  *See* AC ¶¶ 485, 503.

1   and a three-year repose period.  *See Hite v. Leeds Weld Equity Partners IV, L.P.*,

2   429 F. Supp. 2d 110, 114-15 (D.D.C. 2006) (applying 1933 Act case law to Section

3   31-5606.05 because it "is the closest analogue").

4        Thus, for the same reasons that the 1933 Act claims are time-barred, FHFA's

5   District of Columbia Securities Act claims are also untimely as to all 48 MBS

6   purchased by Fannie Mae.  The one-year statute of limitations has expired because

7   Fannie Mae "was clearly on notice of Countrywide's [alleged] misrepresentations

8   regarding underwriting standards by late 2007 or early 2008" (*i.e.*, more than one

9   year before the effective date of the alleged tolling agreement).  *Stichting*, 802 F.

10  Supp. 2d at 1136-37; *see also Maine State I*, 722 F. Supp. 2d at 1165.   Because all

11  of Fannie Mae's MBS purchases occurred before September 2, 2008 (*i.e.*, more than

12  three years before the filing of the Complaint), the Act's three-year statute of repose

13  likewise has expired.  *See* AC ¶ 258; App. B.[27]

14  **II.   THE HERA "EXTENDER STATUTE" DOES NOT APPLY.**

15       Effectively conceding that Counts I-VII are otherwise time-barred, FHFA

16  alleges that these counts are timely pursuant to the limitations period "extender

17  statute" contained in HERA, 12 U.S.C. § 4617(b)(12).  *See* AC ¶¶ 412, 433, 449,

18  467, 483, 501, 517.  The full text of the HERA extender statute is as follows:

19

20

---

21  [27] In its Amended Complaint, FHFA alleges for the first time that the GSEs could not
    have discovered the alleged misstatements before the dates on which the MBS they
22  bought "were downgraded below investment grade by a credit ratings agency"—
    January 30, 2008 for Fannie Mae and July 17, 2008 for Freddie Mac.  AC ¶ 193.  But
23  this argument lacks merit.  This Court has held many times that a reasonable investor
    in Countrywide MBS should have discovered the alleged misstatements no later than
24  late 2007 or early 2008 based on the appearance beginning in 2007 of numerous
    Countrywide investor lawsuits, government investigations, and news reports all
25  making substantially the same allegations FHFA makes here about Countrywide's
    loan origination practices, regardless of whether or when ratings downgrades
26  occurred.  *See supra*, at 12-13.  In any event, even if these January 30, 2008 and July
    17, 2008 downgrade dates were relevant to the statute of limitations analysis, which
27  they are not, they would still be over two years before this action was filed in
    September 2011 and the one-year statute of limitations for FHFA's 1933 Act and
28  District of Columbia Securities Act claims nevertheless would have expired.

1    (12)   Statute of limitations for actions brought by conservator or receiver

2          (A)   In general:  Notwithstanding any provision of any contract, the

3                applicable statute of limitations with regard to any action brought

4                by the [FHFA] as conservator or receiver shall be—

5                (i)    in the case of any contract claim, the longer of—

6                       (I)    the 6-year period beginning on the date on which

7                              the claim accrues; or

8                       (II)   the period applicable under State law; and

9                (ii)   in the case of any tort claim, the longer of—

10                      (I)    the 3-year period beginning on the date on which

11                             the claim accrues; or

12                      (II)   the period applicable under State law.

13         (B)   Determination of the date on which a claim accrues:  For

14                purposes of subparagraph (A), the date on which the statute of

15                limitations begins to run on any claim described in such

16                subparagraph shall be the later of—

17                (i)    the date of the appointment of the [FHFA] as conservator

18                       or receiver; or

19                (ii)   the date on which the cause of action accrues.

20   12 U.S.C. § 4617(b)(12).

21         A related provision of HERA permits the revival of certain expired state law

22   tort claims based on fraud or intentional misconduct:

23   (13)   Revival of expired state causes of action

24          (A)   In general:  In the case of any tort claim described under clause [(B)]

25                for which the statute of limitations applicable under State law with

26                respect to such claim has expired not more than five years before the

27                appointment of the [FHFA] as conservator or receiver, the [FHFA]

28                may bring an action as conservator or receiver on such claim without

1  regard to the expiration of the statute of limitations applicable under

2  State law.

3  (B)  Claims described:  A tort claim referred to under clause [(A)] is a

4  claim arising from fraud, intentional misconduct resulting in unjust

5  enrichment, or intentional misconduct resulting in substantial loss to

6  the regulated entity.

7  12 U.S.C. § 4617(b)(13).  FHFA does not allege that the revival provision is

8  applicable here—nor could it given that the Amended Complaint expressly disclaims

9  any allegation of fraud or intentional misconduct as to FHFA's 1933 Act and state

10  blue sky claims.  *See* AC ¶¶ 400, 414, 434, 450, 468, 484, 502.  The revival provision

11  is relevant, however, to the proper interpretation of the extender provision.

12      The HERA extender statute cannot save FHFA's untimely claims, for three

13  reasons.  First, the extender statute applies only to statutes of *limitations*, not statutes

14  of *repose*.  Second, it does not apply to federal law claims (such as claims under the

15  1933 Act), but instead is limited to certain state law claims.  Third, the extender

16  provision applies only to two particular types of common law claims—*i.e.*, tort and

17  contract claims—and has no application to *sui generis* statutory claims, like those

18  asserted here under the 1933 Act, Virginia Securities Act, and District of Columbia

19  Securities Act.  FHFA's invocation of the HERA extender statute is inconsistent

20  most importantly with the plain language of the statute, but also Congressional

21  intent and the purpose and policies underlying the applicable statutes of limitations

22  and repose.  The extender statute is inapplicable here, and FHFA's claims should be

23  dismissed as time-barred.

24      **A.    The Extender Statute Does Not Apply To Statutes Of Repose.**

25      Courts interpreting extender statutes virtually identical to HERA have held that

26  they do not apply to statutes of repose.  For example, in *Nat'l Credit Union Admin.*

27  *Bd. v. RBS Securities, Inc.*, No. 11-CV-5887-GW (JEMx) (C.D. Cal.), and *Nat'l*

28  *Credit Union Admin. Bd. v. Goldman, Sachs & Co.*, No. 11-CV-6521-GW (JEMx)

1    (C.D. Cal.), Judge Wu issued three tentative rulings on motions to dismiss in which he

2    concluded that the extender provision of the Federal Credit Union Act ("FCUA")

3    "clearly does not apply to statutes of repose." *RBS Securities*, RJN Ex. 55 at 14 (Dec.

4    19, 2011); *accord RBS Securities*, RJN Ex. 56 at 1-2 (Jan. 30, 2012); *Goldman, Sachs*,

5    RJN Ex. 59 at 6-8 (Mar. 15, 2012).[28]  Similarly, in *Resolution Trust Corp. v. Olson*,

6    768 F. Supp. 283, 285 (D. Ariz. 1991), the district court reached the same conclusion

7    with respect to the extender provision of the Financial Institutions Reform, Recovery

8    and Enforcement Act ("FIRREA"), holding that it applies only to "statutes of

9    limitations and not substantive statutes of repose."  This Court should reach the same

10   conclusion here as to the extender provision of HERA.

11           **1.       Statutes of Repose Are Fundamentally Different From**
                        **Statutes Of Limitations.**
12

13          "Statutes of limitations are fundamentally different from statutes of repose."  *In*

14   *re Lehman Bros. Sec. & ERISA Litig.*, 800 F. Supp. 2d 477, 482 (S.D.N.Y. 2011).  A

15   statute of limitations "bear[s] on the availability of remedies," preventing an already-

16   accrued claim from being asserted by a plaintiff that has slept on its rights.  *P. Stolz*

17   *Family P'ship L.P. v. Daum*, 355 F.3d 92, 102 (2d Cir. 2004).  A statute of repose,

18   however, "is not a limitation of a plaintiff's remedy," but part of the substantive

19   definition of the claim.  *Id.*  As such, it "affect[s] the availability of the underlying

20   right," *id.*, and "extinguishes a plaintiff's cause of action after the passage of a fixed

21   period of time," *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 88

22   n.4 (2d Cir. 2010) (emphasis omitted), even if the claim has not yet accrued.  As the

23   Ninth Circuit has explained:

24          [A] statute of limitations does not take away rights, as such.  Rather, it merely

25          precludes the plaintiff from proceeding, if the statute of limitations defense is

26   _____

27   [28] Although Judge Wu has not yet finalized his tentative rulings, he has reached the
     same conclusion on this issue in three separate opinions, despite extensive argument
     from the NCUA for a different result.  The Countrywide Defendants will submit
28   Judge Wu's final order on the motions to dismiss to this Court as soon as it is issued.

raised.  It can be said that, although the plaintiff was not diligent enough, the right (moral or legal) goes on, but the plaintiff simply cannot go to court in order to enforce it.  A statute of repose, however, has a more substantive effect because it can bar a suit even before the cause of action could have accrued . . . .  In proper circumstances, it can be said to destroy the right itself.

