QUINN EMANUEL URQUHART & SULLIVAN, LLP
Richard A. Schirtzer (Bar No. 150165)
richardschirtzer@quinnemanuel.com
Molly Stephens (Bar No. 232211)
mollystephens@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Christine H. Chung
christinechung@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Attorneys for Plaintiff Federal Housing Finance
Agency

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORP. MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 11-ML-02265-MRP (MANx)<br><br>OPPOSITION TO THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT |
| FEDERAL HOUSING FINANCE AGENCY, AS CONSERVATOR FOR THE FEDERAL NATIONAL MORTGAGE ASSOCIATION AND THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>          Plaintiff,<br><br>     vs.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, *et al.*,<br><br>          Defendants. | Case No. 12-CV-01059-MRP (MANx)<br><br>Date:          September 18, 2012<br>Time:          11:00 a.m.<br>Courtroom:  12<br>Judge:        Hon. Mariana R. Pfaelzer |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................ 2

STATEMENT OF FACTS ............................................................................... 6

    A.    Defendants' Creation And Marketing Of Faulty Mortgage-
           Backed Securities ........................................................................... 6

    B.    Defendants' Sale of Defective Certificates to the GSEs ........................ 7

    C.    FHFA's Investigation of the Defective Securitizations........................... 8

    D.    The Proceedings ............................................................................ 11

ARGUMENT ............................................................................................... 12

I.     FHFA INITIATED THIS ACTION WITHIN THE TIME LIMIT
       CONGRESS SET ................................................................................. 12

    A.    Defendants Concede That This Action Is Timely If HERA
           Controls ....................................................................................... 12

    B.    HERA Replaces All Time Restrictions That Previously Applied ........ 15

         1.    By Its Plain Language, HERA's Replaces the Time
              Restrictions Defendants Seek to Impose Here ........................... 16

         2.    Interpreting HERA To Replace All Prior Time
              Restrictions Is Consistent With Congress's Purpose To
              Afford FHFA Time To Investigate And Assert Claims ............. 26

    C.    HERA Applies To Federal Law Claims ............................................. 30

         1.    By Its Plain Language, HERA Applies To Actions That
              Include Federal Law Claims.................................................... 30

         2.    Applying HERA To Federal Law Claims Does Not Lead
              To Absurd Results ................................................................. 33

         3.    Applying HERA To Federal Law Claims Is Consistent
              With Congress's Purpose In Enacting HERA ........................... 35

    D.    HERA Applies To Statutory Claims.................................................. 36

    E.    *FHFA v. UBS* Is Persuasive And This Court Should Follow Its
           Well-Reasoned Analysis ................................................................. 38

    F.    None Of FHFA's Section 11 Claims Is Time-Barred Because All
           Of The Securitizations Were Bona Fide Offered To The Public
           On Or After September 6, 2005 ........................................................ 40

II.     EVEN IF HERA DOES NOT APPLY, NEARLY ALL OF FHFA'S
         CLAIMS ARE STILL TIMELY ...................................................................42

         A.      The *Summerlin* Doctrine Preserves All of FHFA's State Law
                  Claims .............................................................................................42

         B.      The *American Pipe* Doctrine or Tolling Agreements Preserve
                  Many of FHFA's Claims.................................................................44

CONCLUSION.............................................................................................................46

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abrams v. Ciba Specialty Chem. Corp.*,
  659 F. Supp. 2d 1225 (S.D. Ala. 2009) ..................................................... 19

*Albertson's, Inc. v. C.I.R.*,
  42 F.3d 537 (9th Cir. 1994) ............................................................. 26, 30

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005) ....................................................... 22

*Ali v. Fed. Bureau of Prisons*,
  552 U.S. 214 (2008) ........................................................................ 31

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,
  824 F. Supp. 2d 1164 (C.D. Cal. 2011) ..................................................... 44

*American Pipe & Construction Co. v. Utah*,
  414 U.S. 538 (1974) ................................................................. 5, 44, 45

*BP Am. Prod. Co. v. Burton*,
  549 U.S. 84 (2006) ........................................................................ 30

*Badaracco v. Comm'r*,
  464 U.S. 386 (1984) ....................................................................... 30

*In re Boesky Sec. Litig.*,
  882 F. Supp. 1371 (S.D.N.Y. 1995) ......................................................... 20

*Branch v. Smith*,
  538 U.S. 254 (2003) ....................................................................... 28

*Bresson v. Comm'r*,
  213 F.3d 1173 (9th Cir. 2000) ..................................................... 5, 21, 42

*Byrd v. Trans Union LLC*,
  2010 WL 2555119 (D.S.C. June 18, 2010) ................................................... 19

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
  132 S. Ct. 1670 (2012) ................................................................ 24, 35

*Caviness v. Derand Res. Corp.*,
  983 F.2d 1295 (4th Cir. 1993) ............................................................. 21

*Chumney v. U.S. Repeating Arms Co., Inc.*,
  196 F.R.D. 419 (M.D. Ala. 2000) .......................................................... 20

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011) .............................................................. 14

*In re Countrywide Fin. Corp. Sec. Litig.,*
2009 WL 943271 (C.D. Cal. Apr. 6, 2009)....................................18, 40

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.,*
2012 WL 1574285 (Mar. 9, 2012).........................................45

*Dolan v. U.S. Postal Serv.,*
546 U.S. 481 (2006)...................................................15, 30

*E.I. Dupont de Nemours & Co. v. Davis,*
264 U.S. 456 (1924)......................................................30

*In re Enron Corp. Sec., Deriv., and "ERISA" Litig.,*
2005 WL 3704688 (S.D. Tex. Dec. 5, 2005)..............................46

*In re Exxon Mobil Corp. Sec. Litig.,*
500 F.3d 189 (3d Cir. 2007).........................................17, 18

*FDIC v. Belli,*
981 F.2d 838 (5th Cir. 1993).............................................35

*FDIC v. Dawson,*
4 F.3d 1303 (5th Cir. 1993)..............................................14

*FDIC v. Former Officers & Dirs. of Metro. Bank,*
884 F.2d 1304 (9th Cir. 1989)............................................30

*FDIC v. Hinch,*
879 F. Supp. 1099 (N.D. Okla. 1995)....................................37

*FDIC v. McSweeney,*
976 F.2d 532 (9th Cir. 1992).........................................14, 15

*FDIC v. Wabick,*
335 F.3d 620 (7th Cir. 2003).............................................36

*FDIC v. Zibolis,*
856 F. Supp. 57 (D.N.H. 1994)...........................................36

*FHFA v. UBS Ams., Inc.,*
2012 WL 2400263 (S.D.N.Y. June 26, 2012).........................40, 41

*FHFA v. UBS Ams., Inc.,*
2012 WL 1570856 (S.D.N.Y. May 4, 2012).........................*passim*

*In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., ERISA Litig.,*
725 F. Supp. 2d 169 (D.D.C. 2010)...................................27, 34

*Finkel v. Stratton Corp.,*
962 F.2d 169 (2d Cir. 1992)..........................................21, 41

*Gen. Dynamics Land Sys., Inc. v. Cline,*
540 U.S. 581 (2004)......................................................26

*Genesee County Emps. Ret. Sys. v. Thornburg Mortg. Secs. Trust*,
  825 F. Supp. 2d 1082 (D.N.M. 2011)............................................................44, 45

*In re Global Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003) ...............................................................22

*Harrison v. PPG Indus., Inc.*,
  446 U.S. 578 (1980) ...........................................................................................31

*Holdsworth v. Strong*,
  545 F.2d 687 (10th Cir. 1976) ............................................................................37

*Jones v. Saxon Mortg., Inc.*,
  537 F.3d 320 (4th Cir. 1998) ..............................................................................19

*Joslin v. Grossman*,
  107 F. Supp. 2d 150 (D. Conn. 2000) .................................................................37

*In re Juniper Networks, Inc. Sec. Litig.*,
  542 F. Supp. 2d 1037 (N.D. Cal. 2008) ..............................................................22

*Keene Corp. v. United States*,
  508 U.S. 200 (1993) ...........................................................................................32

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997) ...........................................................................................29

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
  501 U.S. 350 (1991) .....................................................................................17, 22

*Lombardo v. Sec'y of Health & Human Servs.*,
  34 Fed. Cl. 21 (Fed. Cl. 1995) ...........................................................................19

*Lyon v. Agusta S.P.A.*,
  252 F.3d 1078 (9th Cir. 2001) ...................................................................4, 18, 28

*Mass. Mutual Life Ins. Co. v. Countrywide Fin. Corp.*,
  2012 WL 1322884 (C.D. Cal. Apr. 16, 2012).....................................................14

*McCann v. Hy-Vee, Inc.*,
  663 F.3d 926 (7th Cir. 2011) .........................................................................22, 25

*McDonald v. Sun Oil Co.*,
  548 F.3d 774 (9th Cir. 2008) ...........................................................4, 18, 23, 24

*Merck & Co. v. Reynolds*,
  130 S. Ct. 1784 (2010) .......................................................................................22

*Midstate Horticultural Co. v. Pennsylvania Railroad Co.*,
  320 U.S. 356 (1943) ...........................................................................................25

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
  810 F. Supp. 2d 650 (S.D.N.Y. 2011) ................................................................45

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) ................................................................................28

*Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*,
   2012 WL 3028803 (D. Kan. July 25, 2012) ....................................*passim*

*Nixon v. Mo. Mun. League*,
   541 U.S. 125 (2004) ................................................................................27

*P. Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004) ...........................................................4, 17, 18

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) ................................................................................32

*Resolution Trust Corp. v. Olson*,
   768 F. Supp. 283 (D. Ariz. 1991) .......................................................19, 20, 21

*RTC v. Artley*,
   28 F.3d 1099 (11th Cir. 1994) ................................................................14

*RTC v. Gardner*,
   798 F. Supp. 790 (D.D.C. 1992) .............................................................37

*S.E.C. v. Seaboard Corp.*,
   677 F.2d 1301 (9th Cir. 1982) ................................................................21

*S.E.C. v. Willis*,
   777 F. Supp. 1165 (S.D.N.Y. 1991) ........................................................43

*Smith v. FDIC*,
   61 F.3d 1552 (11th Cir. 1995) ................................................................37

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
   802 F. Supp. 2d 1125 (C.D. Cal. 2011) ...................................14, 15, 18

*Stoll v. Ardizzone*,
   2007 WL 2982250 (S.D.N.Y. Oct. 9, 2007) ...........................................22

*Stonehedge/Fasa-Tex. JDC v. Miller*,
   1997 WL 119899 (5th Cir. Mar. 10, 1997) .............................................20

*Thomas v. Housing Auth. of Los Angeles*,
   2005 WL 6133692 (C.D. Cal. June 3, 2005) ...........................................20

*Treiber v. Katz*,
   796 F. Supp. 1054 (E.D. Mich. 1992) ....................................................28

*UMLIC-Nine Corp. v. Lipan Springs Dev. Corp.*,
   168 F.3d 1173 (10th Cir. 1999) ..............................................................14

*In re United Ins. Mgmt., Inc.*,
   14 F.3d 1380 (9th Cir. 1994) ..................................................................21

*United States v. Am. Trucking Ass'n, Inc.*,
310 U.S. 534 (1940) ............................................................................ 27

*United States v. California*,
507 U.S. 746 (1993) ............................................................................ 43

*United States v. City & Cnty. of San Francisco*,
446 F. Supp. 2d 1140 (E.D. Cal. 2006) .............................................. 43

*United States v. Evans*,
340 Fed. App'x 990 (5th Cir. Aug. 18, 2009) ................................... 42

*United States v. Global Mortg. Funding, Inc.*,
2008 WL 5264986 (C.D. Cal. May 15, 2008) ................................... 43

*United States v. Gonzales*,
520 U.S. 1 (1997) ................................................................................ 31

*United States v. Neidorf*,
522 F.2d 916 (9th Cir. 1975) ............................................................. 37

*United States v. Peoples Household Furnishings, Inc.*,
75 F.3d 252 (6th Cir. 1996) ............................................................... 43

*United States v. Summerlin*,
310 U.S. 414 (1940) ................................................................. 5, 42, 43

*Wilson v. Garcia*,
471 U.S. 261 (1985) ............................................................................ 29

*In re WorldCom, Inc. Sec. Litig.*,
2004 WL 1435356 (S.D.N.Y. June 28, 2004) ................................... 22

*In re WorldCom Sec. Litig.*,
496 F.3d 245 (2d Cir. 2007) ............................................................... 21

## **Statutes**

12 U.S.C. § 1787(b)(14) ........................................................................ 3

12 U.S.C. § 1821(d)(14) ........................................................... 14, 35, 36

12 U.S.C. §§ 4501(1), (2) ..................................................................... 43

12 U.S.C. § 4511(a) ................................................................. 8, 35, 42

12 U.S.C. § 4617(b)(2) ................................................................*passim*

12 U.S.C. § 4617(b)(12) ..............................................................*passim*

12 U.S.C. § 4617(b)(13) ....................................................................... 32

42 U.S.C. § 9658 ............................................................................ 18, 19

15 U.S.C. § 77m .................................................................................. 15

CASE NO. 12-CV-01059-MRP (MANx)
OPPOSITION TO COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

15 U.S.C. § 78i ................................................................................................ 17

17 C.F.R. § 229.512(a) ................................................................................... 41

28 U.S.C. § 1292(b) ................................................................................ 12, 38

28 U.S.C. § 2415 ............................................................................................ 37

Conn. Gen. Stat. § 52-552a ........................................................................... 37

D.C. Code § 31-5606.05(a)(1)(B) ................................................................ 15

Va. Code § 13.1-522(D) ................................................................................ 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), by its attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, respectfully submits this memorandum of law in opposition to the Motion to Dismiss ("Mem.") the Amended Complaint ("Am. Compl.") filed by Defendants Countrywide Financial Corp., Countrywide Home Loans, Inc., Countrywide Capital Markets, LLC, Countrywide Securities Corp., CWAS, Inc., CWALT, Inc., and CWMBS, Inc. (collectively, "Countrywide" or the "Countrywide Defendants"); Defendants Bank of America Corporation, Bank of America, N.A., NB Holdings Corporation (collectively, the "Bank of America Defendants"); Defendants Citigroup Global Markets Inc., Deutsche Bank Securities Inc., RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc., and UBS Securities LLC (collectively, the "Underwriter Defendants"); and N. Joshua Adler, Ranjit Kripilani, Stanford Kurland, Jennifer S. Sandefur, Eric Sieracki, and David A. Spector (collectively, the "Individual Defendants," and, together with the other defendants, "Defendants"), insofar as the Individual Defendants move to dismiss claims under the Securities Act of 1933 and Blue Sky claims under Virginia and District of Columbia law on timeliness grounds.[1]

---

[1] FHFA addresses other arguments by the Individuals Defendants in its accompanying "Opposition to the Individual Defendants' Motions to Dismiss the Amended Complaint" (the "Individual Defendants' Opp."). Defendants have submitted a total of five briefs and two joinders seeking dismissal of this action. *See* Dkt. Nos. 134-138, 139-1, 140, 142. By agreement of the parties, FHFA is responding in two briefs, one addressed principally to the arguments of the Countrywide Defendants and one addressed principally to the arguments of the Individual Defendants. FHFA herein incorporates by reference all of the arguments made in the Individual Defendants' Opp.