*Underwood Cotton Co. v. Hyundai Merch. Marine (Am.), Inc.*, 288 F.3d 405, 408 (9th Cir. 2002).  In *Stichting*, this Court likewise held that "statutes of limitations differ from statutes of repose because the former bars plaintiff[s] from bringing an already accrued claim after a specified period of time, whereas the latter terminates a right of action after a specific time, even if the injury has not yet occurred."  802 F. Supp. 2d at 1130.[29]

Put another way, a statute of repose "is not concerned with the plaintiff's diligence; it is concerned with the defendant's peace."  *Underwood*, 288 F.3d at 409; *accord Burlington N. & Santa Fe Ry. v. Poole Chem. Co.*, 419 F.3d 355, 363 (5th Cir. 2005) ("a statute of repose establishes a right not to be sued, rather than a right to sue").  As the Ninth Circuit has held:

The focus of a statute of repose is entirely different from the focus of a statute of limitations.  The latter bars a plaintiff from proceeding because he has slept on his rights, or otherwise been inattentive. . . .  However, a statute of repose proceeds on the basis that it is unfair to make somebody defend an action long

---

[29] *Accord Johnson v. Aljian*, 490 F.3d 778, 781 n.12 (9th Cir. 2007) (same); *Fields v. Legacy Health Sys.*, 413 F.3d 943, 952 n.7 (9th Cir. 2005) (same); *McOmie-Gray v. Bank of Am. Home Loans*, 667 F.3d 1325, 1329 (9th Cir. 2012) (statute of repose "completely extinguishes the underlying right itself"); *Balam-Chuc v. Mukasey*, 547 F.3d 1044, 1049 (9th Cir. 2008) (statute of repose provides "outer date," "endpoint," "cuts off a cause of action at a certain time irrespective of the time of accrual of the cause of action"); *Albillo-De Leon v. Gonzales*, 410 F.3d 1090, 1097 n.5 (9th Cir. 2005) ("[a] statute of repose . . . extinguishes a cause of action after a fixed period of time . . . regardless of when the cause of action accrued"); *Pinkham v. Collyer Insulated Wire Co., Inc.*, 1994 WL 385375, at *6 (D.R.I. Mar. 22, 1994) ("A statute of limitations only makes a claim unenforceable because of the plaintiff's delay in bringing the action after his right to do so arises," while "[s]tatutes of repose . . . determine whether or not a litigant has the right to bring suit, regardless of when the action accrues, and create a condition precedent to the right to bring the action itself").

1   after something was done or some product was sold.  It declares that nobody

2   should be liable at all after a certain amount of time has passed, and that it is

3   unjust to allow an action to proceed after that.

4   *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1086 (9th Cir. 2001).  In other words, statutes

5   of repose reflect a deliberate legislative judgment that "there is a time when

6   allowing people to put their wrongful conduct behind them—and out of the law's

7   reach—is more important than providing those wronged with a legal remedy, even if

8   the victims never had the opportunity to pursue one."  *In re Exxon Mobil Corp. Sec.*

9   *Litig.*, 500 F.3d 189, 200 (3d Cir. 2007).

10       Thus, although a statute of limitations is generally triggered by plaintiff-

11  specific variables—such as the date of injury, date of discovery, or date of accrual—

12  a statute of repose is "a fixed period of time, usually measured from one of the

13  *defendant's* acts."  *Ma*, 597 F.3d at 88 n.4 (emphasis added).  Also unlike a

14  limitations period, a statute of repose runs "even if the plaintiff has not yet, or could

15  not yet have, discovered that she has a cause of action," *P. Stolz*, 355 F.3d at 102-03,

16  "even if equitable considerations would warrant tolling," *id.*, and "even if the injury

17  has not yet occurred," *Stichting*, 802 F. Supp. 2d at 1130.[30]  Against this backdrop,

18

19  _____

    [30] *Accord Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363

20  (1991) ("[t]he 3-year limit is a period of repose inconsistent with tolling"; "tolling principles do not apply to that period"); *McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 930

21  (7th Cir. 2011) ("a period of repose bars a suit a fixed number of years after an action by the defendant (such as manufacturing a product), even if this period ends before the

22  plaintiff suffers any injury"); *Balam-Chuc*, 547 F.3d at 1049 ("a statute of repose is a fixed, statutory cutoff date, usually independent of any variable, such as claimant's

23  awareness of a violation"); *Johnson*, 490 F.3d at 781 n.12 (repose period "terminates a right of action . . . even if the injury has not yet occurred"); *Fields*, 413 F.3d at 952 n.7

24  (same); *Munoz v. Ashcroft* 339 F.3d 950, 957 (9th Cir. 2003) (same); *Goad v. Celotex Corp.*, 831 F.2d 508, 511 (4th Cir. 1987) ("In contrast to statutes of limitation, statutes

25  of repose serve primarily to relieve potential defendants from anxiety over liability for acts committed long ago."); *Estate of Kennedy v. Bell Helicopter Textron, Inc.*, 283

26  F.3d 1107, 1111 (9th Cir. 2002) (statute of repose "declares that nobody should be liable at all after a certain amount of time has passed, and that it is unjust to allow an

27  action to proceed after that"); *Sch. Dist. No. 1J, Multnomah County v. AC & S, Inc.*, 5 F.3d 1255, 1259 (9th Cir. 1993) (statute of repose "reflects the policy judgment . . . to

28  relieve a [defendant] of the risk of loss . . . after a substantial period of time").

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

there are several reasons why the HERA extender statute should be read as not applying to statutes of repose.

### 2.    The Plain Language Of The Extender Statute Confirms That It Does Not Apply To Statutes Of Repose.

"The starting point for [the] interpretation of a statute is always its plain language."  *In re Silverman*, 616 F.3d 1001, 1006 (9th Cir. 2010).  When "the statute's language is plain, the sole function of the courts is to enforce it according to its terms, for courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *In re Meruelo Maddux Props., Inc.*, 667 F.3d 1072, 1076 (9th Cir. 2012).[31]  Here, the plain language of the HERA extender statute shows that it applies only to statutes of limitations, and does not apply to statutes of repose.

First, as Judge Wu observed in *RBS Securities* and *Goldman, Sachs* with respect to the virtually identical FCUA extender statute, "[t]he statute plainly refers to statutes of *limitation*.  It makes no mention whatsoever of statutes of repose."  RJN Ex. 55 at 14; Ex. 56 at 1-2; Ex. 59 at 6-8 (emphasis added).  More specifically, the text of the extender statute contains three unambiguous references to the applicable statute of "limitations," and no references whatsoever to any statute of "repose":

- 12 U.S.C. § 4617(b)(12):  "Statute of *limitations* for actions brought by conservator or receiver."

- 12 U.S.C. § 4617(b)(12)(A):  "Notwithstanding any provision of any contract, the applicable statute of *limitations* with regard to any action brought by [FHFA] as conservator or receiver shall be . . . ."

- 12 U.S.C. § 4617(b)(12)(B):  "For purposes of subparagraph (A), the date on which the statute of *limitations* begins to run on any claim described in such subparagraph shall be . . . ."

---

[31] *Accord Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("[i]t is well established that, when the statutory language is plain, we must enforce it according to its terms"); *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993) ("[t]he starting point for interpreting a statute is its language").

(Emphases added.)  The same is true of HERA's revival provision.  It also references the applicable statute of "limitations," and says nothing of statutes of "repose":

- 12 U.S.C. § 4617(b)(13)(A):  "In the case of any tort claim described under clause [(B)] for which the statute of *limitations* . . . has expired. . ."

- 12 U.S.C. § 4617(b)(13)(A):  "[T]he [FHFA] may bring an action . . . without regard to the expiration of the statute of *limitations* applicable under State law."

(Emphases added.)

Because statutes of limitations and statutes of repose are "fundamentally different," *supra*, at 19-22, a reference to the former cannot be construed as a reference to the latter.  If Congress wished to apply the extender statute to periods of repose, it could have done so clearly and easily—but it did not.  As the Ninth Circuit said in *Meruelo Maddux Props.*, 667 F.3d at 1077, this Court thus must "presume that Congress said what it meant," and "apply the statute as it is written."[32]

Second, the extender statute repeatedly speaks of when a claim "accrues"— which is the language of a statute of limitations, not a statute of repose.  For instance:

- 12 U.S.C. § 4617(b)(12)(A)(i):  "[I]n the case of any contract claim," the applicable statute of "limitations" shall be the longer of "the 6-year period beginning on the date on which the claim *accrues*" or the period applicable under state law.

- 12 U.S.C. § 4617(b)(12)(A)(ii):  "[I]n the case of any tort claim," the applicable statute of "limitations" shall be the longer of "the 3-year

---

[32] *Cf. Burlington*, 419 F.3d at 364 ("The plain language of [CERCLA], however, refers to state statutes of limitations—not state statutes of repose.  This court is bound by that plain language, absent express congressional intent to the contrary."); *Evans v. Walter Indus., Inc.*, 579 F. Supp. 2d 1349, 1363 (N.D. Ala. 2008) (relying on "the statutory language and the inherent differences between the rule of repose and statute of limitations," held that CERCLA did not preempt statute of repose because "a rule of repose is not the same as an 'applicable limitations period'"); *but see infra*, note 33.

1    period beginning on the date on which the claim *accrues*" or the period

2    applicable under state law.

3    •    12 U.S.C. § 4617(b)(12)(B):  "Determination of the date on which a

4         claim *accrues*."

5    •    12 U.S.C. § 4617(b)(12)(B)(ii):  "For purposes of subparagraph (A)," the

6         statute of "limitations" begins to run on the later of the date on which

7         FHFA was appointed as conservator or "the date on which the cause of

8         action *accrues*."

9    (Emphases added.)  In other words, subparagraph (A) sets the applicable "limitations"

10   period (three years, six years, or the period applicable under state law) and states that

11   it runs from the date of "accrual."  In turn, subparagraph (B) defines the date of

12   "accrual" for purposes of subparagraph (A).