**PRELIMINARY STATEMENT**

        In response to the greatest economic crisis since the Great Depression, Congress enacted the Housing and Economic Recovery Act ("HERA") in July 2008 and thereby reaffirmed its longstanding commitment to the safe and sound operation of the GSEs and their mission of promoting home ownership in the United States. As part of that commitment, Congress created FHFA and vested it with the duty, upon its appointment as conservator to the GSEs, to "preserve and conserve the assets" of those entities.  To ensure that FHFA could fulfill that mandate, Congress provided FHFA with broad powers as conservator, including the authority to assert claims for the GSEs and a new limitations period in which to investigate and formulate those claims. FHFA's investigation confirmed that Defendants misrepresented numerous material facts bearing on the credit quality of more than $26.6 billion in residential mortgage-backed securities ("RMBS") that the GSEs purchased in 86 Securitizations.  Acting as Congress empowered it to, FHFA brought this action, along with 17 similar actions now pending in the Southern District of New York and the District of Connecticut, to hold Defendants accountable for their misrepresentations and to recoup the resulting damages suffered by the GSEs, and ultimately the U.S. taxpayer.

        Defendants' primary argument for dismissal is that FHFA filed its claims after expiration of the limitations and repose periods under the Securities Act of 1933 and the Blue Sky statutes of Virginia and the District of Columbia.  That is the identical argument recently advanced by the defendants in the Southern District of New York, and the Court rightly rejected it.  *FHFA v. UBS Ams., Inc.* ("*UBS*"), --- F. Supp. 2d ---, 2012 WL 1570856, at *5 (S.D.N.Y. May 4, 2012).  In her 66-page Opinion and Order binding across all of the 16 actions pending before her, the Honorable Denise L. Cote concluded that HERA, in setting "the applicable statute of limitation" for "any action" by FHFA, 12 U.S.C. § 4617(b)(12)(A), replaces all

previous time restrictions, including specifically the limitations and repose periods Defendants seek to apply here.  Further, contrary to the suggestion of Defendants that the court certified the question of HERA's applicability for interlocutory appeal because of any uncertainty about the correctness of its ruling (Mem. 44), Judge Cote expressed that the court harbored "little doubt that its interpretation of HERA is the one that best comports with the 'everyday' meaning of the statutory text and 'the objectives of the statute overall,'" *UBS*, 2012 WL 1570856, at *29 (citing *id.* at *5), and stated that she was certifying mainly because she anticipated that an affirmance by the Second Circuit would advance settlement discussions between the parties before her.  FHFA RJN Ex. A (*UBS*, Tr. of Proceedings, June 13, 2012, at 29:7-11) ("[I]f I certify, it is not because I have any doubt as to the merits of the way I resolve the issue.  That's not why I would be doing it.  I think this litigation should settle.  I expect it will settle.  I don't want to impede settlement by any doubt on this threshold issue.").  Judge Cote's reasoning was recently reaffirmed in a 90-page decision issued by Judge Rogers, which construed identical statutory language to likewise conclude that, by setting "the applicable statute of limitations" for claims by an agency plaintiff, Congress replaced previously applicable periods of repose. *See Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.* ("*NCUA Kansas*"), No. 11-2340-RDR, 2012 WL 3028803, at *16-17 (D. Kan. July 25, 2012) (discussing 12 U.S.C. § 1787(b)(14)).

Judge Cote and Judge Rogers's rejection of the Defendants' arguments is correct based both on HERA's language and purpose.  Starting with HERA's plain terms, the premise of Defendants' argument—that "limitations" cannot be understood to encompass or replace periods of repose—is contradicted by literally dozens of authorities in which Congress and the Courts have used that language in precisely the manner FHFA advances here.  Section 13 itself, which sets the repose period Defendants seek to impose on FHFA, is a prime example:  The provision is

1   entitled "Limitations on Actions" and nowhere uses the term "repose."  Numerous

2   courts, including the Ninth Circuit, have likewise used the term "limitations" to

3   encompass periods of repose.  *See McDonald v. Sun Oil Co.*, 548 F.3d 774, 779 (9th

4   Cir. 2008); *Lyon v. Agusta S.P.A.*, 252 F.3d 1078 (9th Cir. 2001).  In fact,

5   Defendants' own cited authority demonstrates that HERA is not the first instance in

6   which Congress has enacted a "statute of limitations" that replaced all previous time

7   restrictions, including periods of repose.  Congress did the same thing, also in the

8   securities law context, through its enactment of Sarbanes-Oxley.  *See P. Stolz*

9   *Family P'ship L.P. v. Daum* ("*Stolz*"), 355 F.3d 92, 104 (2d Cir. 2004).  Defendants

10  cannot avoid this overwhelming authority with their observation that Congress has

11  "drafted" more than a dozen bills referring expressly to periods of "repose."  It is far

12  more telling that Congress has *never* used the term "statute of repose" in the United

13  States Code, and that it routinely uses the word "limitations," just as it did in HERA,

14  to set *all* applicable time limits on a plaintiff's ability to bring suit.

15       Interpreting the term "statute of limitations" to encompass statutes of repose

16  is also the only logical way to further HERA's purpose "to 'put the [GSEs] in a

17  sound and solvent condition.'" 12 U.S.C. § 4617(b)(2)(D).  It approaches fantasy for

18  Defendants to claim that Congress's primary concern, when it met in an emergency

19  session in 2008 in response to a financial crisis precipitated largely by the faulty

20  mortgage securitization practices of banks like Countrywide, was to provide those

21  banks with "finality and peace."  Mem. 33.  In fact, Congress enacted HERA to

22  ensure that FHFA would have the ability to recover damages on behalf of the GSEs,

23  and ultimately the United States taxpayer, including from those banks responsible

24  for the GSEs' losses.  Judge Cote's reasoning that it makes no sense, given the

25  statute's purpose, to read HERA such that "the statute's only effect with regard to

26  the Securities Act was to relieve FHFA of the requirement that it file suit within one

27  year of discovering the misrepresentations for which it seeks to recover" while

28

1   keeping "the three-year post-offering deadline . . . in place," *UBS*, 2012 WL

2   1570856, at *3, cannot credibly be assailed.

3          Defendants' separate argument that HERA does not apply to federal law

4   claims, including the Securities Act claims at issue here, is equally implausible.  As

5   Judge Cote concluded, HERA applies by its plain language to "*any action* brought

6   by the Agency as conservator."  12 U.S.C. § 4617(b)(12)(A) (emphasis added).  Nor

7   does applying HERA to federal claims lead to an "absurd" result.  Mem. 38.

8   Defendants' attempt to point to cherry-picked federal statutes under which applying

9   a fixed three-year period under HERA could hypothetically shorten FHFA's time to

10  commence suit, provided that those theoretical claims accrue within a certain

11  window of time, is misdirected.  FHFA is not bringing Defendants' hypothetical

12  RICO, CERCLA, or antitrust claims.  Rather, it is bringing securities law claims,

13  which are claims Congress logically expected it would bring on the GSEs' behalf,

14  and Defendants' strained construction of HERA would prevent FHFA from doing

15  precisely what it is Congressionally required to do: "conserve and preserve" the

16  conservatorship estates that it administers.

17         Finally, even if Defendants were correct in construing HERA (and they are

18  not), they fail to address the "well settled" doctrine "that the United States is not

19  bound by state statutes of limitation."  *United States v. Summerlin*, 310 U.S. 414,

20  416 (1940).  The Ninth Circuit, among other courts, has specifically applied the

21  *Summerlin* doctrine to state statutes of repose.  *Bresson v. Comm'r*, 213 F.3d 1173,

22  1178 (9th Cir. 2000).  This doctrine thus protects all of FHFA's state Blue Sky

23  claims.  Along similar lines, large swaths of FHFA's claims are also preserved by

24  the *American Pipe* doctrine, as well as a tolling agreement entered into between

25  Fannie Mae and certain Countrywide Defendants.  For all of these reasons, this

26  action is timely and Defendants' motion should be denied.

27

28

# STATEMENT OF FACTS

A.   Defendants' Creation And Marketing Of Faulty Mortgage-Backed Securities

According to the Securities and Exchange Commission ("SEC"), "by 2005, Countrywide was the largest mortgage lender in the United States, originating over $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007." Am. Compl. ¶ 58. Each of the named Defendants was integral to Countrywide's dominance of the mortgage-backed securities market. *See id.* ¶ 84. The Securitizations referenced in the Amended Complaint were not typical arms'-length transactions but instead, with few exceptions, "the sponsor was Countrywide Home Loans, the depositors were CWABS, CWALT, or CWMBS, and the lead or co-lead underwriter was Countrywide Securities." *Id.* ¶ 67. The Countrywide Defendants thus profited at every step of the securitization chain. *Id.* ¶ 84.

Countrywide Home Loans sponsored securitizations, as it did for all 86 Securitizations in this case. *Id.* ¶ 59. In addition to originating mortgage loans, "Countrywide Home Loans determined the structure of the Securitizations, initiated the Securitizations, determined distribution of principal and interest, and provided data to the ratings agencies to secure investment grade ratings for the Certificates." *Id.* ¶ 59. Countrywide Home Loans then conveyed the mortgage loans being securitized to CWALT, CWABS, and CWMBS (the "Depositor Defendants"). *Id.* ¶ 60. The Depositor Defendants were "special purpose entit[ies] formed solely for the purpose of purchasing mortgage loans," and were responsible for, among other things, "preparing and filing the Registration Statements pursuant to which the Certificates were offered for sale." *Id.* ¶¶ 61-62. The Depositor Defendants conveyed the mortgage loans to trusts, which held the mortgage loans for the benefit of certificateholders. *Id.* ¶¶ 62-63. The individual trusts then "issued the

1   Certificates in public offerings for sale to investors such as Fannie Mae and Freddie

2   Mac." *Id.* ¶ 63.[2]

3          Countrywide Securities, which ranked number one in issuance of securities

4   backed by subprime mortgages for the years 2005-2007, and was controlled by

5   Countrywide Capital Markets, underwrote the vast majority of the Securitizations at

6   issue, Am. Compl. ¶¶ 64-65, with the remaining Underwriter Defendants

7   underwriting a total of eleven Securitizations in which they also sold Certificates to

8   the GSEs. *Id.* ¶¶ 69-75.  Countrywide Financial was the sole corporate parent of

9   each of these Countrywide entities. *Id.* ¶¶ 67, 68.  The Bank of America Defendants

10  are successors-in-interest to Countrywide by virtue of a consolidation or merger in

11  fact, *i.e.*, a *de facto* merger, of Countywide Financial and its subsidiaries and the

12  Bank of America Defendants. *Id.* ¶ 298.

13         B.     Defendants' Sale of Defective Certificates to the GSEs

14         The GSEs purchased approximately $26.6 billion of Certificates in the 86

15  Countrywide Securitizations, nearly all of which were rated AAA (or its equivalent)

16  from August 30, 2005 to January 23, 2008.[3]  Am. Compl. ¶ 2 & tbls.9, 11 & 12.

17  With respect to each Securitization, Countrywide made representations in the

18  Registration Statements and Prospectus Supplements they created to market and sell

19  the Certificates, and those representations were material to the GSEs.  Among other

20  things, Countrywide assured investors, including the GSEs, that the mortgage loans

21  that served as the collateral for the securities were underwritten in accordance with

22  originator guidelines, which were meant to ensure that individual borrowers would

---

24          [2]  As described in more detail in the Individual Defendants' Opp., the Individual
     Defendants controlled the Depositor Defendants, and signed the various Registration
25   Statements at issue in this case.  Am. Compl. ¶¶ 51 & tbl. 3, 63; *see* Individual
     Defendants' Opp. at 2-4.
26
          [3]  Defendants issued the Prospectus Supplements corresponding to all of these
27   Certificates on or after September 6, 2005.  Am. Compl. ¶ 53 tbl. 4.