13        The fact that the extender statute measures the applicable "limitations" period

14   from the date of "accrual" confirms that Congress did not intend for it to reach statutes

15   of repose.  Courts speak of "accrual" when describing the date on which a statute of

16   *limitations* begins to run, which is typically when the plaintiff discovers or is put on

17   notice of its claims.  As the Seventh Circuit explained in *McCann*, 663 F.3d at 932,

18   "the starting gate in statutes of limitations is usually expressed as the date on which

19   'such claim accrues.'"  Statutes of *repose*, however, are generally triggered by a

20   specific act of the defendant (such as an offering, a sale, or an allegedly false

21   statement).  Accordingly, the Ninth Circuit, this Court, and many other courts have

22   held that the date on which a claim "accrues" for statute of limitations purposes is

23   different from the date from which a statute of repose is measured:

24   •    "A statute of repose . . . extinguishes a cause of action after a fixed period

25        of time . . . *regardless of when the cause of action accrued*."  *Albillo-De*

26        *Leon*, 410 F.3d at 1097 n.5.

27

28

1   • "A statute of repose cuts off a cause of action at a certain time

2   *irrespective of the time of accrual* of the cause of action." *Balam-Chuc*,

3   547 F.3d at 1049.

4   • "A statute of repose . . . can bar a suit *even before the cause of action*

5   *could have accrued*, or, for that matter, retroactively after the cause of

6   action has accrued." *Underwood*, 288 F.3d at 408.

7   • "[S]tatutes of limitations differ from statutes of repose because the

8   former bars plaintiffs from bringing *an already accrued claim* after a

9   specified period of time, whereas the latter terminates a right of action

10   after a specific time, *even if the injury has not yet occurred*." *Stiching*,

11   802 F. Supp. 2d at 1130 (quoting *Fields*, 413 F.3d at 952 n.7).

12   • "A repose period can run to completion even before injury has occurred

13   to a potential plaintiff, extinguishing a cause of action *before it even*

14   *accrues*." *P. Stolz*, 355 F.3d at 103.

15   • "Unlike statutes of limitations, which traditionally do not begin to run

16   until a cause of action has *accrued* (*i.e.*, when all required elements have

17   occurred) . . . statutes of repose start upon the occurrence of a specific

18   event and may expire *before a plaintiff discovers he has been wronged or*

19   *even before damages have been suffered at all*." *Exxon*, 500 F.3d at 199.

20   • "[A] statute of repose is measured from an event *unrelated to the accrual*

21   of the action. . ." *Pinkham*, 1994 WL 385375, at *6-7.

22   • "A statute of repose limits the time within which an action may be

23   brought and *is not related to the accrual of any cause of action*." *Lewis*

24   *v. Russell*, 2012 WL 201877, at *7 n.5 (E.D. Cal. Jan. 23, 2012).

25   • "[A] statute of repose . . . *is not related to accrual*. . . .  Unlike an

26   ordinary statute of limitations which begins running upon accrual of the

27   claim, [the] period contained in a statute of repose begins when a special

28   event occurs, *regardless of whether a cause of action has accrued* or

1    whether any injury has resulted."  *Deirmenjian v. Deutsche Bank, A.G.*,

2    2010 WL 3034060, at *15 (C.D. Cal. July 30, 2010).

3    (Emphases added.)  Thus, because the HERA extender statute provides for a time

4    period that runs from the date of "accrual," the only rational reading of the plain

5    language of the statute is that it governs limitations periods only and does not

6    supersede any applicable statutes of repose.

7        <u>Third</u>, the Court must "assume that Congress is aware of existing law when it

8    passes legislation," *Aguirre v. L.A. Unified Sch. Dist.*, 461 F.3d 1114, 1118 (9th Cir.

9    2006), and that "it is aware of past judicial interpretations and practices," *In re

10   Egebjerg*, 574 F.3d 1045, 1050 (9th Cir. 2009), including the clear distinctions that

11   courts have drawn between statutes of limitations and statutes of repose.  Although

12   certain courts have sometimes used imprecise language in distinguishing between

13   statutes of limitations and statutes of repose, "the proper inquiry focuses on the

14   ordinary meaning of the [extender statute's language] at the time Congress enacted it."

15   *McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir. 2008).[33]  Here, it is well-settled

16   that statutes of repose and statutes of limitations are "fundamentally different"

17   *Lehman Bros.*, 800 F. Supp. 2d at 482, and that "the differences . . . are substantive,

18   not merely semantic," *Burlington*, 419 F.3d at 362, and these differences were well-

19   known to Congress at the time HERA was passed in 2008.

20       For example, in interpreting the virtually identical FCUA extender statute in

21   *RBS Securities*, Judge Wu explained that it "cannot be disputed" "that there was an

22

---

23   [33] In *McDonald*, the Ninth Circuit held that the meaning of the phrase "statute of
     limitations" was ambiguous at the time CERCLA was passed in 1986.  As such, it
24   looked to the legislative history and concluded that Congress intended the relevant
     provision of CERCLA to reach both statutes of limitations and statutes of repose.  *See
25   McDonald*, 548 F.3d at 779-83 (disagreeing with *Burlington*, cited *supra*, note 32).
     As Judge Wu concluded in *RBS Securities*, however, *McDonald* "is not controlling"
26   here, because (1) it involved CERCLA, not HERA or any other extender statute; and
     (2) it analyzed the meaning of "statute of limitations" as of *1986*.  RJN Ex. 55 at 15-
27   16 & n.16.  As set forth herein, the distinction between a "statute of limitations" and a
     "statute of repose" was well-settled by the time HERA was enacted in 2008—as
28   evidenced by *McDonald* itself (among other cases), which was a 2008 decision.

important distinction between statutes of limitation and statutes of repose in the nation's securities legislation by *1989*." RJN Ex. 55 at 16 n.19 (citing *Davis v. Birr, Wilson & Co., Inc.*, 839 F.2d 1369, 1374 (9th Cir. 1988) (Aldisert, J., concurring)) (emphasis added).  In 1991, the Supreme Court itself reaffirmed this distinction in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991). Also in 1991, the *Olson* court explicitly applied this distinction to the virtually identical FIRREA extender statute, holding that it "deal[t] only with procedural statutes of limitations and not substantive statutes of repose."  768 F. Supp. at 285. Moreover, well before HERA's enactment in 2008, the Ninth Circuit had repeatedly explained the fundamental differences between statutes of limitations and statutes of repose.  *See, e.g.*, *Sch. Dist. No. 1J* (1993), *Lyon* (2001), *Estate of Kennedy* (2002), *Underwood* (2002), *Munoz* (2003), *Albillo-DeLeon* (2005), *Fields* (2005), and *Johnson* (2007); *accord supra*, at 19-22.  And in 2008, about the time HERA was enacted, the Ninth Circuit again held that "[t]here is a crucial distinction in the law between 'statutes of limitations' and 'statutes of repose,'" *Balam-Chuc*, 547 F.3d at 1048, and that "[s]tatutes of limitations and repose are distinct legal concepts with distinct effects," *McDonald*, 548 F.3d at 779.[34]  Thus, despite the isolated cases over the years in which some courts "confused the terms or used them interchangeably," *McDonald*, 548 F.3d at 781, the law was indisputably clear by the time of HERA's enactment in 2008:  the phrase "statute of limitations" meant one thing, and the phrase "statute of repose" meant something very different.

Viewed in this context, applying the HERA extender provision to statutes of repose would not make sense.  To do so would require this Court to conclude that Congress ignored the extensive body of case law sharply distinguishing between limitation periods and periods of repose, and silently intended the phrase "statute of

---

[34] Other Courts of Appeals around the country reached the same conclusion prior to HERA's enactment in 2008.  *See, e.g.*, *P. Stolz*, 355 F.3d at 102-03 (2d Cir. 2004); *Exxon*, 500 F.3d at 199-200 (3d Cir. 2007); *Goad*, 831 F.2d at 511 (4th Cir. 1987).

limitations" in the extender statute actually to mean "statutes of limitations *and repose*." Nothing in the statutory plain language would support such a reading. Rather, "[w]hen Congress enacts a statute using a phrase that has a settled judicial interpretation"—as the phrase "statute of limitations" had a settled judicial interpretation materially different from the phrase "statute of repose"—Congress "is presumed to be aware of the prior interpretation." *Dobbs v. Anthem Blue Cross & Blue Shield*, 600 F.3d 1275, 1282 (10th Cir. 2010).[35] This Court thus should enforce the statutory plain language as written, consistent with Congress' awareness of the fundamental difference between a "statute of limitations" and a "statute of repose."

Fourth, if Congress had intended the extender statute to apply to statutes of repose, it could have—and would have—done so expressly. For instance, in the wake of *Lampf*, Congress enacted a law that explicitly suspended "the running of any such period of limitation *or repose*" with respect to certain claims brought by certain Native American tribes. *See* Pub. L. No. 102-339 § 3(b), 106 Stat. 869 (Aug. 11, 1992) (RJN Ex. 89) (emphasis added). In addition, Congress has drafted more than a dozen bills since *Lampf* that expressly distinguish between "statutes of limitations" and "statutes of repose," including for tolling purposes. *See, e.g.*, H.R. 1468, 111th Cong. § 14 (2009) (RJN Ex. 91) (providing for separate "statute of limitations" and "statute of repose," and permitting tolling as to former but not as to latter).[36] These examples prove that Congress knew how to draft legislation that specifically

---

[35] *Accord Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1795 (2010) ("when Congress enacts statutes, it is aware of relevant judicial precedent"); *Aguirre*, 461 F.3d at 1118 (same); *Egebjerg*, 574 F.3d at 1049 (same).