28

1  be able to meet their payment obligations.  *Id.* ¶ 5.  Countrywide also provided

2  statistics detailing the extent to which the amount of the individual mortgage loans

3  compared to the actual value of the underlying properties ("loan-to-value" or "LTV"

4  ratios), and the extent to which the individual borrowers would reside in those

5  properties—both key factors in assessing the likelihood that a mortgage loan will

6  ultimately be repaid.  *Id.* ¶¶ 6-7.

7       As became clear only later, Countrywide's mortgage-backed securities were

8  riddled with misrepresentations, omissions, and outright fraud.

9       C.    <u>FHFA's Investigation of the Defective Securitizations</u>

10       On July 30, 2008, Congress, through its enactment of HERA, Pub. L. No.

11  110-289, 122 Stat. 2654 (2008), created FHFA as an "independent agency of the

12  Federal Government," 12 U.S.C. § 4511(a), and charged it with the mandate to

13  restore the GSEs to financial health in the event of conservatorship, *id.*

14  § 4617(b)(2)(B).  In HERA, Congress reaffirmed its longstanding view that the

15  GSEs' shared mission, to promote home ownership in the United States, is pivotal to

16  the stability of the Nation's economy.  *Id.* § 4501(1), (2); *see also id.* § 1716; *id.*

17  § 1451 note.  Because the GSEs suffered massive losses, FHFA was appointed

18  conservator of the GSEs on September 6, 2008.  Am. Compl. ¶ 13.  Congress

19  empowered FHFA as conservator to "take such action as may be—(i) necessary to

20  put the [GSEs] in a sound and solvent condition," 12 U.S.C. § 4617(b)(2)(D), and to

21  "take any action authorized by [HERA], which [FHFA] determines is in the best

22  interests of the [GSEs] or [FHFA]," *id.* § 4617(b)(2)(J)(ii).  Congress vested FHFA

23  with extensive powers, including the authority to "collect all obligations and money

24  due the" GSEs in order to "preserve and conserve the assets" of the GSEs.  *Id.*

25  § 4617(b)(2)(B).

26       Consistent with its statutory mandate, FHFA responded to the extraordinary

27  default rates in the loans underlying the Certificates sold by Defendants to the GSEs

28

1  by evaluating whether Defendants' representations in the Registration Statements,

2  including Prospectus Supplements, were accurate.  *See* Am. Compl. ¶ 193.  Among

3  other things, FHFA and the GSEs oversaw a loan-level analysis demonstrating that

4  Defendants' Prospectus Supplements routinely misrepresented key factual data,

5  such as the rates of owner occupancy or the LTV ratios of the mortgage loans

6  underlying the Securitizations.  *See* Am. Compl. ¶¶ 123-35.  For example, each of

7  the Prospectus Supplements for the Securitizations understated the percentage of

8  non-owner-occupied properties by a minimum of six percent, with nearly two-thirds

9  understating the non-owner occupancy rate by ten percent or more.  *Id.* ¶ 128.

10 Likewise, the Prospectus Supplements uniformly understated the loan-to-value ratio

11 of the mortgage loans, a key indicator of a borrower's ability to repay.  *Id.* ¶ 130.

12 Although for every Securitization the Prospectus Supplement reported that none of

13 the loans in the supporting loan group had loan-to-value ratio over 100 percent, in

14 reality somewhere between 2.97 and 27.12 percent of the loans in the supporting

15 loan group in each Securitization had a loan-to-value ratio of over 100 percent

16 (meaning that those mortgages exceeded the value of the corresponding properties).

17 *Id.* ¶ 133 & tbl. 8.  "These representations were material to a reasonable investor's

18 decision to purchase the Certificates," *id.* ¶ 108, yet they were routinely incorrect.  It

19 is those incorrect representations that form the basis for the claims here.

20       Furthermore, as alleged in the Amended Complaint, and although such

21 knowledge is not an element of the Securities Act and Blue Sky claims that

22 Defendant challenge in their motions, it is apparent from numerous sources that the

23 Countrywide Defendants knew the Registration Statements, including the

24 Prospectus Supplements, contained false information.  This has been confirmed

25 through multiple government investigations, conducted by Financial Crisis Inquiry

26 Commission ("FCIC"), the SEC, Department of Justice, and other federal and state

27 authorities.  Am. Compl. ¶¶ 139-173, 198.  After interviewing more than 700

28

witnesses and holding more than 19 days of public hearings, the FCIC, for example, which was created by Congress to examine the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market, issued a report specifically identifying Countrywide among the many entities it examined as exemplifying the systemic breakdown in accountability and ethics. *Id.* ¶ 141. It reported that "[a]s early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in catastrophic consequences," and that Countrywide failed to stop even after it became aware that high-risk loans could result in financial and reputational catastrophe for the firm. *Id.* (citing Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States at xxii (Jan. 2011) (hereinafter "FCIC Report")).

Internal Countrywide documents that came to light as a result of an SEC civil action against Angelo Mozilo (Countrywide's CEO), David Sambol (Countrywide's President and COO), and Individual Defendant Eric Sieracki (Countrywide's CFO) revealed that by 2007, Countrywide's Credit Risk Committee was raising serious concerns about the quality of Countrywide's loans to senior management, specifically highlighting "'increased fraud,' 'exception underwriting,' 'guideline drift,' 'attribute deterioration,' and 'appraisal quality'" as areas of concerns. *Id.* ¶¶ 142, 206 (brackets omitted).[4] Countrywide openly aspired to a "matching strategy," under which Countrywide mixed and matched the least demanding

_____

[4]   As described in the Amended Complaint, the SEC action settled, with the defendants paying substantial fines, after the District Court hearing the case determined that the SEC had raised, at a minimum, a genuine issue of material fact regarding whether Defendants had made misleading statements "regarding the quality of Countrywide's underwriting and loan production." *Id.* at ¶ 143 (quoting *SEC v. Mozilo*, No. 09-03994, 2010 WL 3656068, at *10, 12-14 (C.D. Cal. Sept. 16, 2010)).

1  guideline requirements of other lenders, with the objective of increasing
2  Countrywide's market share.  *Id.* ¶ 144.  Indeed, the SEC found that Countrywide
3  used an underwriting process in which "four attempts" were made to approve any
4  loan, with the result that in excess of 20% of mortgage loans typically were
5  approved as exceptions to Countrywide's underwriting guidelines.  *Id.* ¶ 145.
6  Simple greed drove these decisions:  top Countrywide executives testified to the
7  FCIC that "saleability was the sole criteria for approving a loan."  *Id.* ¶ 204.  Risk
8  management executives at Countrywide were ignored when they questioned the
9  matching strategy or pointed out that underwriting guidelines or risk guidances were
10 not being followed.  *Id.* ¶¶ 205-19.

11      The Amended Complaint also describes a myriad of other sources that
12 establish Countrywide's knowledge of the falsity of its representations in Prospectus
13 Supplements (including former Countrywide employees and whistleblowers,
14 borrowers, and former employees of due diligence firms), and also the tens of
15 billions of dollars of liabilities that Countrywide's successor, Bank of America, has
16 incurred and continues to anticipate in light of what Bank of America's CEO and
17 President has described as Bank of America's effort to "pay for the things that
18 Countrywide did."  *See id.* ¶¶ 220-27, 233-39, 368-90.

19      D.      The Proceedings

20      Consistent with its mandate to "collect all obligations and money due the"
21 GSEs, 12 U.S.C. § 4617(b)(2)(B)(ii), FHFA filed its initial complaint in the
22 Supreme Court of the State of New York, New York County, on September 2, 2011.
23 This action was one of 17 actions that FHFA filed in New York state or federal
24 court against many of the leading bank sponsors of MBS.  (Another action was filed
25 in the District of Connecticut.)  In all of those actions, as well as in this action,
26 FHFA has asserted claims, as conservator for the GSEs, under Sections 11, 12 and
27 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2),

28

77o; under the Virginia and District of Columbia Securities Acts, Va. Code § 13.1-522(A)(ii), (C) & D.C. Code § 31-5606.05(a)(1)(B), (c) (collectively, the "Blue Sky" laws); and for common law negligent misrepresentation.  In its present action against Countrywide, FHFA also asserted claims for fraud, aiding and abetting fraud, fraudulent conveyance, and constructive fraudulent conveyance.

Defendants removed this case to the United States District Court for the Southern District of New York on September 30, 2011, and the Judicial Panel on Multidistrict Litigation transferred the action to this Court on February 8, 2012.

The Defendants in the actions still pending in the Southern District of New York, which Countrywide calls "substantially similar" to this action (Mem. 2), filed a motion to dismiss, applicable across all of those cases.  By order dated May 4, 2012, the district court (Cote, J.) denied the motion, rejecting the "[d]efendants' chief argument in favor of dismissal . . . that this action is untimely."  *UBS*, 2012 WL 1570856, at *2, *6, *10.[5]  Countrywide now brings nearly the identical motion before this Court, arguing again that FHFA's claims are time-barred.  For the reasons that follow, the motion should be denied.

## ARGUMENT

### I.   FHFA INITIATED THIS ACTION WITHIN THE TIME LIMIT CONGRESS SET

A.   Defendants Concede That This Action Is Timely If HERA Controls

Defendants argue that FHFA filed this action after the limitations and/or repose periods in the Securities Act (Count I-III) and Blue Sky laws (Counts IV-

---

[5]  Notwithstanding that Judge Cote had "little doubt that [her] interpretation of HERA is the one that best comports with the 'everyday' meaning of the statutory text and 'the objectives of the statute overall,'" she certified her order for interlocutory appeal under 28 U.S.C. § 1292(b).  *UBS*, 2012 WL 1570856, at *29, 31.  UBS has filed a petition for permission to appeal in the Second Circuit, which remains pending.  *See FHFA v. UBS Ams., Inc.*, No. 12-2547 (2d Cir.).

VII) had already expired.[6]  Mem. 12-16.  But that argument is irrelevant, as the timeliness of FHFA's claims is not governed by the periods in those statutes; rather, it is governed by HERA, which sets "*the applicable* statute of limitations with regard to *any action* brought by the Agency as conservator," and provides FHFA *at least three years* from its appointment as conservator to file suit.  12 U.S.C. § 4617(b)(12)(A) (emphasis added) (the "HERA claims period").[7]  As Judge Cote concluded—and as the Ninth Circuit and three other Circuits have recognized in construing nearly identical statutory language—any claims open as of the start of the

---

[6]  Defendants spend substantial effort alleging facts outside the Amended Complaint as part of an attempt to demonstrate the GSEs' knowledge of the risky nature of loans the GSEs securitized from 2005 to 2008.  Mem. 7-11.  Defendants nonetheless admit that the extra-record assertions are irrelevant "[a]t this threshold stage of the case."  Mem. 12.  Their factual presentation therefore merits no response other than, once Defendants' motion is denied and the parties engage in discovery, FHFA is confident its claims and allegations will be more than substantiated.

[7]  12 U.S.C. § 4617(b)(12) provides in full:

(12) Statute of limitations for actions brought by conservator or receiver
  (A) In general
  Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Agency as conservator or receiver shall be—
      (i) in the case of any contract claim, the longer of—
          (I) the 6-year period beginning on the date on which the claim accrues; or
          (II) the period applicable under State law; and
      (ii) in the case of any tort claim, the longer of—
          (I) the 3-year period beginning on the date on which the claim accrues; or
          (II) the period applicable under State law.
  (B) Determination of the date on which a claim accrues
  For purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in such subparagraph shall be the later of—
      (i) the date of the appointment of the Agency as conservator or receiver; or
      (ii) the date on which the cause of action accrues.

1   conservatorship remain open for at least more three years.  *See UBS*, 2012 WL

2   1570856, at *6 ("[T]he most natural reading [of HERA] is that it affords FHFA

3   three years from the date of conservatorship to bring suit on its Securities Act

4   claims, irrespective of any other provision of law." ); *see also FDIC v. McSweeney*,

5   976 F.2d 532, 536 (9th Cir. 1992) (construing the identical language in the Financial

6   Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12

7   U.S.C. § 1821(d)(14), to provide that "[t]he statute of limitations began to run anew

8   when the [FDIC's predecessor agency] was appointed"); *see also UMLIC-Nine*

9   *Corp. v. Lipan Springs Dev. Corp.*, 168 F.3d 1173, 1177-79 (10th Cir. 1999) (same);

10  *RTC v. Artley*, 28 F.3d 1099, 1101 (11th Cir. 1994) (same); *FDIC v. Dawson*, 4 F.3d

11  1303, 1307 (5th Cir. 1993) (same).

12          Countrywide effectively concedes that the GSEs' claims remained live on

13  September 6, 2008, the date FHFA was appointed conservator.  Indeed,

14  Countrywide embraces this Court's ruling in *Stichting* that "a reasonable investor in

15  Countrywide MBS 'was clearly on notice of Countrywide's misrepresentations

16  regarding underwriting standards by late 2007 or early 2008.'"  Mem. 12-13

17  (quoting *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d

18  1125, 1136-37 (C.D. Cal. 2011) (alterations omitted)); *see also Mass. Mutual Life*

19  *Ins. Co. v. Countrywide Fin. Corp.*, 2012 WL 1322884, at *4 (C.D. Cal. Apr. 16,

20  2012) (holding that plaintiffs were *not* on "inquiry notice" as of August 31, 2007).