[36] *Accord* H.R. 896, 112th Cong. § 14 (2011); H.R. 364, 112th Cong. § 313 (2011); H.R. 2563, 111th Cong. § 2 (2009); H.R. 1608, 111th Cong. § 3 (2009); H.R. 940, 107th Cong. § 2 (2001); H.R. 4375, 105th Cong. § 2 (1998); H.R. 3905, 105th Cong. § 502 (1998); S. 2546, 105th Cong. § 502 (1998); S. 2236, 105th Cong. § 107 (1998); S. 1415, 105th Cong. § 704(c)(1) (1998); S. 8, 105th Cong. § 506(i) (1998); H.R. 3000, 105th Cong. § 206(e)(3) (1997); S. 648, 105th Cong. § 106(b) (1997); S. 5, 105th Cong. § 106(b) (1997); 151 Cong. Rec. 16751 (2005) (statement of Rep. Conyers) (distinguishing "statute of repose" and "statute of limitations"); Hearing on H.R. 3509, 109th Cong. (2006) (statement of Rep. Cannon) (RJN Exs. 92-106, 108).

1   addressed (and, in some cases, suspended) statutes of repose.  But the extender statute

2   did not do so.

### 3.     Excluding Statutes of Repose Is Consistent With The Apparent Purpose Of The Extender Statute.

5           Because the plain language of the extender statute is clear and unambiguous,

6   the Court need not analyze its legislative history or purpose.  As the Supreme Court

7   explained in *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004), a court's

8   "inquiry begins with the statutory text, and ends there as well if the text is

9   unambiguous."[37]  Even if the Court were to examine the apparent purpose of the

10  extender statute, however, the Countrywide Defendants respectfully suggest that the

11  Court would still be compelled to conclude that the extender statute was not intended

12  to reach statutes of repose.

13          The ostensible purpose of the HERA extender statute was to provide FHFA

14  with additional time to identify, investigate, and assess potential claims that it might

15  assert on behalf of Fannie Mae and Freddie Mac.  *See In re Fed. Nat. Mortgage Ass'n*

16  *Sec., Deriv., ERISA Litig.*, 725 F. Supp. 2d 142, 146 (D.D.C. 2010).[38]  This apparent

17  purpose is identical to the purpose of other legal doctrines that provide plaintiffs with

18  relief from statutes of *limitations*, but not statutes of *repose*.

19          For example, what courts refer to as the "discovery rule" prevents a limitations

20  period from starting to run until the plaintiff discovers or reasonably should have

21  discovered the facts underlying its claim.  *See, e.g.*, *Mangum v. Action Collection*

22  *Serv., Inc.*, 575 F.3d 935, 940 (9th Cir. 2009).  Similarly, the doctrine of equitable

23  tolling may suspend the running of a limitations period if, "despite all due diligence, a

---

[37] *Accord Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1709 (2012) ("reliance on legislative history is unnecessary in light of the statute's unambiguous language"); *Close v. Thomas*, 653 F.3d 970, 975 (9th Cir. 2011) (where "the plain meaning of the statute is unambiguous, that meaning is controlling"); *United States v. Hunter*, 101 F.3d 82, 85 (9th Cir. 1996) ("[g]iven the plain and unambiguous language . . . we need not examine legislative history").

[38] Nothing in HERA's legislative history discusses the extender statute or its intended purpose.

1   plaintiff is unable to obtain vital information bearing on the existence of his claim."

2   *Garcia v. Brockway*, 526 F.3d 456, 465 (9th Cir. 2008) (en banc).  The related

3   doctrines of equitable estoppel and fraudulent concealment also may overcome a

4   statute of limitations defense, "if the defendant takes active steps to prevent the

5   plaintiff from suing in time."  *Coppinger-Martin v. Solis*, 627 F.3d 745, 751 (9th Cir.

6   2010).[39]  Like the HERA extender statute, all of these doctrines share a common goal:

7   providing the plaintiff with a fair opportunity to discover, assess, and assert its claims

8   where—due to the circumstances—the period otherwise provided by the statute of

9   limitations may not provide such an opportunity.

10   But this goal is foreign to statutes of *repose*, and these various doctrines thus

11   provide no relief from repose periods.[40]  This is because a statute of repose is not

12   concerned with considerations of fairness to the plaintiff.  Rather, a statute of repose

13   "is concerned with the defendant's peace."  *Underwood*, 288 F.3d at 409.  Indeed, its

14   "very purpose is to set an outer limit *unaffected by what the plaintiff knows*," *Cada*,

15   920 F.2d at 451 (emphasis added), and is premised on the legislature's determination

16   that "there is a time when allowing people to put their wrongful conduct behind them

17   . . . is more important than providing those wronged with a legal remedy, even if the

18   victims never had the opportunity to pursue one," *Exxon*, 500 F.3d at 200.[41]  That is

19   why a statute of repose is "usually measured from one of the *defendant's* acts," *Ma*,

20   597 F.3d at 88 n.4 (emphasis added), and runs without regard for whether the plaintiff

21   has knowledge of the facts underlying its claim, whether the plaintiff is aware of its

22   injury, or whether any injury has even occurred in the first place.  *See supra*, at 19-22.

---

23   [39] *Accord Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990) (discussing

24   discovery rule, equitable tolling, equitable estoppel/fraudulent concealment); *Nelson v. Int'l Paint Co.*, 716 F.2d 640 (9th Cir. 1983) (same).

25   [40] *See Lampf*, 501 U.S. at 363 ("the equitable tolling doctrine is fundamentally

26   inconsistent with" a period of repose); *P. Stolz*, 355 F.3d at 102-03 (repose period runs "even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action"); *Cada*, 920 F.2d at 451 (equitable estoppel does not apply to statutes of

27   repose).

28   [41] *Accord Estate of Kennedy*, 283 F.3d at 1111; *Lyon*, 252 F.3d at 1086; *Goad*, 831 F.2d at 511; *see supra*, at 19-22.

Just as the "discovery rule," equitable tolling, and equitable estoppel protect plaintiffs by ensuring that they have sufficient time to identify and assess their claims, the extender statute ostensibly protects one particular plaintiff—FHFA—by ensuring that it will have sufficient time to identify and assess certain claims that it might bring on behalf of Fannie Mae and Freddie Mac.  And just as those case law doctrines do not apply to statutes of repose—which are concerned with the defendant's peace—it makes perfect sense that the extender statute does not apply to statutes of repose either, consistent with the statutory plain language.

### 4.    Applying The Extender Statute To Statutes Of Repose Would Conflict With The Text And Purpose Of Repose Periods.

If the references to "statute of limitations" in the HERA extender statute were interpreted to mean "statutes of limitations *and repose*," that interpretation also would collide with the plain language and purpose of the statutes of repose contained in the 1933 Act (as well as those contained in the Virginia Securities Act and District of Columbia Securities Act).  Because there is no clear evidence of Congressional intent to nullify such statutes of repose, this interpretation must be rejected.

More specifically, Section 13 of the 1933 Act provides that "*[i]n no event*" may a claim be brought "more than three years after the security was bona fide offered to the public, or . . . the sale."  15 U.S.C. § 77m (emphasis added).  This period of repose is absolute and unqualified, and applies to all potential plaintiffs and all potential claims.  If the HERA extender statute applied to Section 13, however, this would mean that Congress intended it to amend Section 13—without ever indicating that it was doing so—such that the words "in no event" in Section 13 now mean "in no event except for claims brought by FHFA as conservator for Fannie Mae and Freddie Mac." The plain language of the extender statute, however, does not permit such a reading.

Indeed, were it applied to Section 13, the extender statute would not so much "extend" the Section 13 repose period as *eliminate it*.  In other words, the time limit for 1933 Act claims brought by FHFA would no longer have any relationship to the

date of the offering or sale of the securities (as it now does in Section 13).  Instead, the repose period would be replaced by a three-year limitations period running from the later of the date of FHFA's appointment as conservator or the date of "accrual" (*i.e.*, when the alleged false statement was—or reasonably should have been—discovered), regardless of how many years may have passed since the offering and sale.[42]  In effect, interpreting the extender statute to apply to statutes of repose would mean that Congress silently repealed Section 13 with respect to claims brought by FHFA.

As the Supreme Court has held, however, a federal statute will not be construed to amend or repeal an earlier enacted federal statute "unless the later enacted statute expressly contradict[s] the original act or unless such a construction is absolutely necessary in order that the words of the later statute shall have any meaning at all." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007).  "Repeals by implication are not favored," and will not be found unless the statutes are "irreconcilable" or "unless the legislature's intention to repeal is clear and manifest." *Id*. at 662-63.  Instead, courts must "interpret each provision to fit harmoniously as part of a symmetrical and coherent statutory scheme," and must give effect to both statutes whenever possible.  *Rodriguez v. Holder*, 619 F.3d 1077, 1079 (9th Cir. 2010).  As the Supreme Court explained:

> The courts are not at liberty to pick and choose among congressional
> enactments, and when two statutes are capable of co-existence, it is the duty of

---

[42] For example, suppose a security was offered in October 2005, with just one month remaining in the 1933 Act repose period when FHFA was appointed conservator in September 2008.  According to FHFA's apparent reading of the extender statute, FHFA would have *at least* until September 2011—nearly six years after the offering (*i.e.*, three years after its 2008 appointment)—to bring 1933 Act claims with respect to that security.  Moreover, if FHFA did not reasonably discover the alleged false statements until long after it was appointed conservator (*e.g.*, 2015, 2020, 2025), its claim could be timely for years and years afterwards, because the extender statute would give FHFA three years after the claim "accrued" to file suit, with no outer limit on the defendant's liability.  Thus, a claim discovered in 2020 could be sued on in 2023, 15 years after the repose period otherwise would have run on a 2005 offering.

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
32

1     the courts, absent a clearly expressed congressional intention to the contrary, to

2     regard each as effective.