21  Even under this view, the earliest Section 13's one-year limitations period could

22  have expired was late 2008 or early 2009, *after* FHFA was appointed conservator on

23  September 6, 2008.  *See UBS*, 2012 WL 1570856, at *8 (Section 13's one-year

24  limitations period begins to run when "'a reasonably diligent plaintiff' in the GSEs'

25  position would have had 'sufficient information about a given misstatement or

26  omission to adequately plead it in a complaint.'") (brackets omitted) (quoting *City of*

27  *Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011));

28

1   *Stichting*, 802 F. Supp. 2d at 1135 (similar, also quoting *City of Pontiac*).

2           Similarly, with a small number of exceptions addressed in Part I.F *infra*,

3   Countrywide does not dispute that the Securitizations at issue were "bona fide

4   offered" to the public (15 U.S.C. § 77m) less than three years prior to FHFA's

5   appointment as conservator on September 6, 2008, *see* Am. Compl. tbls. 2 & 3; *see*

6   *also* Mem. 14, and thus Section 13's three-year repose period had not expired by the

7   appointment date.[8]

8           Since (1) all of the GSEs' claims were live when FHFA was appointed

9   conservator on September 6, 2008, and (2) FHFA filed this action on September 2,

10  2011, which was within three years of its appointment as conservator of the GSEs,

11  all of FHFA's claims are timely under HERA.  *See, e.g.*, *McSweeney*, 976 F.2d at

12  536.

13          B.      HERA Replaces All Time Restrictions That Previously Applied

14          Defendants seek to avoid application of HERA's claims period, but their

15  arguments uniformly distort HERA's plain meaning and disregard Congress's

16  purpose in empowering FHFA, as conservator, to pursue the claims asserted here.

17  Analysis of the HERA claims period "depends upon reading the whole statutory

18  text, considering the purpose and context of the statute, and consulting any

19  precedents or authorities that inform the analysis."  *Dolan v. U.S. Postal Serv.*, 546

20  U.S. 481, 486 (2006).  Here, HERA's plain language and purpose point in precisely

21

22          [8]  Countrywide acknowledges that Fannie Mae's claims under the D.C. Securities
23  Code are subject to the same analysis as the federal Securities Act claims, and thus
    the D.C. claims were also live as of September 6, 2008.  *See* Mem. 15-16 (citing
24  D.C. Code § 31-5606.05(a)(1)(B)).  Countrywide also does not dispute (Mem. 15)
25  that FHFA has limited its claims under the Virginia Securities Code to those
    Certificates "that were purchased by Freddie Mac on or after September 6, 2006"
26  (Am. Compl. ¶¶ 451, 469), and thus the two-year statute of repose in Virginia
27  Securities Act, Va. Code § 13.1-522(D), had not expired as of September 6, 2008.

28

the same direction:  In setting "the applicable statute of limitations with regard to any action brought by the Agency as conservator," 12 U.S.C. § 4617(b)(12)(A), Congress replaced all prior limitations periods, whether denominated "statutes of limitations" or "statutes of repose," so as to give FHFA a fixed period of time to "take such action as may be . . . necessary to put the [GSEs] in a sound and solvent condition," *id.* § 4617(b)(2)(D).

1.   <u>By Its Plain Language, HERA Replaces the Time Restrictions Defendants Seek to Impose Here</u>

Countrywide offers four purportedly text-based arguments that the HERA claims period "applies only to statutes of limitations, and does not apply to statutes of repose."  Mem. 22.  None of them has merit.

***First***, Countrywide reasons that since HERA uses the term "statute of limitations," and "statutes of limitations are fundamentally different from statutes of repose," the HERA claims period should not be read to replace statutes of repose, including the three year repose period in the Securities Act.  Mem. 19 (quotation marks omitted).  But as Judge Cote stated in rejecting this exact argument, "Congress, the courts and learned commentators regularly use the term 'limitations' to encompass both types of timeliness provisions."  *UBS*, 2012 WL 1570856, at *4. Countless authorities, including many of the ones on which Countrywide relies, prove this point:  Congress's use of the term "statute of limitations" or "limitations" encompasses periods of repose.

There is no better starting point than Section 13 itself.  According to Countrywide (Mem. 14), Section 13's "three-year repose period expired" before FHFA filed this action.  But "Section 13 itself is entitled 'Limitations of Actions,' and nowhere uses the term 'repose.'"  *UBS*, 2012 WL 1570856, at *4 (quoting 15 U.S.C. § 77m).  This provision thereby demonstrates that the term "limitations" encompasses periods of "repose," and thus directly refutes Countrywide's

1    demonstrably false assertion that a statutory "reference to the former cannot be

2    construed as a reference to the latter."  Mem. 22-23.  The language Congress used in

3    HERA, setting "the applicable statute of limitations" for actions by FHFA, is thus

4    plainly broad enough to replace the similarly worded "Limitation of Actions" in

5    Section 13, including its three-year repose component.

6         The Securities Act is not the only instance in which Congress has used the

7    term "statute of limitations" to encompass, or, as in HERA, replace, a period of

8    repose.  In two cases Defendants rely on, the Second and Third Circuit Courts of

9    Appeal examined another such provision.  *See In re Exxon Mobil Corp. Sec. Litig.*,

10   500 F.3d 189, 195 (3d Cir. 2007) (cited in Mem. 21, 25, 27, 30); *Stolz*, 355 F.3d at

11   96, 104 (cited in Mem. 19, 21, 25, 27, 30).  Securities fraud claims brought under

12   Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and

13   SEC Rule 10b-5 were once subject to one-year limitations and three-year repose

14   periods similar to the periods under Section 13.  *Lampf, Pleva, Lipkind, Prupis &*

15   *Petigrow v. Gilbertson*, 501 U.S. 350, 364 & n.9 (1991) (adopting 15 U.S.C. §

16   78i(e) as the limitations period for § 10(b) and Rule 10b-5 claims).  As addressed by

17   the Second Circuit in *Stolz*, 355 F.3d at 104, in 2002 Congress passed Section 804 of

18   the Sarbanes-Oxley Act, entitled "*Statute of limitations* for securities fraud," Pub. L.

19   No. 107-204, § 804, 116 Stat. 745, 801 (2002) (emphasis added) (codified at 28

20   U.S.C. § 1658(b)), which moved to a two-year/five-year scheme.  The Second

21   Circuit recognized that, in enacting this "statute of limitations," which nowhere uses

22   the term "repose," Congress "extend[ed] the effective date of the *statute of repose*

23   from three years to five years."  *Stolz*, 355 F.3d at 104 (emphasis added); *see also In*

24   *re Exxon Mobil Corp. Sec. Litig.*, 500 F.3d at 195 (holding that "Sarbanes-Oxley

25   extended *the limitations period*" for Exchange Act claims so that "[s]uch actions

26   now have the benefits of a two-year statute of limitations and a five-year *statute of*

27   *repose*.") (emphasis added).  This Court has reached the same conclusion:  "The

28

Sarbanes-Oxley Act of 2002 amended the Exchange Act to make clear that an action under Rule 10(b) is subject to a two-year statute of limitations and a five-year *statute of repose*." *Stichting*, 802 F. Supp. 2d at 1131-32 (emphasis added). In enacting Sarbanes-Oxley, Congress took the same action it took here—it enacted a "statute of limitations" and thereby replaced previous time restrictions, including periods of repose.

Countrywide also places considerable weight on the Ninth Circuit's decision in *Lyon v. Agusta S.P.A.*, 252 F.3d 1078 (9th Cir. 2001) (cited in Mem. 20-21, 27, 30), to support its argument that statutes of repose are different from statutes of limitation. But Countrywide fails to mention that in the very decision it touts for the limitations/repose distinction, the Ninth Circuit characterized Section 2(a)(1) of the General Aviation Revitalization Act of 1994 ("GARA"), Pub. L. No. 103-298, 108 Stat. 1552 (1994), as "a classic statute of repose," 252 F.3d at 1084, even though it is entitled "*Time limitations* on civil actions against aircraft manufacturers," Pub. L. No. 103-298, § 2 (emphasis added), and "makes no mention whatsoever of statutes of repose" (Mem. 22). Likewise, while Countrywide cites the Ninth Circuit's recent decision in *McDonald v. Sun Oil Co.*, 548 F.3d 774, 779 (9th Cir. 2008) for the undisputed point that "statutes of limitations and repose are distinct legal concepts" (Mem. 27 (brackets omitted)), Countrywide ignores that in *McDonald*, the Ninth Circuit construed a provision entitled "State *statutes of limitations* for hazardous substance cases,"42 U.S.C. § 9658 (emphasis added), so as to encompass statutes of repose, *McDonald*, 548 F.3d at 779. The conceptual differences between limitations and repose periods, relied upon by Defendants, do not change the fact that the term "limitations" is commonly used to encompass both time restrictions.

*McDonald*, *Lyon*, *Exxon*, *Stolz*, and *Countrywide* are not isolated examples. In fact, Congress routinely uses the terms "statute of limitations" or "limitations" to

1    set statutes of repose throughout the United States Code.[9]   As Judge Cote concluded

2    after canvassing these and numerous other authorities, "[t]he more natural reading of

3    the provision, the one that is both in line with everyday usage and consistent with

4    the objectives of the statute overall, is that by including in HERA a provision

5    explicitly setting out the 'statute[s] of limitations' applicable to claims by FHFA,

6    Congress intended to prescribe *comprehensive* time limitations for '*any action*' that

7    the Agency might bring as conservator, including claims to which a statute of repose

8    generally attaches."   *UBS*, 2012 WL 1570856, at *5 (quoting 12 U.S.C.

9    § 4617(b)(12)(A)).

10    Countrywide ignores this overwhelming authority and relies heavily on a

11    trilogy of *tentative* rulings issued over the last nine months by a single district court

12    in two cases in which the National Credit Union Administration Board ("NCUA") is

13    a plaintiff,[10] as well as the 1991 decision in *Resolution Trust Corp. v. Olson*, 768 F.

14    Supp. 283 (D. Ariz. 1991) (cited at Mem. 19, 27), both of which interpreted

15

16    [9]   *See, e.g.*, *Jones v. Saxon Mortg., Inc.*, 537 F.3d 320, 326 (4th Cir. 1998)

17    (construing 15 U.S.C. § 1635(f), entitled "Time *limit* for exercise of right," as a
statute of repose) (emphasis added); *Byrd v. Trans Union LLC*, 2010 WL 2555119,

18    at *1 (D.S.C. June 18, 2010) (construing 15 U.S.C. § 1681p, which Congress
captioned as a "statute of *limitations*," Pub. L. No. 108-159, § 156, 117 Stat. 1952

19    (2003), as a repose period) (emphasis added); *Abrams v. Ciba Specialty Chem.
Corp.*, 659 F. Supp. 2d 1225, 1234-35 (S.D. Ala. 2009) (concluding that 42 U.S.C.

20    § 9658(a)(1), entitled "State statutes of *limitations* for hazardous substance cases"

21    and applying to all "applicable *limitations* period[s]," extends statutes of repose)
(emphasis added); *Lombardo v. Sec'y of Health & Human Servs.*, 34 Fed. Cl. 21, 25

22    (Fed. Cl. 1995) (deeming 42 U.S.C. § 300aa-16, entitled "*Limitations* of actions," a

23    statute of repose) (emphasis added).

24    [10]   *See* Mem. 18-19, 22-23 (citing *Nat'l Credit Union Admin Bd. v. RBS

25    Securities*, No. 11-CV-6521-GW (C.D. Cal. Dec. 19, 2011); *Nat'l Credit Union
Admin Bd. v. RBS Securities*, No. 11-CV-6521-GW (C.D. Cal. Jan. 30, 2012); *Nat'l*

26    *Credit Union Admin Bd. v. Goldman, Sachs & Co.* ("*NCUA Goldman*",) No. 11-CV-

27    6521-GW (C.D. Cal. Mar. 15, 2012)).

28

1  identical statutory language in the Federal Credit Union Act ("FCUA"), 12 U.S.C.

2  § 1787(b)(14), and FIRREA, respectively.  But as Judge Cote concluded, the

3  tentative orders—which by their very nature "bind[] neither the court nor the

4  parties" (*Thomas v. Housing Auth. of Los Angeles*, 2005 WL 6133692, at *1 (C.D.

5  Cal. June 3, 2005))—and *Olson* offer "little explanation" to support their analysis,

6  which is "untenable in light of the commonly understood meaning of 'statute of

7  limitations' and the frequent practice by Congress, federal courts and commentators

8  of using the term to encompass all forms of time limitation."  *UBS*, 2012 WL

9  1570856, at *30.

10        Indeed, in a separate action brought by NCUA, another district court recently

11  issued a *final* decision that reached the same conclusion as Judge Cote in *UBS*:

12  because "Congress has referred to statutes of repose as statutes of limitations,"

13  language in FCUA, identical to the HERA claims period, "should be construed in

14  favor of the government and in conformity with its apparent purpose" to extend the

15  time in which government agencies may bring suit on behalf of entities that have

16  been placed into conservatorship or receivership.  *NCUA Kansas*, 2012 WL

17  3028803, at *16-17.  Likewise, while *Olson* concluded that FIRREA "deal[s] only

18  with procedural statutes of limitations and not substantive statutes of repose," 768 F.