3   *Morton v. Mancari*, 417 U.S. 535, 551 (1974).[43]

4        Here, the extender statute and the applicable statutes of repose are not

5   "irreconcilable," Congress has not expressed a "clear and manifest" "intention to

6   repeal," and repealing statutes of repose is not "absolutely necessary" for the words of

7   the extender statute to "have any meaning at all."  To the contrary, the two statutes are

8   undeniably "capable of co-existence."  *Id*.  Rather than reading the extender statute as

9   an implicit repeal of all statutes of repose with respect to cases brought by FHFA, the

10  Court need only follow its plain language and hold that it applies to certain statutes of

11  limitations only, not statutes of repose.

12       In addition, FHFA's invocation of the extender statute ignores the important

13  policy considerations underlying both federal and state securities laws' statutes of

14  repose.  For instance, Congress undertook a delicate balancing of competing policies

15  in crafting the 1933 Act.  On the one hand, Congress drafted Sections 11 and 12(a)(2)

16  of the Act so as not to require plaintiffs to plead or prove scienter, reliance, or loss

17  causation, creating the potential for what one court has called "*in terrorem*" liability.

18  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).  On the

19  other hand, Congress included in the 1933 Act a three-year statute of repose, which

20  was designed as an absolute cut-off that would provide potential defendants with

21  finality and peace after a fixed period of time.  *See Norris v. Wirtz*, 818 F.2d 1329,

22  _____

23  [43] *Accord Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("[w]here there are two acts upon the same subject, effect should be given to both if possible");

24  *United States v. Maes*, 546 F.3d 1066, 1069 (9th Cir. 2008) ("repeals by implication are not favored and will only be found when the new statute is clearly repugnant, in words or purpose, to the old statute"); *Firebaugh Canal Co. v. United States*, 203 F.3d

25  568, 575 (9th Cir. 2000) ("in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the

26  earlier and later statutes are irreconcilable"); *Nat'l Labor Relations Bd. v. Kolkka*, 170 F.3d 937, 941 (9th Cir. 1999) (repeal by implication is "a heavily disfavored

27  construction"); 2B N. Singer and J.D. Singer, *Sutherland Statutory Construction* § 53.1, at 382-84 (7th ed. 2000) ("courts have been said to be under a duty to construe

28  statutes harmoniously where that can reasonably be done").

1332 (7th Cir. 1987) ("Congress included statutes of repose because of fear that
lingering liabilities would disrupt normal business and facilitate false claims"); *Davis*,
839 F.2d at 1374 (Aldisert, J., concurring) (same).[44]  If Congress wished to upset this
careful balance by eliminating statutes of repose for 1933 Act claims brought by
FHFA—thereby disturbing defendants' settled expectations of finality, and exposing
them to extensive liability years after the fact—Congress would have said so more
clearly.  Because it did not do so, however, the far more reasonable reading of the
extender provision is that Congress excluded statutes of repose in order to preserve the
important policies of certainty and finality that Section 13 of the 1933 Act and its state
law analogues protect.

Because the statutes of repose governing FHFA's claims under the 1933 Act,
Virginia Securities Act, and District of Columbia Securities Act all have expired, *see
supra* at 12-16, Counts I-VII are time-barred and must be dismissed with prejudice.

## B.   The Extender Statute Does Not Apply To Federal Law Claims.

The extender statute also does not apply to federal law claims, including claims
asserted under the 1933 Act.  For this separate and independent reason, Counts I-III of
the Amended Complaint must be dismissed as time-barred.  *See* AC ¶¶ 400-49.

---

[44] *Accord Norris*, 818 F.2d at 1333 ("[t]he statute of repose is designed to deal with
the problems of proof—and the invitation to file claims easier to advance than to
refute—that arise if long-delayed litigation is permissible"); *McCann*, 663 F.3d at 930
("[t]he argument for so unbending a rule is that the risk of error is great when the
interval between an alleged wrongful act and its harmful consequence is a protracted
one"); SEC Amicus Curiae Brief, submitted in *P. Stolz*, 2003 WL 23469697, at *7
(2003) ("[t]he three-year provision assures businesses that are subject to liability
under [Sections 11 and 12] that after a certain date they may conduct their businesses
without the risk of further strict liability for nonculpable conduct").  In fact,
Section 13 initially contained a 10-year repose period when Congress enacted it in
1933.  *See* Pub. L. No. 73-22, 48 Stat. 74, 84 (1933) (RJN Ex. 90).  In response to
"criticisms and complaints . . . that the present act is too drastic, and is interfering with
business," Congress reduced the repose period to three years in 1934.  78 Cong. Rec.
8668 (1934) (remarks of Sen. Fletcher) (RJN Ex. 107).

1

### 1.    The Plain Language Of The Extender Statute Shows That It <u>Applies Only To State Law Claims.</u>

2

3    *There Must Be A Period "Applicable" Under State Law*.  Just as the plain

4    language of the extender statute does not apply to statutes of repose, it also does not

5    apply to federal law claims.  Rather, the statute speaks solely of "State law" claims.

6    More specifically, the extender statute provides that the limitations period for claims

7    brought by FHFA in its role as conservator shall be:

8    •    "[I]n the case of any contract claim," the longer of six years or "*the*

9    *period applicable under State law*."

10    •    "[I]n the case of any tort claim," the longer of three years or "*the period*

11    *applicable under State law*."

12    12 U.S.C. § 4617(b)(12)(A) (emphasis added).  Congress's express wording logically

13    requires that there be a state law limitations period that is "*applicable*"—*i.e.*, that the

14    claim in question arises under state law and thus is governed by state law.  The statute

15    does not say "the period applicable under State *or Federal* law," or the "the period

16    under State law, *if applicable*," or "the period *otherwise* applicable *under law*," any of

17    which might suggest that the statute sought to reach beyond state law claims.  Instead,

18    it unambiguously references "the period applicable under State law," showing that

19    Congress intended the extender statute to apply only where state law governs the

20    timeliness of the claim in question—*i.e.*, where an "applicable" state law period

21    actually exists.  Because the timeliness of federal law claims (including 1933 Act

22    claims) that have their own federal limitations periods are governed by those periods

23    and not by state law,[45] there is no "period applicable under State law" for such claims.

24

25

26    ---

[45] When Congress enacted HERA, it was well-settled that federal claims having their

27    own statutory limitations periods are governed by those federal periods and not by state law periods or other state law rules concerning timeliness of a claim.  *See, e.g.*, *Kirk v. Rockwell Int'l Corp.*, 578 F.2d 814, 819 (9th Cir. 1978) ("If Congress

28    explicitly puts a limit upon the time for enforcing a right which it created, there is an end of the matter.  The Congressional statute of limitation is definitive.").

1   The plain language of the extender statute thus logically must be read as applying only

2   to state law claims, for which there *will be* a "period applicable under State law."[46]

3        *When Congress Intended To Reference Federal Law, It Did So.*  If Congress

4   intended the HERA extender statute to apply to federal law claims, it could have—and

5   would have—expressed that intent clearly.  Rather than "the period applicable under

6   State law," it could simply have said "the period applicable under State *or Federal*

7   law."  But Congress chose not to use these additional words.  Circuit Judge Dyk's

8   words regarding a different statute in *Russell v. Merit Sys. Prot. Bd.*, 324 F. App'x

9   872, 877 (Fed. Cir. 2008) (separate opinion), are entirely apt here:

10        The language of the statute explicitly refers to 'any State law,' and makes no

11        reference to federal law . . . .  The explicit reference to 'State' law and the

12        absence of any reference to federal law suggest that this provision was not

13        intended to implicitly repeal federal law.

14        Not only did Congress choose not to reference "federal law" in the extender

15   provision, but it also made *eight* express references to "federal law" elsewhere in

16   HERA.  HERA contains the following explicit references to federal law outside of the

17   extender provision (emphases added):

18       •   12 U.S.C. § 4617(a)(1):  "Notwithstanding any other provision of

19          *Federal* or State law . . . ."

20       •   12 U.S.C. § 4617(a)(3)(B)(i):  "any violation of any provision of *Federal*

21          or State law . . . ."

22

23

---

24   [46] The extender statute is also limited to tort and contract claims, and does not apply to

25   *sui generis* statutory claims like those asserted under the 1933 Act, Virginia Securities Act, and District of Columbia Securities Act.  *See infra*, at 41-43.  This further confirms that the extender statute was intended to apply to state law claims only,

26   because common law tort and contract claims are primarily creatures of state law, not federal law.  *See, e.g.*, *Am. Elec. Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527,

27   2535 (2011) ("[t]here is no federal general common law"; federal common law only exists in "specialized" contexts, such as where federal courts "fill in statutory

28   interstices").

- 12 U.S.C. § 4617(d)(8)(A):  "notwithstanding any other provision of this chapter . . . any other *Federal law*, or the law of any State . . . ."

- 12 U.S.C. § 4617(d)(8)(C)(i):  "Notwithstanding paragraph (11), or any other provision of *Federal* or State law . . . ."

- 12 U.S.C. § 4617(d)(8)(E):  "Notwithstanding any other provision of this section, any other *Federal law*, or the law of any State . . . ."

- 12 U.S.C. § 4617(e)(1):  "Notwithstanding any other provision of *Federal law* or the law of any State . . . ."

- 12 U.S.C. § 4617(i)(5):  "Notwithstanding any other provision of *Federal* or State law . . . ."

- 12 U.S.C. § 4617(i)(7)(A)(iii):  "The transfer . . . shall be effective without any further approval under *Federal* or State law . . . ."

These references to federal law further confirm that the omission of federal law claims in the extender provision was intentional.  As the Supreme Court has recognized, "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004).[47]  In short, Congress knew how to reference federal law when it wished to do so, and it chose not do so in the extender provision.