19  Supp. at 285, several courts (in addition to Judge Cote) have found this analysis

20  "unpersuasive for several reasons," *Stonehedge/Fasa-Tex. JDC v. Miller*, 1997 WL

21  119899, at *2 (5th Cir. Mar. 10, 1997), if not "legally unsound," *In re Boesky Sec.

22  Litig.*, 882 F. Supp. 1371, 1380-81 (S.D.N.Y. 1995); *see also NCUA Kansas*, 2012

23  WL 3028803, at *18 (disagreeing with *Olson* "[b]ecause the court did not discuss

24  and may not have considered whether Congress intended the extender statute to

25  apply to statutes of repose"); *Chumney v. U.S. Repeating Arms Co., Inc.*, 196 F.R.D.

26  419, 427 (M.D. Ala. 2000) ("disagree[ing] with the *Olson* court's total reliance on

27  the fact that a statute of limitations is procedural in nature and a statute of [repose] is

28

1    substantive in nature to determine the answer").  Importantly, the Ninth Circuit

2    rejected *Olson*'s core holding (768 F. Supp. at 285) that "[s]ubstantive time limits,

3    as opposed to procedural statutes of limitations, are binding on the federal

4    government."  *See Bresson v. C.I.R.*, 213 F.3d 1173, 1178 (9th Cir. 2000) (holding

5    that substantive time limits such as a state "extinguishment provision" cannot

6    "cause[] a valid, fully accrued right of action to lose its vitality through the passage

7    of time" when brought by the federal government).

8          ***Second***, the above authorities highlight that it is Defendants' position, not

9    FHFA's, that fails to honor the tenet that Congress is "presumed to be aware of past

10   judicial interpretations and practices."  Mem. 26.  As Judge Cote observed, courts

11   across the country, "well versed in the law of securities, have [] used the term

12   'statute of limitations' to invoke the three-year repose period," *UBS*, 2012 WL

13   1570856, at *4; *see, e.g.*, *In re WorldCom Sec. Litig.*, 496 F.3d 245, 250 (2d Cir.

14   2007) (describing "the Securities Act's one- and three-year statutes of *limitations*")

15   (emphasis added); *In re United Ins. Mgmt., Inc.*, 14 F.3d 1380, 1385 (9th Cir. 1994)

16   (discussing a Supreme Court holding "that equitable tolling considerations were

17   inapplicable to the one- and three-year *limitations* periods of § 13 of the Securities

18   Act of 1933") (emphasis added); *Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d

19   Cir. 1992) ("Section 13 of the '33 Act imposes a *special, two-tiered statute of*

20   *limitations* onto § 12(2) claims.") (emphasis added); *S.E.C. v. Seaboard Corp.*, 677

21   F.2d 1301, 1308 (9th Cir. 1982) (describing California statute barring actions

22   brought either one-year from discovery or four-years from the transaction as

23   "contain[ing] a statute of *limitations* similar to [§] 13 of the 1933 Act") (emphasis

24   added); *see generally Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1300 (4th Cir.

25   1993) (cited at Mem. 15) ("Limiting periods for bringing court actions are here

26   generally referred to as statutes of limitations, and *a statute of repose is a*

27

28

*subspecies*.") (emphasis added).[11]  Moreover, as Judge Posner recently pointed out, just two years ago the Supreme Court in *Merck & Co. v. Reynolds*, 130 S. Ct. 1784 (2010), used the term "statute of limitations" "as a generic label for statutes that impose deadlines for filing suit."  *McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 932 (7th Cir. 2011) (citing *Merck*, 130 S. Ct. at 1793, 1799).  And before that, in *Lampf*, a case Countrywide cites as "reaffirm[ing] this distinction" between statutes of repose and limitations (Mem. 27), the Supreme Court likewise held that "the 1- and 3-year structure" of the 1934 Exchange Act "provide[s] a more appropriate *statute of limitations*."  *Lampf*, 501 U.S. at 362 (emphasis added); *see also NCUA Kansas*, 2012 WL 3028803, at *16 (collecting additional authorities).

Thus, contrary to Countrywide's strained assertion that there are only "isolated cases over the years in which some courts 'confused the terms or used them interchangeably'" (Mem. 27), there is overwhelming authority for the proposition that the term "limitations" is reasonably understood and commonly used to encompass periods of repose.[12]  Congress used the term "limitations" in HERA

_____

[11]  *See also, e.g.*, *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1050 (N.D. Cal. 2008) (Ware, J.) (discussing *Lampf*'s construction of the Exchange Act's "one and *three year limitation*" period) (emphasis added); *Stoll v. Ardizzone*, 2007 WL 2982250, at *2 (S.D.N.Y. Oct. 9, 2007) (discussing "the 'one year/*three year*' statute of limitations" in Section 13) (emphasis added); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 522 (S.D.N.Y. 2005) ("the *three-year statute of limitations* under section 13 of the Securities Act") (emphasis added); *In re WorldCom, Inc. Sec. Litig.*, 2004 WL 1435356, at *3 (S.D.N.Y. June 28, 2004) (describing 15 U.S.C. § 77m as "the *three year statute of limitations* contained in the Securities Act") (emphasis added);  *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 198 (S.D.N.Y. 2003) ("the one-year/*three-year statute of limitations* set forth in 15 U.S.C. § 77m") (emphasis added).

[12]  Furthermore, to the extent Congress incorporated any "existing law" when it enacted HERA (Mem. 26), it would be the law in existence as of 1989, when Congress enacted FIRREA.  "HERA is emergency legislation" that was "[p]assed by the Senate during a special weekend session and signed by the President only
(footnote continued)

precisely as it has used it before and as Courts have used it consistently—to describe all time limits, including periods of repose, in which a plaintiff is authorized to bring suit.

*Third*, Countrywide argues that "had [Congress] intended the extender statute to apply to statutes of repose, it could have—and would have—done so expressly." Mem. 28 (citing Pub. L. No. 102-339 § 3, 106 Stat. 869 (1992)). But this ignores, as the Ninth Circuit has recognized, that Congress has *never*, in its more than two centuries of existence, used the term "statute of repose" in the United States Code. *McDonald*, 548 F.3d at 784 ("[A]n electronic search of the text of the United States Code also fails to reveal a single instance of the phrase 'statute of repose.'"). Defendants are thus left to rely on a single, uncodified law, in which Congress used the term "repose" in providing additional time for settlement negotiations relating to Native American land claims in South Carolina. Pub. L. No. 102-339, § 3. Even this provision, however, discusses a "repose" period under the heading "STATUTE OF LIMITATION," *id.*, again demonstrating that Congress uses that term to encompass both limitations and repose periods. Without any actual Congressional enactments to support its position, Countrywide instead relies on more than a dozen

_____

days later." *UBS*, 2012 WL 1570856, at *5. In the course of this speedy legislative process, Congress copied the text of FIRREA into HERA, as evidenced by the scriveners' errors that result from FIRREA's slightly different organizational structure. *Compare, e.g.*, HERA, 12 U.S.C. § 4617(b)(13)(A) (referring to a "tort claim described under clause (ii)," where there is no "clause (ii)" in that subsection of HERA), *with* FIRREA, 12 U.S.C. § 1821(d)(14)(C) (referring to a "tort claim described in clause (ii)," where clause (ii) states that "[a] tort claim referred to in clause (i) is a claim arising from fraud, [etc.]"). As Countrywide recognizes, "[i]n *McDonald* [548 F.3d at 781], the Ninth Circuit held that the meaning of the phrase 'statute of limitations' was ambiguous at the time CERCLA was passed in 1986." Mem. 26 n.33. There is no reason to believe that when Congress enacted FIRREA just three years later, the judicial understanding of the term "statute of limitations" has crystallized to exclude "statutes of repose."

1  *proposed* bills where legislators used the phrase "statute of repose," purportedly

2  indicating that "Congress" is "capable" of using that term.  Mem. 28.  But the issue

3  is not whether Congress is "capable" of using the term "repose" in proposed

4  legislation; rather, the issue is what Congress meant when it enacted HERA and set

5  "the applicable statute of limitations" for "any action" by FHFA, 12 U.S.C.

6  § 4617(b)(12)(A).  The answer to that question is clear, given that Congress

7  routinely uses the term "limitations" to set *all* applicable restrictions, whether

8  limitations or repose, on the time in which a plaintiff may bring suit.

9      Moreover, the entire premise behind Countrywide's argument—that "[i]f

10  Congress wished to apply the extender statute to periods of repose, it could have

11  done so clearly and easily," (Mem. 23; *see also* Mem. 28-29, 36)—is erroneous as a

12  matter of law.  The Supreme Court unanimously held that "the mere possibility of

13  clearer phrasing cannot defeat the most natural reading of a statute; if it could (with

14  all due respect to Congress), we would interpret a great many statutes differently

15  than we do."  *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 132 S. Ct. 1670,

16  1682 (2012).  Countrywide's attempt to avoid the plain language of HERA, by

17  insisting on a legislative phrase that Congress has never used and a mode of

18  statutory construction that the Supreme Court has expressly rejected, must therefore

19  fail.

20      ***Fourth***, Countrywide argues that because HERA "speaks of when a claim

21  'accrues,'" it somehow "confirms that Congress did not intend for [HERA] to reach

22  statutes of repose."  Mem. 23-24.  The Ninth Circuit rejected this argument in

23  *McDonald*, where the defendant also relied upon the contention "that the use of the

24  word 'accrues,'" a term "which typically applies to discovery of injury in statutes of

25  limitations cases, is evidence that Congress intended to exclude statutes of repose."

26  548 F.3d at 783.  The Ninth Circuit explained that the term "accrual" "says nothing

27  about whether Congress intended that [the statute] apply to statutes of repose."  *Id.*

28

1    The Seventh Circuit reached the same conclusion in *McCann* (a case upon which

2    Defendants rely for this very point (*see* Mem. 24)).  There, the court acknowledged

3    that a possible "argument for treating the statute as a statute of repose is that the

4    starting gates in statutes of limitations is usually expressed as the date on which

5    'such claim accrues' or 'the date on which the cause of action arose.'"  663 F.3d at

6    932 (internal citations omitted).  But it held that argument not dispositive,

7    explaining that "legislation is not noted for consistent terminology," and that other

8    "practical considerations" were therefore more useful in construing the statute at

9    issue there.  *Id.*

10         Most recently, in *NCUA Kansas*, the court rejected an identical argument

11   based on identical language as here, ruling that "[t]his argument does not outweigh

12   the other reasons to hold that the extender statute applies to the statute of repose

13   provisions in § 13 [of the Securities Act]."  2012 WL 3028803, at *17.

14   Countrywide's own authority makes this point crystal clear:  while Defendants cite

15   the Supreme Court's decision in *Midstate Horticultural Co. v. Pennsylvania*

16   *Railroad Co.*, 320 U.S. 356 (1943), as holding that a "statute of repose" cannot be

17   waived by the parties (Mem. 50 n.60), the ostensible "statute of repose" at issue

18   provided that "All complaints . . . shall be filed with the commission within two

19   years from the time *the cause of action accrues*, and not after," *Midstate*

20   *Horticultural*, 320 U.S. at 357 n.1 (emphasis added).  Congress's use of the term

21   "accrual" does not demonstrate that it intended prior repose periods to remain in

22   place when Congress enacted "the applicable statute of limitations with regard to

23   any action brought by the Agency as conservator."

24         There is no reason to adopt anything other than the same plain language

25   interpretation that this Court, the Ninth Circuit, and courts across the country have

26   previously given to the term "statute of limitations."  That term, as used by Congress

27

28

CASE NO. 12-CV-01059-MRP (MANx)
OPPOSITION TO COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

1   both in HERA and throughout the United States Code, encompasses *all* limitations

2   periods, including the statutes of repose at issue in this case.

3            2.      Interpreting HERA To Replace All Prior Time Restrictions Is

4                    Consistent With Congress's Purpose To Afford FHFA Time To

5                    Investigate And Assert Claims

6            It is also clear based on HERA's purpose and structure that Congress intended

7   HERA to set the claims period for any action by FHFA as conservator.  *See, e.g.*,

8   *Gen. Dynamics Land Sys., Inc. v. Cline,* 540 U.S. 581, 600 (2004) (observing that a

9   statute should be interpreted according to its "text, structure, purpose, and history");

10  *Albertson's, Inc. v. C.I.R.*, 42 F.3d 537, 545 (9th Cir. 1994) ("We may not adopt a

11  plain language interpretation of a statutory provision that directly undercuts the clear

12  purpose of the statute.").  "HERA is emergency legislation aimed at addressing

13  some of the most pressing problems of the housing crisis—chief among them the

14  questionable financial security of the GSEs."  *UBS*, 2012 WL 1570856, at *5.

15  "Indeed, given that in 2008 the GSEs financed about 40% of all American

16  mortgages and owed debt in excess of $5.3 trillion, their failure would have been

17  catastrophic for the American economy."  *Id.* at *30.  Consistent with its goal to

18  rescue the nation's housing crisis,

19            Congress gave FHFA the power to appoint itself

20            conservator of the GSEs and 'take such action as may

21            be—(i) necessary to put the [GSEs] in a sound and solvent

22            condition; and (ii) appropriate to carry on the business of

23            the [GSEs] and ***preserve and conserve [their] assets*** and

24            property,' 12 U.S.C. § 4617(b)(2)(D).  In addressing the

25            Agency's powers as conservator, ***Congress specifically***

26            ***referenced the 'collect[ion of] all obligations and money***

27            ***due to the [GSEs]*.'** *Id.* § 4617(b)(2)(B)(ii).