*HERA's Revival Provision Likewise Is Limited To State Law Claims*.  The fact that HERA's revival provision does not apply to federal law claims further supports the conclusion that the extender statute does not apply to federal law claims.  More specifically, the plain text of the revival provision applies only to certain, specified *state* law claims:

---

[47] *Accord Bates v. United States*, 522 U.S. 23, 29-30 ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

1    (13)   <u>Revival of expired *state causes of action*</u>

2        (A)    <u>In general</u>.  In the case of any tort claim described under clause [(B)]

3            for which the *statute of limitations applicable under State law* with

4            respect to such claim has expired not more than 5 years before the

5            appointment of the [FHFA] as conservator or receiver, the [FHFA]

6            may bring an action as conservator or receiver on such claim without

7            regard to the expiration of the *statute of limitations applicable under*

8            *State law*.

9    12 U.S.C. § 4617(b)(13) (emphasis added).[48]  There would be no logical reason for

10   Congress to *extend both* state and federal law claims, but to *revive only* state law

11   claims.  Rather, the more natural reading is that *neither* the extender provision *nor* the

12   revival provision applies to federal law claims, and that both apply only to state law

13   claims.  This construction interprets the extender provision and the revival provision

14   consistently, "interpret[ing] each provision to fit harmoniously as part of a

15   symmetrical and coherent statutory scheme."  *Rodriguez*, 619 F.3d at 1079.

16        **2.    Applying The Extender Statute To Federal Law Claims**
17             **Would Lead To Absurd Results.**

18        Applying the extender statute to federal law claims also would lead to absurd

19   results and would be contrary to the apparent purpose of the statute.  More

20   specifically, such an interpretation would have at least three perverse consequences.

21        <u>First</u>, it would result in the extender statute treating federal law claims and state

22   law claims inconsistently.  The structure of the extender statute is disjunctive:  it

23   provides that the applicable limitations period is *either* three/six years *or* "the period

24   ―――――――――――――――――
25   [48] The legislative history of the FIRREA revival statute, on which the HERA revival
     statute is based, confirms that it only applies to state law claims.  *See* H.R. Rep. No.
26   103-651 at 80 (1994), *reprinted in* 1994 U.S.C.C.A.N. 2068, 2085 (RJN Ex. 109)
     ("Section 201 of the bill . . . would permit the FDIC or the RTC . . . to 'revive' under
27   certain circumstances, certain tort claims that had expired under a *State statute of
     limitations*"; fraud/intentional misconduct requirement "recognize[s] that there is a
28   level of misconduct which justifies Congressional actions to retroactively set aside a
     *State statute of limitations*") (emphases added).

1  applicable under State law," whichever is "longer."  By creating this either/or choice,

2  the extender statute provides a *minimum* limitations period of three years for state law

3  tort claims and six years for state law contract claims, while building flexibility into

4  the statutory scheme to allow for a longer period if the otherwise applicable state law

5  period is longer than that.  This flexibility appears to be designed to ensure that FHFA

6  will not lose the benefit of a longer state law period if one exists.  But if the extender

7  statute applied to federal law claims, there would be no flexibility at all.  Instead,

8  because there would be no "period applicable under State law" (as state law periods

9  do not apply to federal law claims), the extender statute would assign a *fixed*

10  limitations period of three or six years to every federal law claim asserted by FHFA,

11  *regardless of how long the otherwise applicable federal statute of limitations might*

12  *be*.  As a result, state law claims and federal law claims would be subject to two

13  fundamentally different methods of selecting the applicable limitations period.  There

14  is no sensible reason why Congress would have designed the extender statute to

15  operate in such an inconsistent way.  And absent any evidence of such intent on the

16  face of the statute, this Court should instead adopt the only logical statutory

17  interpretation, *i.e.*, that the extender statute does not apply to federal law claims.

18      Second, the fundamental "either/or" structure of the statute would become

19  superfluous if applied to federal law claims because no state law period is

20  "applicable" to federal statutory claims.  Such an interpretation therefore would

21  violate "a cardinal principle of statutory construction"—namely, "that a statute ought,

22  upon the whole, [] be so construed that, if it can be prevented, no clause, sentence, or

23  word shall be superfluous, void, or insignificant."  *City of L.A. v. U.S. Dep't of*

24  *Commerce*, 307 F.3d 859, 870 (9th Cir. 2002).[49]

25  _____

[49] *Accord Garcia*, 526 F.3d at 466 ("Even if we thought this interpretation were more
26  equitable, we don't have the authority to interpret a provision in a manner that renders
other provisions of the same statute inconsistent, meaningless or superfluous"); *Boise*
27  *Cascade Corp. v. U.S. E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991) ("we must
interpret statutes as a whole, giving effect to each word and making every effort not to
28  interpret a provision in a manner that renders other provisions of the same statute
inconsistent, meaningless or superfluous"); *Ball v. Rodgers*, 492 F.3d 1094, 1105 (9th

1    <u>Third</u>, applying the extender statute to federal law claims would result in the

2    *shortening*—not extending—of many federal limitations periods.  For example,

3    federal RICO claims are subject to a four-year statute of limitations.  *See Pincay v.*

4    *Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001).  Certain federal antitrust claims are

5    also subject to a four-year statute of limitations.  *See* 15 U.S.C. § 15b.  Under some

6    circumstances, claims to recover remedial costs under CERCLA are subject to a six-

7    year limitations period.  *See* 42 U.S.C. § 9613(g).  Likewise, the limitations period

8    applicable to claims arising under federal statutes enacted after 1990 that do not have

9    a specified limitations period of their own is four years.  *See* 28 U.S.C. § 1658(a).  But

10   if the HERA extender statute applied to federal law claims, all of these claims would

11   be subject to a maximum *three-year* limitations period (as provided by the extender

12   statute) when asserted by FHFA.  All other plaintiffs, however, would have the benefit

13   of the *four-year* or *six-year* limitations period otherwise provided by federal statute.

14   That result would make no sense, and cannot be the law.  Such an interpretation

15   would transform the "extender" statute into a "shortening" statute for a variety of

16   federal law claims, and would directly conflict with the apparent purpose of the statute

17   to provide FHFA with *more* time, not *less* time, to identify and assess potential claims.

18   It is well-settled that courts have a duty to "avoid statutory interpretations which

19   would produce absurd results."  *Compton Unified Sch. Dist. v. Addison*, 598 F.3d

20   1181, 1184 (9th Cir. 2010); *accord Silverman*, 616 F.3d at 1006 (same).  To avoid

21   such absurd results here, the Court should interpret the plain language of the extender

22   statute as applying to state law claims only.

23                  **3.      Limiting The Extender Statute To State Law Claims**
                        **<u>Preserves The Policy Choices Made By Congress.</u>**
24

25   Applying the extender statute to federal law claims also would require ignoring

26   the important policy choices Congress has made in enacting other federal statutes of

27   _____

28   Cir. 2007) ("evidence of [congressional] intent can be found in a statute's language as well as in its overarching structure").

limitations.  The specific limitations periods that Congress has adopted for particular federal law claims are the result of careful deliberation and balancing by Congress, and each one reflects policy choices unique to the relevant claim.  The limitations (and repose) periods that Congress adopted for 1933 Act claims exemplify this balancing, as Congress chose to set relatively short periods in order to eliminate public companies' "fear that lingering liabilities would disrupt normal business and facilitate false claims." *Norris*, 818 F.2d at 1332.  If Congress had intended to upset this careful balance by replacing all federal statutes of limitations for claims brought by FHFA with a blanket three-year or six-year limitations period—thereby creating a one-size-fits-all period that would override all other competing policy considerations—Congress would have said so more clearly.

### C.   The Extender Statute Applies Only To Tort And Contract Claims.

By its express terms, the HERA extender statute applies only to "tort" claims and "contract" claims.  Because claims under the 1933 Act, Virginia Securities Act, and District of Columbia Securities Act are neither tort claims nor contract claims, the extender statute cannot save FHFA's untimely Counts I-VII.

As the Ninth Circuit has explained, "under traditional principles of statutory interpretation, Congress' explicit listing of [certain categories] should be understood as an exclusion of others."  *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 885 (9th Cir. 2005).[50]  Here, FHFA's claims under the 1933 Act, Virginia Securities Act, and District of Columbia Securities Act are neither "tort" claims nor "contract" claims.  These claims are neither created by a contract nor exist under common law tort principles; rather, they are rights created by *statute*, as part of a separate and unique body of law aimed at regulating the securities markets.  Such statutory rights

---

[50] *Accord id.* ("The doctrine of '*expressio unius est exclusio alterius*' ['the express mention of one thing excludes all others'] as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions").

1   are often called "*sui generis*"—"of its own kind."  Federal and state courts routinely

2   make this distinction, with respect to many different statutory rights.  For example:

3   • "A cause of action may be found in tort or contract, or it may be

4       statutorily created.  While a liability created by statute may often seem

5       similar to related actions at common law, this court has repeatedly held

6       that a statutory action in this state is *sui generis*—that is, it is neither a

7       contract action nor a tort action, but something entirely its own."  *Burnett*

8       *v. Sw. Bell Tel., L.P.*, 151 P.3d 837, 843 (Kan. 2007).

9   • "RICO is a strictly statutory remedy to enforce statutory rights. . . .  [It] is

10      truly *sui generis* and [] particular claims cannot be readily analogized to

11      causes of action known at common law . . . ."  *Malley-Duff & Assocs.,*

12      *Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 352-53 (3d Cir. 1986).