28

*Id.* at *5 (brackets in original; emphasis added).  As multiple courts have recognized, "[i]n order to facilitate these functions," HERA established a uniform statute of limitations "to give FHFA 'more time to decide whether and how to pursue any claims it inherited as the GSEs' newly-appointed conservator." *Id.* (brackets omitted) (quoting *In re Fed. Nat'l Mortg. Ass'n Sec., Deriv., ERISA Litig.*, 725 F. Supp. 2d 169, 177-78 (D.D.C. 2010), *rev'd on other grounds sub nom. Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012)).  That purpose is met only by interpreting HERA to replace all time periods, including periods of repose.

To conclude otherwise would prevent FHFA from exercising the authority Congress granted it in HERA.  As this case demonstrates, the HERA claims period, adopted to provide FHFA adequate time to investigate and institute claims for the GSEs, would cease to serve that function if defendants could invoke repose provisions to bar such actions.  Judge Cote correctly summarized the argument that Defendants re-advance here:  that "the statute's only effect with regard to the Securities Act was to relieve FHFA of the requirement that it file suit within one year of discovering the misrepresentations for which it seeks to recover" but that "the three-year post-offering deadline remains in place."  2012 WL 1570856, at *3.  She also aptly concluded that such an argument "cannot be squared with HERA's text or purpose."  *Id.*  Countrywide's skewed view is that Congress created a new limitations period while maintaining repose as an absolute bar to the very claims Congress empowered FHFA to investigate and assert.  To posit that Congress intentionally hamstrung the agency it created to rescue the nation's housing markets is precisely the "absurd or futile result[]," forbidden by basic rules of statutory construction.  *E.g.*, *Nixon v. Mo. Mun. League*, 541 U.S. 125, 138 (2004) (citing *United States v. Am. Trucking Ass'n, Inc.*, 310 U.S. 534, 543 (1940)).

Countrywide nonetheless argues that this Court should not interpret HERA in light of its purpose because to do so "would mean that Congress silently repealed

1    Section 13 with respect to claims brought by FHFA." Mem. 32. Countrywide's

2    argument, however, rests on a fatal misapplication of the "implied repeal" doctrine.

3    As Countrywide's own authority makes clear, "[a]n implied repeal will only be

4    found where provisions in two statutes are in 'irreconcilable conflict,' or where the

5    latter Act covers the whole subject of the earlier one and 'is clearly intended as a

6    substitute.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644,

7    663 (2007) (quoting *Branch v. Smith*, 538 U.S. 254, 273 (2003)) (cited in Mem. 32).

8         Neither situation applies here. HERA does not "cover the whole subject of"

9    Section 13, but rather sets a new period for one plaintiff, FHFA as conservator, to

10   commence lawsuits for claims that have legally passed from the GSEs to FHFA.

11   *UBS*, 2012 WL 1570856, at *5 n.8 (addressing identical "statutory repeal"

12   arguments and concluding that defendants "are wrong. Even on the construction

13   suggested by [FHFA], Section 13 continues to apply with full force to the vast

14   majority of litigants"). Section 13 remains operative for every other private

15   plaintiff. *See id.* Nor does HERA "irreconcilabl[y]" conflict with Section 13; rather

16   HERA presupposes the validity of Section 13 (and any other time restriction HERA

17   affects), by setting new periods provided those underlying periods are still open as

18   of the date of conservatorship, as here. For the statutes to "co-exist[]" in this

19   manner (Mem. 33) is not only faithful to Congress's purpose in enacting HERA but

20   does no harm to the Securities Act. It is, moreover, Congress's prerogative to take

21   such action. *See, e.g.*, *Treiber v. Katz*, 796 F. Supp. 1054, 1059 (E.D. Mich. 1992)

22   ("It is indisputable that, if supported by a rational legislative purpose, Congress can

23   lengthen or wholly abolish a statute of limitation for a cause of action." (collecting

24   authorities)); *cf. Lyon*, 252 F.3d at 1086 ("[r]epose is a choice that the legislature is

25   free to make").

26        Countrywide also argues that this Court should refrain from applying HERA

27   to "any action brought by the Agency as conservator," 12 U.S.C. § 4617(b)(12)(A),

28

1   and presume that Congress was "concerned with the defendant's peace" when it

2   enacted HERA.  Mem. 30 (quotations omitted).  This argument is nonsensical, so it

3   is unsurprising that Countrywide provides absolutely no evidence of Congress's

4   supposed interest in "provid[ing] potential defendants with finality and peace"

5   (Mem. 33) when it met in emergency session to "address[] some of the most

6   pressing problems of the housing crisis," *UBS*, 2012 WL 1570856, at *5.  Nor is this

7   purported purpose reconcilable with HERA's plain language, which expressly

8   authorizes FHFA, as conservator, to "collect all obligations and money due" to the

9   GSEs so as to "preserve and conserve the[ir] assets."  12 U.S.C. § 4617(b)(2)(B).

10       Countrywide's recycled argument also makes no sense on its own terms.

11   Countrywide contends that because Congress gave FHFA more time to bring claims

12   on behalf of the GSEs, that "purpose is identical to the purpose of other legal

13   doctrines that provide plaintiffs with relief from statutes of *limitations*, but not

14   statutes of *repose*."  Mem. 29.  But as Judge Cote ruled in rejecting nearly identical

15   arguments in *UBS*, "[r]eading HERA's reference to 'statute of limitations' in the

16   narrow fashion that defendants propose would undermine the congressional purpose

17   of a statute whose overriding objective was to maximize the ability of FHFA to 'put

18   the GSEs in a sound and solvent condition.'"  2012 WL 1570856, at *5 (brackets

19   omitted) (quoting 12 U.S.C. § 4617(b)(2)(D)).

20       In any event, Countrywide's creative categorization of certain policies as

21   associated only with statutes of limitations and others as associated only with

22   statutes of repose relies on a distinction created out of whole cloth:  as the Supreme

23   Court has repeatedly held, "repose" is "a basic objective . . . that underlies

24   limitations periods," whether classified as statutes of repose or statutes of

25   limitations.  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187 (1997); *see also Wilson v.*

26   *Garcia*, 471 U.S. 261, 271 (1985) ("[T]he application of any statute of limitations

27   would promote repose.").  The court in *NCUA Kansas* rejected the same argument

28

1   Countrywide makes here, noting that "[o]ther statutes of repose have been construed
2   as being subject to supposedly incompatible concepts of notice and equitable
3   tolling."  2012 WL 3028803, at *17 (collecting cases).  Countrywide's preferred
4   interpretation thus does not withstand scrutiny.  *Dolan*, 546 U.S. at 486; *Albertson's*,
5   42 F.3d at 545.

6        Finally, Countrywide conspicuously ignores that if there is any uncertainty as
7   to whether HERA's "statute of limitations" applies to all limitations periods, FHFA
8   is due "the benefit of the doubt."  *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 96
9   (2006).  This is because "[s]tatutes of limitation sought to be applied to bar rights of
10  the Government[ ] must receive a strict construction in favor of the Government."
11  *Badaracco v. Comm'r.*, 464 U.S. 386, 391 (1984) (quoting quoting *E.I. Dupont de*
12  *Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924)).  "A corollary of this rule is that
13  when the sovereign elects to subject itself to a statute of limitations, the sovereign is
14  given the benefit of the doubt if the scope of the statute is ambiguous."  *Burton*, 549
15  U.S. at 96; *see also FDIC v. Former Officers & Dirs. of Metro. Bank*, 884 F.2d
16  1304, 1309 (9th Cir. 1989) ("To the extent that a statute is ambiguous in assigning a
17  limitations period for a claim, we will interpret it in the light most favorable to the
18  government.").  As the court explained in *NCUA Kansas*, "[t]his maxim supports the
19  application of the extender statute to the repose period in § 13" of the Securities Act.
20  2012 WL 3028803, at *17.

21        C.   HERA Applies To Federal Law Claims

22             1.   By Its Plain Language, HERA Applies To Actions That Include
23                  Federal Law Claims

24        Countrywide next posits that HERA does not apply to claims arising under
25  federal law because "the statute speaks solely of 'State law' claims."  Mem. 35.  But
26  as Judge Cote ruled in rejecting this very argument, the provision of HERA
27  addressing the claims period, by its "plain language . . . states in unambiguous terms

28

that it shall apply to '*any action* brought by the Agency as conservator.'"  *UBS*,

2012 WL 1570856, at *6 (quoting 12 U.S.C. § 4617(b)(12)(A)).  Judge Cote's

ruling was correct under controlling principles of statutory construction:  the

Supreme Court has repeatedly held that "read naturally, the word 'any' has an

expansive meaning, that is 'one or some indiscriminately of whatever kind.'"

*United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting *Webster's Third New Int'l*

*Dictionary* 97 (1976)); *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219

(2008) (same); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 589 (1980) (similar and

describing the term "any" as "expansive language").  As Judge Rogers reasoned in

*NCUA Kansas* in rejecting a similar argument, "[i]n various cases, the [Supreme]

Court has followed an expansive construction even though the context or legislative

history of the statute was cited in favor of a narrower meaning."  2012 WL 3028803,

at *13-14 (discussing *Ali*, *Gonzales*, and *Harrison*); *see also NCUA Goldman*, slip

op. at 5 (cited in Mem. 18, 22) (tentatively rejecting the argument that "a *federal*

statute applying to a *federal* agency . . . *only* applies to *state* law claims").  Congress

therefore had no need to specify whether the HERA claims period applied

specifically to state or federal law claims, because it had already stated, in

expansive, unambiguous terms, that the HERA claims period applied to "whatever

kind" of action FHFA may bring, *see Gonzales*, 520 U.S. at 5.

Countrywide's argument also fails because it disregards half of the relevant

statutory language.  HERA sets the "applicable statute of limitations" for "any

action brought by [FHFA] as conservator" as "the longer of" "(I) the 3-year period

beginning on the date on which the claim accrues [defined to begin at the earliest

with the appointment of FHFA as conservator]; *or* (II) the period applicable under

State law."  12 U.S.C. § 4617(b)(12)(A) (emphasis added).  Thus, in an action by

FHFA asserting a federal claim, as here, the claims period begins under subclause

(I) with FHFA's appointment as conservator in September 2008, and continues for

at least three years from that appointment.  *Id.*  Defendants' contrary construction ignores that the reference to "state law" is not a limitation on the scope of the HERA claims period; as even Countrywide admits, "[t]he structure of the [HERA claims period] is disjunctive."  Mem. 38*; cf. Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) (rejecting a "strained construction [that] would have us ignore the disjunctive 'or'").  Here, Congress used the term "State law" in one subclause but not in the immediately preceding one; this Court must presume that Congress acted intentionally in doing so, and thus did not mean for the second subclause to somehow limit the first.  *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotation marks, brackets, and ellipsis omitted).

Countrywide next argues that the fact "that HERA's revival provision does not apply to federal law claims further supports the conclusion that the extender statute does not apply to federal law claims."  Mem. 37.  The opposite is true.  The fact that a separate provision of HERA, not relevant here, expressly applies only to "state causes of action," *see* 12 U.S.C. § 4617(b)(13) (entitled "Revival of expired state causes of action"), whereas the HERA provision actually at issue in this case (the HERA claims period) includes no such limiting language, only highlights that no such limitation applies.  *See Keene*, 508 U.S. at 208.  As discussed, the HERA claims period expressly applies to "any action," and Defendants cannot avoid that broad language by relying on limiting language that applies, by its own terms, to a separate statutory provision.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.     <u>Applying HERA To Federal Law Claims Does Not Lead To Absurd Results</u>

Countrywide next argues (Mem. 40) that applying HERA's plain language will lead to the perverse result of shortening limitations periods under a handful of federal statutes.  But as the court in *NCUA Kansas* explained in considering—and rejecting—an identical argument, "it should be remembered that the apparent role of the extender statute is to permit plaintiff, operating in the capacity as a conservator, a practical but fixed amount of time to bring an action.  If this result varies in some instances from the limitations provisions governing most parties, it does not seem like a 'perverse' or 'absurd' result."  2012 WL 3028803, at *15; *see also UBS*, 2012 WL 1570856, at *6 (rejecting identical "perversity" arguments because "the most natural reading of [the HERA claims provision] is that it affords FHFA three years from the date of conservatorship to bring suit on its Securities Act claims, irrespective of any other provision of law.").  In any event, this argument is, at best, hypothetical:  FHFA is not bringing antitrust, CERCLA, or RICO claims, but rather federal and state securities claims so as to carry out its federally-mandated duty to "take such action as may be—(i) necessary to put the [GSEs] in a sound and solvent condition," 12 U.S.C. § 4617(b)(2)(D).  Moreover, this hypothetical "shortening" scenario would only apply in the particular situation in which the GSEs accrued such hypothetical claims after September 6, 2007.  Should the GSEs come to possess such claims prior to that date, FHFA's time to bring those claims would be longer than would otherwise under federal law.[13]  The theoretically perverse results

---

[13]  Because FHFA was appointed the GSEs' conservator on September 6, 2008, that is "the date on which [the] claim accrues" for any causes of action that began to run prior to that date.  12 U.S.C. § 4617(b)(12)(B) (establishing that date as "the later of" FHFA's appointment as conservator or the date on which the cause of action accrued).  For those claims with a limitations period of four years—assuming they are non-contract claims, *see id.* § 4617(b)(12)(A)(i)(I)—the period is shortened
(footnote continued)

envisioned by Countrywide cannot overcome a construction of HERA that comports with its plain language and purpose, which was to provide at least three years for FHFA to bring claims available to the GSEs as of the commencement of the conservatorships.