13  • "Section 8-401 is a *sui generis* statutory creation," which "creates neither

14      a tort nor a contract cause of action."  *Jodek Charitable Trust, R.A. v.*

15      *Vertical Net Inc.*, 412 F. Supp. 2d 469, 483 (E.D. Pa. 2006).

16  • "The [North Carolina Trade Practices Act] claim is a creature of statute,

17      *i.e.*, *sui generis*, under State law and is neither a breach of contract claim

18      nor a common law tort claim."  *Cruise Connections Charter Mgmt. 1, LP*

19      *v. Attorney Gen. of Can.*, 764 F. Supp. 2d 155, 164 (D.D.C. 2011).

20  • "Chapter 93A . . . is *sui generis*.  It is neither wholly tortious nor wholly

21      contractual in nature . . . . [and] [a]nalogies between common law claims

22      for breach of contract, fraud, or deceit and claims under c. 93A are

23      inappropriate."  *Kattar v. Demoulas*, 739 N.E.2d 246, 257 (Mass. 2000).

24  • "An action under Chapter 75 . . . which is a creation of statute, has been

25      characterized as *sui generis* and thus neither wholly tortious nor wholly

26      contractual in nature."  *CBP Res., Inc. v. SGS Control Servs., Inc.*, 394 F.

27      Supp. 2d 733, 743-44 (M.D.N.C. 2005).

28

The same is true for claims under the 1933 Act, the Virginia Securities Act, and the District of Columbia Securities Act.  As the Supreme Court has explained, "[t]he primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities."  *Pinter v. Dahl*, 486 U.S. 622, 638 (1988).  Its main goal is not to redress personal wrongs (like tort law) or to enforce contractual promises (like contract law), but rather "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry."  *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988).[51]  The 1933 Act employs a wide variety of tools to achieve this purpose, including registration requirements, disclosure obligations, and private rights of action.  Like RICO, unfair trade practice laws, and other unique statutory schemes, Securities Act claims are truly *sui generis* and cannot be characterized as sounding in either tort or contract.  *See, e.g.*, *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 637 (3d Cir. 1990) (Section 12(a)(2) claims "not analogous to . . . tort law"); *Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1127 (2d Cir. 1989) (Section 12(a)(2) "not derived from tort law principles").  The same is true for claims under the Virginia and District of Columbia state "blue sky" statutes that FHFA seeks to assert. In short, because the extender statute does not apply to the *sui generis* statutory claims FHFA has brought, it cannot save Counts I-VII from being time-barred.

### D.   *FHFA v. UBS* Is Not Persuasive And Not Binding.

Before FHFA filed this action and 16 substantially similar actions in September 2011, no court had interpreted the scope of the HERA extender statute.  Recently, on May 4, 2012, a district court addressed defendants' motions to dismiss in *Fed. Hous.*

---

[51] *Accord Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) (1933 Act "was designed to provide investors with full disclosure of material information concerning public offerings of securities . . . [and] to promote ethical standards of honesty and fair dealing"); *United States v. Berger*, 473 F.3d 1080, 1102 (9th Cir. 2007) ("[t]he essential purpose of the [1933 Act] is to protect investors by requiring publication of certain information concerning securities *before* offered for sale").

1   *Fin. Agency v. UBS Ams., Inc.*, 2012 WL 1570856 (S.D.N.Y. May 4, 2012), holding

2   in part that the extender statute applies to FHFA's claims under the 1933 Act, Virginia

3   Securities Act, and District of Columbia Securities Act.  For all the reasons addressed

4   in this memorandum, however, the Countrywide Defendants respectfully disagree

5   with the rulings in *UBS* and submit that they should not be followed by this Court.

6   Indeed, the *UBS* court itself has concluded that there are "substantial grounds for a

7   difference of opinion" regarding the interpretation of HERA, and has certified the

8   issue for interlocutory appeal to the Second Circuit pursuant to 28 U.S.C. § 1292(b).

9   *See Fed. Hous. Fin. Agency v. UBS Ams., Inc.*, 2012 WL 2324486, at *4-6 (S.D.N.Y.

10   June 19, 2012).

11         *Statutes of Repose*.  In concluding that the extender statute applies to statutes of

12   repose, the *UBS* court held that "the semantic distinction" between statutes of repose

13   and statutes of limitations is unclear, pointing to examples of courts using the term

14   "limitations" to encompass both limitations and repose.  *UBS*, 2012 WL 1570856 at

15   *4.  But this Court has spent the past nearly two years articulating the substantial

16   *differences* between repose periods and limitations periods and applying their *different*

17   requirements.  *See*, *e.g*., *Stichting*, 802 F. Supp. 2d at 1130; *Maine State I*, 722 F.

18   Supp. 2d at 1165-66.  The district court also ignored the fact that "the differences

19   between statutes of limitations and statutes of repose are substantive, not merely

20   semantic."  *Burlington*, 419 F.3d at 362.  Even if the distinctions between these

21   periods may in some decisions have been blurred by imprecise language, courts must

22   interpret statutes according to their plain language in the context of settled case law

23   interpretations at the time of enactment.  *See supra*, at 22-29.  Moreover, the *UBS*

24   court did not consider—because the *UBS* defendants did not argue—that the extender

25   statute's use of the term "accrual" indicates that it was meant to be limited to statutes

26   of limitations only.

27         The *UBS* court also opined that excluding statutes of repose would "undermine"

28   the purpose of the extender statute, which it held was "to give FHFA more time to

decide whether and how to pursue any claims it inherited." 2012 WL 1570856, at *5. The Countrywide Defendants respectfully disagree with this, for two reasons. First, even assuming this is the extender statute's purpose, what a court believes a statute's purpose to be cannot displace the statute's plain language, which here evidences no intent to reach statutes of repose. *See Cal. State Legislative Bd., United Transp. Union v. Dep't of Transp.*, 400 F.3d 760, 764 (9th Cir. 2005) (court may not adopt "expansive reading" of statute "in the face of the normative and textual indicia of statutory meaning").[52] Second, the *UBS* court did not consider that the ostensible purpose of the extender statute is no different from that of doctrines like the "discovery rule," equitable tolling, and equitable estoppel, none of which provide relief from statutes of repose (another argument not addressed by the *UBS* defendants). As explained *supra*, at 29-34, interpreting the extender statute to exclude statutes of repose is the only reading that is consistent with *both* the apparent purpose of the extender statute itself *and* the important policies underlying Section 13 of the 1933 Act and other statutes of repose.

*Federal Law Claims*. Although the *UBS* court acknowledged that "Congress could have been clearer about HERA's applicability to claims under federal law," it nevertheless held that the extender statute's reference to "any action brought by the [FHFA] as conservator or receiver" should be read as absolute and unqualified, and thus applicable to federal law claims as well as state law claims. 2012 WL 1570856, at *6. But this interpretation disregards the plain language of the statute and the numerous textual and structural markers that show Congress did not intend the statute to reach federal law claims (*e.g.*, the references to "the period *applicable* under *State* law;" the references to "federal law" in provisions of HERA *other than* the extender

---

[52] *See also id.* ("[N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.").

provision; the express limitation of the revival provision to state law claims; and the "either/or" structure of the statute).  *See supra*, at 35-39.  In addition, the *UBS* court's decision to read the words "any action" in isolation, without reference to the remainder of the statutory language, will lead to illogical results—including the *shortening* of otherwise applicable federal limitations periods.  *See supra*, at 38-40. These anomalies and inconsistencies could not have been intended by Congress, and the *UBS* court's opinion did not address any of them.

> *Tort/Contract Claims*.  In a footnote, the district court rejected the *UBS* defendants' argument—also made in a footnote—that the extender statute applies only to tort and contract claims, not *sui generis* statutory claims like those asserted under the 1933 Act, Virginia Securities Act, and District of Columbia Securities Act.  *See* 2012 WL 1570856, at *6 n.9.  Given the limited argument by the parties and limited discussion by the court, *UBS* provides little guidance to this Court on that issue.

### E.  Even If The Extender Statute Applied, Which It Does Not, FHFA Concedes That Many Claims Are Nevertheless Time-Barred.

Even if the extender statute applied to statutes of repose, federal law claims, and *sui generis* statutory claims—which it does not—FHFA concedes that many claims concerning the MBS bought by Fannie Mae and Freddie Mac are nevertheless time-barred, because the applicable repose period expired before FHFA was appointed conservator on September 6, 2008.  More specifically, the Amended Complaint expressly concedes that Fannie and Freddie's potential Section 11 claims had expired with respect to 24 of the 86 MBS offerings at issue, because they were "bona fide offered to the public" before September 6, 2005—*i.e.*, more than three years before FHFA was appointed as conservator—and thus were barred by the 1933 Act's three-year repose period.  *See* AC ¶¶ 401, 409; Apps. A-B (registration statements dated between October 28, 2002 and July 25, 2005).[53]  FHFA also concedes that Freddie

---

[53] In addition, Freddie Mac's Section 12(a)(2) claim as to one MBS expired under the three-year repose period because its purchase occurred prior to September 6, 2005. *See* AC ¶ 257 & tbl. 11; App. A (CWL 2005-8 purchased on August 30, 2005).

1   Mac's Virginia Securities Act claims likewise had expired prior to September 6, 2008

2   with respect to 34 of the 62 MBS it purchased, because those 34 MBS were purchased

3   prior to September 6, 2006—*i.e.*, more than two years before FHFA was appointed as

4   conservator.  *See* AC ¶¶ 451, 469; App. A (purchases between August 30, 2005 and

5   August 30, 2006).  These claims thus were time-barred prior to FHFA's appointment

6   under the Virginia Securities Act's two-year statute of repose.