Countrywide also suggests that applying HERA's plain language will rob FHFA of the "flexibility" that Congress created "to ensure that FHFA will not lose the benefit of a longer state law period if one exists." Mem. 38-39. But Countrywide fails to explain why, if Congress had such flexibility in mind when it charged FHFA with the duty to take any action necessary to put the GSEs in a sound and solvent condition, including to "collect *all* obligations and money due the" GSEs in order to "preserve and conserve the assets of" the GSEs, *id.* § 4617(b)(2)(B) (emphasis added), Congress *sub silentio* drafted a statute that prevented FHFA from collecting obligations due to the GSEs under federal law. Rather, the setting of a "*fixed* limitations period of three or six years to every federal law claim asserted by FHFA" (Mem. 39) is an intended feature, not an oversight: Congress's purpose is to "permit plaintiff, operating in the capacity as conservator, *a practical but fixed amount of time to bring an action*." *NCUA Kansas*, 2012 WL 3028803, at *15 (emphasis added); *see also UBS*, 2012 WL 1570856, at *5 ("[T]he purpose of [the HERA claims period] was unambiguously to give 'more time to decide whether and how to pursue any claims it inherited as the GSEs' newly-appointed conservator.") (brackets omitted) (quoting *In re Fed. Nat'l Mortg. Ass'n*, 725 F. Supp. 2d at 177-78).

One might think that Countrywide, so concerned with "provid[ing] potential defendants with finality and peace after a fixed period of time" (Mem. 33), would

_____

only if the claims accrued after September 6, 2007, because HERA resets the limitations period to three years before the additional year runs.

welcome the fact that Congress set a date certain for a defendant to know when a
claim against it had expired, namely three or six years from the date on which FHFA
was appointed conservator.  Defendants' attempt to eviscerate HERA while paying
lip service to the statute's "flexibility" rings hollow, and must be rejected.

### 3.   Applying HERA To Federal Law Claims Is Consistent With Congress's Purpose In Enacting HERA

Finally, Countrywide argues that applying HERA to federal law "would
require ignoring the important policy choices Congress has made in enacting other
federal statutes of limitations," particularly where it has specified "relatively short
periods."  Mem. 40-41.  But nothing in HERA suggests that Congress "ignored" its
prior policy choices; instead, HERA's plain language demonstrates that Congress
created a new federal agency, 12 U.S.C. § 4511(a), endowed it with a range of
powers, *e.g.*, *id.* § 4617(b)(2), and created a new period for that single plaintiff to
carry out its statutory mandate, *id.* § 4617(b)(12).  Congress's election in HERA to
set a single statute of limitations for FHFA merely expresses Congress's prerogative
to apply different policies to different plaintiffs under different laws.

Nor is Countrywide correct that "Congress would have said so more clearly"
had it desired to set "a blanket three-year or six-year limitations period" for FHFA.
Mem. 41.  Beyond the fact that the Supreme Court rejected this same "could have
been clearer" mode of analysis, *Caraco Pharm. Labs.*, 132 S. Ct. at 1682, Congress
here was clear:  it set "***the applicable*** statute of limitations with regard to ***any action***
brought by the Agency as conservator," 12 U.S.C. § 4617(b)(12)(A) (emphases
added).  Indeed, the Fifth Circuit has interpreted the identical language in other laws
as "reflect[ing] a congressional intent . . . to lengthen the limitations periods
applicable to the FDIC."  *FDIC v. Belli*, 981 F.2d 838, 841 (5th Cir. 1993) (citing 12
U.S.C. § 1821(d)(14)(B)).  HERA's language, as show above, comports fully with
the broad meaning of "limitations" that courts have employed in numerous cases at

1    every level of the federal system.  There is thus no disparity that undermines a

2    reading of "any action" to encompass federal actions.

3            D.      HERA Applies To Statutory Claims

4            Countrywide further maintains that because HERA expressly limits its

5    application to "tort" or "contract" claims, the statute cannot apply to FHFA's

6    statutory claims here.  Mem. 41-43.  But the plain language is not so limited,

7    because HERA applies "In general" to "any action brought by the Agency as

8    conservator."  12 U.S.C. § 4617(b)(12)(A).  Every court to have considered

9    similarly structured provisions has ruled that "[t]he fact that a . . . claim cannot

10   easily be defined as a contract or a tort claim does not make the federal statute of

11   limitations inapplicable. . . .  [F]or statute of limitations purposes, [such a] claim is

12   necessarily considered to sound either in contract or tort."  *FDIC v. Zibolis*, 856 F.

13   Supp. 57, 61 (D.N.H. 1994) (applying FIRREA's limitations period, 12 U.S.C.

14   § 1821(d)(14), to claim under state Uniform Fraudulent Transfer Act because

15   FIRREA "applies 'to any action brought by the FDIC as receiver'"); *NCUA Kansas*,

16   2012 WL 3028803, at *14 ("[T]he introductory language of the extender statute [for

17   the NCUA, 12 U.S.C. § 1787(b)(14)] does not limit its scope to certain claims,

18   rather it states that the statute relates to the limitations for 'actions' brought by

19   plaintiff.  Nor does the statute ever refer to 'state tort claims' or 'state contract

20   claims.'"); *UBS*, 2012 WL 1570856, at *6 & n.9 ("This argument fails in the face of

21   the [HERA] limitations provision's plain language, which states in unambiguous

22   terms that it shall apply to '*any action* brought by the Agency as conservator'"

23   (quoting 12 U.S.C. § 4617(b)(12)(A)).

24           Moreover, other courts have applied FIRREA's identical statutory language

25   to statutory claims and common law claims that are not traditionally conceived as

26   "tort" or "contract" claims.  *See FDIC v. Wabick*, 335 F.3d 620 (7th Cir. 2003)

27   (treating unjust enrichment claim as "contract" claim for purposes of FIRREA's

28

1   limitations period); *Smith v. FDIC*, 61 F.3d 1552 (11th Cir. 1995) (mortgage

2   foreclosure claim under Florida common law constituted a "contract" claim for

3   purposes of FIRREA's limitations period); *Joslin v. Grossman*, 107 F. Supp. 2d 150,

4   156-57 (D. Conn. 2000) (treating fraudulent transfer claim under Conn. Gen. Stat.

5   § 52-552a *et seq.* as a "tort" claim for purposes of FIRREA's limitations period);

6   *FDIC v. Hinch*, 879 F. Supp. 1099, 1108-09 (N.D. Okla. 1995) (treating fraudulent

7   transfer claim brought under federal statute as a "contract" claim for purposes of

8   FIRREA's limitations period); *RTC v. Gardner*, 798 F. Supp. 790 (D.D.C. 1992)

9   (treating unjust enrichment claim as a "tort" claim for purposes of FIRREA's

10   limitations period); *cf. Holdsworth v. Strong*, 545 F.2d 687, 694 n.3 (10th Cir. 1976)

11   ("The 10b-5 wrong is in nature and character a statutory tort in that it inflicts an

12   injury of the same nature as a common law tort.").  These precedents demonstrate

13   that courts have routinely construed "any action" to encompass claims other than

14   common law contract or tort claims.

15        As *NCUA Kansas* explained, before Congress enacted HERA, "the statute of

16   limitations governing claims by federal . . . agencies like plaintiff was 28 U.S.C.

17   § 2415.  Section 2415 is somewhat similar to the [HERA claims period] in that it

18   refers expressly to contract and tort actions, but does not mention actions pursuant to

19   statute.  Nevertheless, § 2415 has been applied to statutory claims."  2012 WL

20   3028803, at *14 (collecting cases); *see also United States v. Neidorf*, 522 F.2d 916,

21   919 (9th Cir. 1975) ("[W]henever the United States sues for damages, the substance

22   of the claims must be characterized for purposes of section 2415 as sounding in

23   either tort, contract or quasi-contract.").  This Court should follow the reasoning of

24   every court to have considered this issue, and conclude that Congress meant what it

25   said when it set the statute of limitations "in general" for "any action brought by the

26   Agency as conservator."  12 U.S.C. § 4617(b)(12)(A).

27

28

E.     *FHFA v. UBS* Is Persuasive And This Court Should Follow Its Well-
       Reasoned Analysis

Judge Cote issued a comprehensive opinion that considered and rejected
nearly every argument that Countrywide offers here.  But Countrywide barely
acknowledges the *UBS* decision until the closing pages of its brief (Mem. 43-46),
and even then leads with misleading arguments.  Judge Cote's determination to
certify the issue of the interpretation of HERA for interlocutory appeal was ***not***
based in the conclusion "that there are 'substantial grounds for difference of
opinion' regarding the interpretation of HERA."  Mem. 44 (citing *UBS*, 2012 WL
1570856, at *25-31).  Rather, Judge Cote's decision was "driven primarily" by "the
compelling arguments for certification" on the two prongs of the Section 1292(b)
analysis that examine whether the decision involves a "controlling question of law,"
the resolution of which would "materially advance the ultimate termination of the
litigation."  *UBS*, 2012 WL 1570856, at *27-31 (quoting 28 U.S.C. § 1292(b)).  By
contrast, in considering whether there are "substantial grounds for a difference of
opinion," the court reaffirmed that it considered defendant's statutory interpretation
arguments to be "untenable" and unconvincing, but nonetheless deemed certification
to be appropriate because "there may be grounds, ***however weak***, for a difference of
opinion on this question."  *Id.* at *30 (emphasis added).[14]

Countrywide likewise mischaracterizes the *UBS* decision to imply that Judge
Cote improperly disregarded the distinction between statutes of limitations and
repose as "semantic."  Mem. 44.  Judge Cote addressed this same argument in her
certification order and found it "disingenuous," because she had used the term

_____

[14]  As mentioned, UBS's petition for permission to appeal Judge Cote's May 4
order to the Second Circuit remains pending.

1 "'semantic' in its literal sense, to refer to a distinction 'relating to meaning in

2 language.'" 2012 WL 1570856 at *29.  The court continued:

3              At no point was it suggested that the terms are

4              synonymous.  To the contrary, the Court was careful to

5              observe the conceptual distinctions between them in

6              arriving at its conclusion that HERA's reference to

7              "statutes of limitations" embraces both the narrow sense of

8              that term intended by the defendants as well as what

9              defendants refer to as "statutes of repose."

10 *Id.* Countrywide mistakes Judge Cote's rejection for disregard.  Judge Cote

11 determined the statutory interpretation question against UBS, based on the

12 conclusions that "[i]n ordinary usage, the term 'statute of limitations' refers

13 generally to 'a statute assigning a certain time after which rights cannot be enforced

14 by legal action or offenses cannot be punished,'" *id.* (quoting *Merriam-Webster's*

15 *Collegiate Dictionary* 1220 (2003)), and that her interpretation "best comports with

16 the 'everyday' meaning of the statutory text and 'the objectives of the statute

17 overall,'" *id.* (citing 2012 WL 1570856, at *5).

18        In its remaining challenges to the *UBS* decision (Mem. 45-46), Countrywide

19 follows the same misguided methodology of restating its statutory construction

20 arguments and wrongly asserting or implying that the district court in *UBS*

21 overlooked them.  As stated above, the distinction between statutes of repose and

22 statutes of limitations is not in dispute.  The question is what Congress meant when

23 it set "the applicable statute of limitations with regard to any action brought by the

24 Agency as conservator."  12 U.S.C. § 4617(b)(12).  In contending that *UBS* was

25 wrongly decided, Countrywide merely relies on the same "plain language"

26 arguments that Judge Cote correctly found to be inconsistent with an unbroken

27 chain, over two centuries long, of Congress creating or extending "statutes of

28

repose" using the term "statute of limitations" or "limitations," such as with Section 13 in 1933, CERCLA in 1986, GARA in 1994, and Sarbanes-Oxley in 2002. Moreover, in reaching this conclusion, Judge Cote considered and squarely rejected the arguments that HERA cannot be interpreted to apply to both federal and state claims, 2012 WL 1570856, at *6, that to do so would create "anomalies" or "absurdities," *id.*, and that HERA can only apply to tort and contract claims, *id.* at *6 & n.9. Countrywide's assertions that the *UBS* decision is faulty, neglectful, and can provide "little guidance" (Mem. 46) are predictable but meritless.

F.      None Of FHFA's Section 11 Claims Is Time-Barred Because All Of The Securitizations Were Bona Fide Offered To The Public On Or After September 6, 2005

Countrywide next argues (Mem. 46) that FHFA's Section 11 claims relating to 24 of the 86 Securitizations are untimely under the Securities Act three year repose period, even assuming HERA applies, because they were "bona fide offered" to the public before September 6, 2005, *i.e.*, more than three years before FHFA was appointed as conservator. In fact, FHFA's complaint makes clear that all of the Securitizations were "bona fide offered" to the public on or after September 6, 2005, which this Court must take as true for purposes of this motion. *See* Am. Compl. ¶ 53 tbl. 4 (earliest offering date on September 6, 2005).