7   **III.   *AMERICAN PIPE* TOLLING DOES NOT APPLY.**

8         In its Amended Complaint, FHFA alleges for the first time that the limitations

9   and repose periods for its 1933 Act claims were tolled by the filing of the *Luther* class

10  action complaints pursuant to *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).[54]

11  *See* AC ¶¶ 264-73, 412, 421, 432.[55]  As this Court has held, however, the only MBS

12  eligible for *American Pipe* tolling are those for which "the named plaintiffs in the

13  prior putative class actions had standing to sue, *i.e.*, those tranches that the *Luther*

14  named plaintiffs had actually purchased."  *Allstate Ins. Co. v. Countrywide Fin. Corp.*,

15  824 F. Supp. 2d 1164, 1169, 1179-80 (C.D. Cal. 2011).[56]  If "[n]o named plaintiff in

16  *Luther* purchased any of the tranches that are involved in this case," then "those

17

18  [54] As this Court knows, *Luther v. Countrywide Home Loans Servicing LP*, No. BC380698 (Cal. Super. Ct. Nov. 14, 2007) and *Wash. State Plumbing & Pipefitting Pension Trust v. Countrywide Fin. Corp.*, No. BC392571 (Cal. Super. Ct. June 12, 2008) (collectively, "*Luther*"), are putative class actions asserting 1933 Act claims with respect to 429 Countrywide MBS offerings, based on the same allegations at issue here.  Given that the named plaintiffs in these cases purchased only a small fraction of the MBS over which they sued, this Court has noted that "*Luther* is precisely the type of abusive placeholder lawsuit that has prompted many courts' concern about *American Pipe* tolling," *Omnibus Dismissal Order*, RJN Ex. 57 at 8, and was filed "with the deliberate plan in mind of doing nothing but tolling the statute of limitations," *Putnam Bank v. Countrywide Fin. Corp.*, No. 11-CV-04698-MRP (MANx) (C.D. Cal.), Hr'g Tr., May 21, 2012 (RJN Ex. 110) at 24-25.  (The recent removal of *Luther* to this Court is not relevant to the tolling analysis here.)

25  [55] FHFA does not allege *American Pipe* tolling with respect to any of its other claims, and tolling thus has not been invoked with respect to those claims.

26  [56] *Accord Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *2-8 (C.D. Cal. May 5, 2011); *Stichting*, 802 F. Supp. 2d at 1131; *Progressive*, RJN Ex. 54 at 2-3; *Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, 2012 WL 1798997, at *2 (C.D. Cal. Feb. 17, 2012); *Omnibus Dismissal Order*, RJN Ex. 57 at 3-8, 10; *Western & Southern*, RJN Ex. 58 at 3-4.

tranches therefore did not belong in *Luther* in the first place, and the pendency of *Luther* does not toll the statute of [limitations or] repose for purpose of those tranches." *Omnibus Dismissal Order*, RJN Ex. 57 at 6.  FHFA's new allegations are insufficient to invoke tolling under this Court's rulings.

More specifically, FHFA fails to allege which specific MBS tranches Fannie Mae and Freddie Mac allegedly bought that also were purchased by the named plaintiffs in *Luther*.  *See* AC ¶¶ 264-73.  As this Court held in *Maine State I* and *Stichting*, however, an MBS plaintiff asserting *American Pipe* tolling must allege facts showing that the named plaintiffs in the prior class action had standing to assert the specific claims that allegedly were tolled.  FHFA's failure to allege such facts is fatal to its attempt to assert *American Pipe* tolling.  *See Maine State I*, 722 F. Supp. 2d at 1167-68 ("Plaintiffs have not adequately pleaded their reliance on *American Pipe* tolling to preserve their claims").  Indeed, in *Stichting*, this Court dismissed plaintiff's 1933 Act claims because it did not allege facts showing that the *Luther* plaintiffs had bought the same tranches Stichting bought.  *See Stichting*, 802 F. Supp. 2d at 1130 & n.5 (where "[n]either the original complaint nor the FAC asserts any basis for tolling," there "is sufficient basis to require Plaintiff to replead"); *accord Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006) ("federal courts have repeatedly held that plaintiffs seeking to toll the statute of limitations on various grounds must have included the allegation in their pleadings").

In any event, putting aside these pleading defects, *American Pipe* tolling is plainly inapplicable here.  Here, none of the *Luther* named plaintiffs purchased any of the 62 MBS tranches purchased by Freddie Mac or any of the 48 MBS tranches purchased by Fannie Mae.  *See* AC ¶¶ 257-58 & tbls. 11-12; RJN Exs. 16-21 (state court complaints and certifications showing named plaintiff purchases); Apps. A-B.[57]

---

[57] Indeed, in the Amended Complaint, FHFA concedes that the GSEs only purchased in a handful of the same *offerings*—let alone the same *tranches*—as the *Luther* named plaintiffs.  *See* AC ¶ 270.

1   As such, the *Luther* named plaintiffs lacked standing to sue as to those MBS,

2   *American Pipe* tolling cannot apply, and the 1933 Act statutes of limitations and

3   repose continued to run.  Counts I-III are therefore time-barred.

## IV.   THE FANNIE MAE TOLLING AGREEMENT DOES NOT SAVE ITS UNTIMELY CLAIMS.

6          Fannie Mae entered into a tolling agreement with the Countrywide Defendants

7   and Bank of America Corporation, effective as of July 13, 2009 ("Agreement").  *See*

8   RJN Ex. 6.[58]  This tolling agreement, however, does not prevent any of the claims

9   FHFA brought based on MBS purchased by Fannie Mae from being untimely.

10         First, the one-year statutes of limitations of both the 1933 Act and the District

11   of Columbia Securities Act already had expired before this tolling agreement became

12   effective.  More specifically, Fannie Mae either discovered or reasonably should have

13   discovered the allegedly untrue statements prior to July 13, 2008—*i.e.*, more than one

14   year before the effective date of the Agreement.  *See supra*, at 12-16.

15         Second, not only had these statutes of limitations expired before this tolling

16   agreement was executed, but the Agreement also did not suspend the running of the

17   applicable statutes of repose.  In describing the scope of tolling, the Agreement merely

18   stated that the time after July 13, 2009 "shall not be included in the calculating any

19   *statute of limitations* that might be applicable to the Tolled Claims," and that the

20   parties "agree not to assert . . . any *defense* to the Tolled Claims based on the passage

21   of time during the tolling period, including the running of any *statute of limitations* or

22   any *defense* to the Tolled Claims based on laches, estoppel, waiver or other principle

23   concerning the timeliness of a Party's filing."  RJN Ex. 6 at 1-2 (emphasis added).  A

24   statute of repose, however, is not a "defense" based on the passage of time.  Rather, it

25   is part of the substantive definition of the claim, *see P. Stolz*, 355 F.3d at 102, which

26   upon expiration "completely extinguishes the underlying right itself," *McOmie-Gray*,

27
─────────────────────────
[58] Freddie Mac is not a party to this agreement, and did not execute any separate
28   tolling agreement.

1   667 F.3d at 1329.[59]  Indeed, FHFA appears to recognize this limitation on the scope of

2   the Agreement in the Amended Complaint, which tellingly alleges only that "[t]he

3   time period from July 13, 2009 through August 30, 2011 has been tolled for *statute of*

4   *limitations* purposes" by virtue of the Agreement.  AC ¶¶ 412, 433, 449, 501, 517

5   (emphasis added).  Thus, the Agreement did not suspend the applicable repose

6   periods, which then expired before this action was filed on September 2, 2011.[60]

7                                **CONCLUSION**

8          For all of these reasons, the Countrywide Defendants respectfully request that

9   Counts I-VII of the Amended Complaint be dismissed with prejudice.

10  Dated:  July 13, 2012                  **GOODWIN PROCTER LLP**

11                                         /s/ Brian E. Pastuszenski
12                                         Brian E. Pastuszenski (*pro hac vice*)
                                           Daniel J. Tyukody (State Bar No. 123323)
13                                         John B. Daukas (*pro hac vice*)
                                           Brian C. Devine (State Bar No. 222240)

14                                         *Counsel for the Countrywide Defendants*

15

16

17

18

---

19  [59] Notably, the tolling agreement makes clear that it "does not create new rights for
20  either of the Parties . . . with respect to the Tolled Claims."  RJN Ex. 6 at 2.

    [60] Unlike a statute of limitations, which provides an affirmative defense that may be
21  suspended or waived by agreement, a statute of repose defines and limits the
    underlying substantive right.  *See supra*, at 19-22.  Parties cannot extend or expand a
22  substantive right by private agreement, because that power resides with the legislature
    alone.  *See, e.g.*, *Midstate Horticultural Co. v. Pa. R.R. Co.*, 320 U.S. 356, 358-64
23  (1943) (holding that statute of repose could not be waived by agreement); *McOmie-
    Gray*, 667 F.3d at 1329-30 (because statute of repose had expired, "whether [parties]
24  had an agreement tolling the statute of limitations is irrelevant"); *Stone & Webster
    Eng'g Corp. v. Duquesne Light Co.*, 79 F. Supp. 2d 1, 8-9 (D. Mass. 2000) ("the
25  statute of repose is nonwaivable," including by express written agreement of the
    parties); *In re Commercial Fin. Servs., Inc.*, 294 B.R. 164, 173-75 (N.D. Okla. Bankr.
26  2003) (noting that statutes of repose may not be waived).  In any event, the three-year
    repose period governing the 1933 Act and District of Columbia Securities Act claims
27  had expired as to 18 of the 48 MBS purchased by Fannie Mae prior to the July 13,
    2009 effective date of the tolling agreement.  *See* AC ¶¶ 51, 53, 258 & tbls. 3-4, 12;
28  App. B (18 MBS offered/purchased prior to July 13, 2006).