Countrywide's argument rests on a misreading of the relevant statutes and regulations. Judge Cote also addressed this same issue in *FHFA v. UBS*, 2012 WL 2400263, at *4 (S.D.N.Y. June 26, 2012). Relying on this Court's decision in *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *6 (C.D. Cal. Apr. 6, 2009), the Court in *UBS* correctly concluded that the date on which a Securitization is offered turns on whether a later offering "fundamental[ly] change[s]" the shelf registration statement, *FHFA v. UBS*, 2012 WL 2400263, at *4. As in *UBS*, the shelf registration statements here failed to contain "[t]he information that was

1    material to investors in deciding whether to purchase the securities at issue"; rather,

2    that information "was only provided at the time that each securitization was

3    marketed to the public—in the form of lengthy prospectus supplements that

4    purported to convey in detail the soundness of the underlying assets." *FHFA v.*

5    *UBS*, 2012 WL 2400263, at \*5.  The date of the bona fide offering is thus the date

6    the prospectus supplement was issued, which in the case of all Securitizations was

7    after September 6, 2005.  *See, e.g.*, 17 C.F.R. § 229.512(a) (post-effective

8    amendments to shelf registration statements constitute a new bona fide offering);

9    *Finkel v. Stratton Corp.*, 962 F.2d 169, 174 (2d Cir. 1992) (post-registration

10   disclosures must be the trigger for the three-year period "since purchasers who

11   acquired securities in a shelf offering more than three years after the initial

12   registration would find their § 11 claims barred by the time limits of § 13, even if

13   they bought the securities in reliance on a fraudulent, post-effective amendment to

14   the registration.").

15        For example, the CWL 2005-9 Securitization was issued pursuant to a shelf

16   registration statement under SEC File Number 333-125164, which was first issued

17   on May 3, 2005, and amended on June 10, 2005.  Am. Compl. tbl. 3.  That shelf

18   registration statement, however, contains blanks for the name of the fund, the

19   classes of certificates, the ratings of all of the certificates, the cut-off date, the

20   number of mortgage loans in the securitization and for each tranche, the aggregate

21   outstanding principal balances, FICO credit scores, LTV ratios, the documentation

22   program for mortgage loans, occupancy types, the type of mortgage properties, etc.

23   *See* FHFA RJN Ex. B (SEC File No. 333-125164), at S-3 to S-9, S-20 to S-29.  It

24   was not until the CWL 2005-9 Prospectus Supplement was issued on September 27,

25   2005—within the relevant time period—that any of this information was made

26   available to investors.  *See* FHFA RJN Ex. C (CWL 2005-9 Prospectus

27   Supplement).  Each of the other registration statements cited by Countrywide—SEC

28

CASE NO. 12-CV-01059-MRP (MANx)
OPPOSITION TO COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

File Nos. 333-100418, 333-125902, and 333-125963, *see* Am. Compl. ¶ 51 tbl. 3—likewise offers only blanks for the same key pieces of information, blanks that were only filled in when the relevant prospectus supplements were filed after September 6, 2005, *see* Am. Compl. ¶ 53 tbl. 4.

None of FHFA's claims is time barred because there was no bona fide offer of the Certificates before September 6, 2005.

## II. EVEN IF HERA DOES NOT APPLY, NEARLY ALL OF FHFA'S CLAIMS ARE STILL TIMELY

Even if this Court were to hold that HERA does not apply to FHFA's claims, nearly all of them would survive under various well-established doctrines.

### A. The *Summerlin* Doctrine Preserves All of FHFA's State Law Claims

All of FHFA's Blue Sky law claims would be timely, even if this Court found HERA not to apply to FHFA's claims, because FHFA is not bound by state statutes of limitations or repose.  In *Summerlin*, 310 U.S. at 416, the Supreme Court held that "[i]t is well settled that the United States is not bound by state statutes of limitation."  Multiple courts, including the Ninth Circuit, have held that the *Summerlin* rule applies to state statutes of repose.  *See, e.g.*, *Bresson*, 213 F.3d at 1178 (declining to enforce a state "claim-extinguishment provision" that would cut off the Government's right to sue over a fraudulent transfer); *United States v. Evans*, 340 Fed. App'x 990, 993 (5th Cir. Aug. 18, 2009) (per curiam) ("Because the fundamental question addressed by *Summerlin* is whether a claim brought by the United States can be time-barred under state law, the effect of a statute of repose—which bars a claim that is untimely—is equivalent to that of a statute of limitations and thus is treated the same under *Summerlin*.")  Even assuming *arguendo* that the time restrictions in the D.C. and Virginia Securities Acts are repose periods, *Summerlin* and its progeny therefore hold that these state time bars do not apply to FHFA, an "agency of the Federal Government," 12 U.S.C. § 4511(a), and FHFA's

1    claims under those provisions are therefore timely regardless of the applicability of

2    HERA in this action.

3              The rule of *Summerlin* applies in the exact scenario here—where a

4    government agency is acting for a public purpose pursuant to a federal statute

5    authorizing it to assert claims previously held by a private entity. *See United States*

6    *v. California*, 507 U.S. 746, 756-58 (1993) (holding that government is subject to

7    state limitations period where asserting rights obtained from a private party through

8    equitable subrogation, and distinguishing *Summerlin* on basis that the government

9    there asserted rights assigned to it from a private party pursuant to federal statute);

10   *see also United States v. Global Mortg. Funding, Inc.*, 2008 WL 5264986, at *3

11   (C.D. Cal. May 15, 2008) (applying *Summerlin* where the government was acting

12   "to protect consumers and the rights of the public"); *United States v. City & Cnty. of*

13   *San Francisco*, 446 F. Supp. 2d 1140, 1146 (E.D. Cal. 2006) (applying *Summerlin*

14   where the United States was acting "as the caretaker of public lands in the National

15   Forest and Park systems"); *S.E.C. v. Willis*, 777 F. Supp. 1165, 1175 (S.D.N.Y.

16   1991) (citing authority for proposition that *Summerlin* applies where "the

17   government agency is acting in the public interest"). The claims here fit squarely

18   within that authority. HERA authorizes FHFA to bring "any action" available to the

19   GSEs, for the public purpose of restoring the health of those entities for the benefit

20   of the U.S. taxpayers. *See* 12 U.S.C. §§ 4501(1), (2), 4617(b)(2)(B), (b)(2)(D), &

21   (b)(2)(J)(ii).

22             Because FHFA automatically succeeded to the GSEs' state claims under

23   HERA, and did so for a public purpose, state statutes of limitation and repose cannot

24   bar FHFA's Blue Sky claims under *Summerlin. See also United States v. Peoples*

25   *Household Furnishings, Inc.*, 75 F.3d 252, 255-56 (6th Cir. 1996) ("Here, as in

26   *Summerlin*, it was pursuant to a federal statute that the government became the

27   assignee of the note on which it brought suit. The statute in question was designed

28

1  to enhance the security and economic well-being of the nation . . . .").

2      B.      The *American Pipe* Doctrine or Tolling Agreements Preserve Many of

3              FHFA's Claims

4      FHFA's claims under Sections 11, 12, and 15 of the Securities Act separately

5  would be timely, even absent HERA, because of the tolling doctrine set forth in

6  *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).  *See* Am. Compl.

7  ¶¶ 264-273, 412, 433, 449.  Under *American Pipe*, FHFA's claims were tolled

8  during the pendency of three class actions in which FHFA was a member of the

9  putative class:  (i) *Luther v. Countrywide Home Loans Servicing LP*, No. BC380698

10  (Cal. Super. Ct. 2007); (ii) *Washington State Plumbing & Pipefitting Pension Trust

11  v. Countrywide Financial Corp.*, No. BC392571 (Cal. Super. Ct. 2008); and (iii)

12  *Maine State Retirement System v. Countrywide Financial Corp.*, No. 10 Civ. 0302

13  (C.D. Cal. 2010).  Am. Compl. ¶¶ 264-273, 412, 433, 449.

14      Under the majority view of *American Pipe* tolling,[15] the statute of limitations

15  is tolled for all putative class members until the denial of class certification,

16  regardless if the named plaintiff ultimately has standing to assert claims on behalf of

17  those members.  *See Genesee County Emps. Ret. Sys. v. Thornburg Mortg. Secs.

18  Trust*, 825 F. Supp. 2d 1082, 1161-62 (D.N.M. 2011) ("The majority of courts who

19  have addressed the issue have concluded that *American Pipe & Construction Co. v.

20  Utah* tolling apples to situations where the district court ultimately determines that

21  the plaintiff lacks standing.").  Any other approach that ties the availability of tolling

22  to a named plaintiff's standing would undermine the very purpose of *American*

23

---

24      [15]  FHFA is mindful of this Court's prior decisions holding that *American Pipe*

25  tolling applies only when the named plaintiffs in the prior class action purchased

26  from *both* the same securitization *and* the same tranche as the class member

27  asserting tolling.  *See, e.g., Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp.

   2d 1164, 1178-79 (C.D. Cal. 2011).

28

1   *Pipe*; class members, uncertain of a court's standing analysis, would file "'a

2   needless multiplicity of actions—precisely the situation that Federal Rule of Civil

3   Procedure 23 and the tolling rule of *American Pipe* were designed to avoid.'"

4   *Genesee*, 825 F. Supp. 2d at 1161-62 (quoting *Crown, Cork & Seal Co. v. Parker*,

5   462 U.S. 345, 351 (1983)); *see also In re Morgan Stanley Mortg. Pass-Through*

6   *Certificates Litig.*, 810 F. Supp. 2d 650, 669-70 (S.D.N.Y. 2011).  This is

7   particularly true in mortgage-backed securities cases, where courts routinely

8   disagree about what constitutes standing.  *See Genesee*, 825 F. Supp. 2d at 1163-64

9   (refusing to consider a named plaintiff's standing for *American Pipe* tolling because

10   standing "is a fact-intensive inquiry, particularly in the area of MBS, in which

11   district courts have reached different results based on subtle distinctions").[16]

12        FHFA, as a purchaser in 86 securitizations included in the *Luther* and

13   *Washington State* class actions (which eventually became the *Maine State* class

14   action), is entitled to tolling beginning when those two class actions were filed.

15   Because *Luther* was filed in November 2007 and *Washington State* was filed in June

16   2008, FHFA's claims under the Securities Act are timely even without HERA.

17        Moreover, several of FHFA's claims are timely for the independent reason

18   that Fannie Mae and Countrywide entered into a tolling agreement that extends the

19

20        [16]  In *In re Countrywide Financial Corp. Mortgage-Backed Securities Litigation*,
21   No. 11-02265, 2012 WL 1574285 (Mar. 9, 2012), this Court acknowledged its
     disagreement with *Genesee* and *Morgan Stanley*, but distinguished the two cases
22   based on the facts of *Luther*—in the Court's view, no potential plaintiff could have
     reasonably relied on Luther to assert its claims because Luther was not required to
23   identify the securities he had purchased in his state court complaint.  *Id.* at *3-*4.
     FHFA disagrees that reliance is relevant.  *See American Pipe*, 414 U.S. at 550 (no
24   reliance required for *American Pipe* tolling).  In any event, Luther named the
25   specific securitization trusts as defendants in his complaint, and FHFA reasonably
     relied on Luther's alleged standing to assert claims based on securities issued by
26   those trusts.  Am. Compl. ¶ 272.

27

28

1   time for filing suit, for the period beginning July 13, 2009, for the specified

2   Securitizations.  *See* Defs.' RJN Ex. 6.  Countrywide seeks to undo this agreement,

3   which it voluntarily entered into, on the grounds that "the one-year statutes of

4   limitations of both the 1933 Act and the District of Columbia Securities Act had

5   expired before this tolling agreement became effective."  Mem. 49.  This argument,

6   however, flies in the face of the proposition never disputed by Countrywide that, at

7   the very least, the HERA claims period applies to extend statutes of limitations.

8   Mem. 18.  Even if HERA did not encompass statutes of repose, which it does for the

9   many reasons discussed above, it still extended the relevant statutes of limitations as

10  of September 6, 2008.  Thus, the statutes of limitations under the D.C. and federal

11  Securities Acts had not expired as of July 13, 2009 (and would not expire until

12  September 6, 2011), making the Fannie Mae tolling agreements still timely.  *See*,

13  *e.g.*, *In re Enron Corp. Sec., Deriv., and "ERISA" Litig.*, 2005 WL 3704688, at *7

14  n.42 (S.D. Tex. Dec. 5, 2005) (applying a tolling agreement signed by the parties to

15  the parallel one/three-year limitations period established by the Supreme Court for

16  10b-5 claims, extending the three-year repose period by over a year).

17                                  **CONCLUSION**

18          For the reasons set forth above, the Court should deny Defendants' Motion to

19  Dismiss the Amended Complaint.

20

21

22

23

24

25

26

27

28

1  DATED:  August 13, 2012          QUINN EMANUEL URQUHART &
2                                                  SULLIVAN, LLP

3

4                                             By:        /s/ Molly Stephens
5                                                  Richard A. Schirtzer
6                                                  Molly Stephens
                                                  865 South Figueroa Street, 10th Floor
7                                                  Los Angeles, California  90017

8                                                  Christine H. Chung
9                                                  51 Madison Avenue
                                                  New York, New York 10010
10

11                                                *Attorneys for Plaintiff Federal Housing
                                                  Finance Agency, as Conservator for
12                                                Fannie Mae and Freddie Mac*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28