1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***O***

LINKS: 173, 175, 176, 177, 178, 179, 180

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORPORATION MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 2:11-ML-02265-MRP (MANx) |
| FEDERAL HOUSING FINANCE AGENCY, as conservator for THE FEDERAL NATIONAL MORTGAGE ASSOCIATION and THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>Plaintiff,<br>v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION, et al.,<br><br>Defendants. | Case No. 2:12-CV-1059 MRP (MANx)<br>*CORRECTED*<br>**Order Re Motions to Dismiss the First Amended Complaint** |

## I.     *Background*

The Federal National Mortgage Association ("Fannie Mae") and the Federal
Home Loan Mortgage Corporation ("Freddie Mac") are government-sponsored
enterprises ("GSEs").  The GSEs are private corporations chartered by Congress to
provide stability to the U.S. mortgage market, to respond appropriately to the
private capital markets and to provide assistance to the secondary market for
residential markets.  12 U.S.C. § 1716; 12 U.S.C. § 1451 note.  The GSEs were a
dominant force in the home mortgage market, together holding trillions of dollars
in mortgage debt and mortgage-backed securities as of 2006.  In the years before
the housing crisis, Fannie Mae sought "bigger market share, profits, and bonuses,
which led it to ramp up its exposure to risky loans and securities." FINANCIAL
CRISIS INQUIRY REPORT xix (2011).[1]  Housing prices began to fall in 2007,
which precipitated "substantial losses" in the value of the mortgages and mortgage-
backed securities held by the GSEs.  First Am. Compl. ("FAC") ¶ 11.  In light of
these losses, Congress passed the Housing and Economic Recovery Act of 2008 on
July 30, 2008.  HERA created the Plaintiff Federal Housing Finance Agency
("FHFA,") and empowered the Director of the FHFA to place both GSEs into
conservatorship and appoint the Agency as conservator.  12 U.S.C. § 4617(a)(1).
The Director did so on September 6, 2008.  FAC ¶ 13.  As conservator, FHFA
succeeded to all legal rights of Fannie Mae and Freddie Mac.  12 U.S.C. §
4617(b)(2).

On September 2, 2011, FHFA sued the defendants and other issuers of
mortgage-backed securities in New York state court.  Defendants removed the case
to federal court on September 30, 2011.  The portion of the case involving these

---

[1]     The Defendants have submitted excerpts of the Financial Crisis Inquiry Report, and the
Court takes judicial notice of those excerpts as well as the entire report under Rule 201 of the
Federal Rules of Evidence.  *See F.D.I.C. as Receiver for Strategic Capital Bank v. Countrywide
Fin. Corp.*, 2012 WL 5900973, at *7 n.17 (Nov. 21, 2012).

defendants was transferred to this Court as part of the Countrywide Multidistrict Litigation proceedings in February 2012. After the Court rejected FHFA's motion to remand the case to state court, FHFA filed an Amended Complaint. Defendants moved to dismiss the Amended Complaint on timeliness and legislative jurisdiction grounds. The Court rejected that motion as to most of the claims on October 18, 2012. *Fed. Hous. Fin. Agency v. Countrywide Fin. Corp.*, 2012 WL 5275327 (C.D. Cal. Oct. 18, 2012). The defendants now move to dismiss the First Amended Complaint on the grounds that it fails to state a claim upon which relief can be granted.

In the FAC, FHFA asserts that the GSEs purchased approximately $26.6 billion in residential mortgage-backed securities ("RMBS") between August 30, 2005 and January 23, 2008, that were originated, sponsored or deposited by Countrywide Financial Corporation ("CFC,") Countrywide Home Loans, Inc. ("CHL,") Countrywide Capital Markets, LLC ("CCM,") Countrywide Securities Corporation ("CSC,") CWALT, Inc. ("CWALT,") CWABS, Inc. ("CWABS") and CWMBS, Inc. ("CWMBS") (the last three are the "Depositor Defendants," and collectively all seven are "Countrywide" or the "Countrywide Defendants"). Banc of America Securities LLC, Citigroup Global Markets, Inc., Deutsche Bank Securities, RBS Securities, Inc., UBS Securities, LLC (collectively, with Countrywide Securities Corporation, the "Underwriter Defendants") underwrote the securities.

The RMBS were created through a process called "securitization." Securitization refers to the creation of pools of residential mortgage loans, each of which produces cash-flows from the payment on the loans. The rights to the cash-flows of these pools are sold to investors as "certificates." Here, CHL originated or acquired thousands of mortgage loans. It sold the loans to the Depositor Defendants, which then transferred the loans to trusts pursuant to a contract called the "Pooling and Servicing Agreement." The trusts issued separate securities in

the form of certificates for purchase by investors. A certificate entitled the holder to a portion of the cash-flow from the pool of underlying mortgages. The certificates were sold in "tranches," i.e., slices of the loan pool with different priorities of payment, interest rates and credit protection. Upon issuance, the credit rating agencies credit ratings to each tranche. If they wished, investors could select riskier certificates in "junior" tranches with higher interest payments but lower credit ratings, instead of the more "senior" tranches with lower interest payments and higher credit ratings.

The legal mechanism by which the securities issued began with the Depositor Defendants, who filed "shelf" registration statements with the SEC, that entitled them to issue certificates at a later date. The certificate would then issue after the "prospectus," which explains the general structure of the investment, and a "prospectus supplement," which includes the detailed descriptions of the mortgage pools underlying the certificate, were filed with SEC. Investors could learn detailed information about the characteristics of their certificates through reading all of the documents filed with the SEC, which were the shelf registration statements, prospectuses and prospectus supplements (collectively, the "Offering Documents").

The FAC alleges that the Offering Documents included four types of false statements, and FHFA brings causes of action based on federal and state securities and common law for the injuries it allegedly suffered from those misstatements.

## II.   *Legal Standards*

The Amended Complaint includes thirteen causes of action. FHFA sues the Underwriter Defendants, CWALT, Inc., CWABS, Inc. and the "Individual Defendants" (N. Joshua Adler, Ranjit Kripalani, Stanford Kurland, Jennifer S. Sandefur, Eric Sieracki and David A. Spector) for violation of Section 11 of the Securities Act of 1933. 15 U.S.C. § 77k. The elements of a Section 11 claim are that a registration statement contained an omission or misrepresentation, and that

1   that omission or misrepresentation was material. *Kaplan v. Rose*, 49 F.3d 1363,

2   1371 (9th Cir. 1994).  Unlike common law fraud or securities fraud statutes, the

3   plaintiff need not show that the defendant knew the information was false.  *Id.*

4   FHFA sues the Underwriter and Depositor Defendants for violations of Section

5   12(a)(2) of the Securities Act.  15 U.S.C. § 77l(a)(2).  Liability extends to

6   defendants that offered or sold a security, using interstate commerce, by means of a

7   prospectus or oral communication that contained an untrue statement of material

8   fact or omits to state a material fact necessary to make the statement not

9   misleading.  *Miller v. Thane Int'l Inc.*, 519 F.3d 879, 885 (9th Cir. 2007).  *Scienter*

10   is not an element of Section 12(a)(2).  *Id.* at 886.  FHFA alleges that CFC, CHL,

11   CCM and the Individual Defendants (collectively, the "Control Person

12   Defendants,") controlled one or both of CSC and the Depositor Defendants in

13   violation of Section 15 of the Securities Act.  15 U.S.C. § 77o(a).  Section 15

14   requires that plaintiffs show that a primary violation of Section 11 and 12(a)(2)

15   occurred, and that the defendant controlled the primary violator.  *Id.*

16      FHFA sues CSC, Citigroup Global Markets, Inc., Deutsche Bank Securities

17   and RBS Securities, Inc., each of whom underwrote securities sold to Freddie Mac,

18   for violations of Virginia state "blue sky" law Section 13.1-522(A)(ii).  "Any

19   person who . . . sells a security by means of an untrue statement of a material fact .

20   . . shall be liable to the person purchasing such security from him."  VA Code Ann.

21   § 13.1-522(A)(ii).  The statute applies only to parties who pass title to the plaintiff,

22   and is "otherwise identical"[2] to Section 12(a)(2).  *Fed. Hous. Fin. Agency v.*

23   *Barclays Bank PLC*, No. 11 Civ. 6190(DLC), 2012 WL 5844189, at *3 (S.D.N.Y.

24   Nov. 19, 2012).  FHFA sues CSC, Banc of America Securities, Deutsche Bank

25   Securities, RBS Securities, UBS Securities, each of whom underwrote securities

26

27

28   [2]     In this Court's interpretation of Section 12(a)(2), *see infra* Section V, the Virginia blue sky law is identical to 12(a)(2).

1   sold to Fannie Mae, and the Depositor Defendants for violations of the

2   Washington, D.C. blue sky law section 31-5606.05(a)(1)(B), which is "nearly-

3   identical" to Section 12(a)(2). *Hite v. Leeds Weld Equity Partners, IV, LP*, 429 F.

4   Supp. 2d 110, 114 (D.D.C. 2006). FHFA sues the Control Person Defendants

5   under the control-person provisions of Washington, D.C. law, and CFC and CCM

6   under the control-person provisions of Virginia law, both of which parallel Section

7   15. D.C. Code § 31- 5606.05(c) (extending liability over a person "who directly or

8   indirectly controls a person liable under" the primary liability subsection);

9   *Barclays Bank*, 2012 WL 5844189, at *2 (interpreting VA Code Ann. § 13.1-

10  522(C)).

11         FHFA sues CSC and the Depositor Defendants for negligent

12  misrepresentation. The parties disagree about the elements of negligent

13  misrepresentation. This case was transferred from New York, so New York

14  choice-of-law rules apply. *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 699

15  n.12 (9th Cir. 2011). New York only applies its choice-of-law rules when there is

16  an "actual conflict between the laws of the jurisdictions involved." *Matter of*

17  *Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993). There is an actual conflict

18  here. New York, which is the transferor state, the place where "many of the acts

19  and transactions alleged" in the Amended Complaint occurred, and the principal

20  place of business of most of the Underwriter Defendants, FAC ¶ 37, requires a

21  "special relationship" between the plaintiff and defendant as an element of the

22  cause of action for negligent misrepresentation. *Kimmell v. Schaefer*, 89 N.Y.2d

23  257, 263–64 (1996). Neither Virginia nor Washington, D.C., which are the

24  locations of Fannie Mae and Freddie Mac, FAC ¶ 14, require such a relationship.

25  *Hall v. Ford Enters., Ltd.*, 445 A.2d 610, 612 (D.C. 1982); *Fentress Families*

26  *Trust v. Va. Elec. & Power Co.*, 81 Va. Cir. 67, 2010 WL 7765113, at *11 (Cir. Ct.

27  July 29, 2010). When there is an actual conflict between the jurisdictions, New

28

1   York choice-of-law rules turn to "interest analysis." *Schultz v. Boy Scouts of Am.,*
2   *Inc.,* 65 N.Y.2d 189, 196 (1985).

3        There are two types of tort claims, those that "regulate primary conduct,"
4   and "those that allocate losses after the tort occurs." *Cooney v. Osgood*
5   *Machinery, Inc.,* 81 N.Y.2d 66, 72 (1993).   The parties agree that the law of
6   negligent misrepresentation is conduct-regulating. Countrywide Defs.' Reply
7   Mem. of P. & A. ("Countrywide Reply") 27, ECF No. 201; Opp. to Countrywide
8   Defs.' Mot. to Dismiss ("Opp. to Countrywide") 57, ECF No. 187 (citing cases
9   that discuss conduct-regulating rules). In such a circumstance, "the law of the
10  jurisdiction where the tort occurred will generally apply because that jurisdiction
11  has the greatest interest in regulating behavior within its borders." *Cooney,* 81
12  N.Y.2d at 72.   The authorities and the parties are split on where a tort like this
13  occurred.   Some courts hold that a tort occurs in the place "where its economic
14  impact is felt, normally, the plaintiff's residence." *Intellivision v. Microsoft Corp.,*
15  No. 07 Civ. 4079(JGK), 2008 WL 3884382, at *5 (examining a claim for negligent
16  misrepresentation); *Dutton v. Glass,* No. 04 CV 3496(GBD), 2005 WL 146503, at
17  *2 (S.D.N.Y. Jan. 20, 2005) (collecting cases).   Others apply the law of another
18  state that "was the site of virtually all the conduct at issue in the transaction."
19  *Amusement Indus., Inc. v. Stern,* 693 F. Supp. 2d 327, 341 (S.D.N.Y. 2010)
20  (applying the law of the state parties "should have reasonably expected" to govern
21  a claim for negligent misrepresentation); *Fed. Hous. Fin. Agency v. UBS Ams.,* 858
22  F. Supp. 2d 306, 335–36 (S.D.N.Y. 2012) (applying New York law to the
23  companion case to the instant action because "the defendants prepared and
24  disseminated the allegedly misleading offering materials that are at the center of
25  this litigation" in New York).

26       Though a particularly close question, the Court concludes that New York
27  law applies. The Amended Complaint plainly states that "many of the acts and
28  transactions alleged herein occurred in substantial part in New York." FAC ¶ 37.

1   The only connections to Washington, D.C. or Virginia are the GSEs' residence
2   there, *id.* ¶ 14, and the alleged targeting of Fannie Mae and Freddie Mac in those
3   jurisdictions. *Id.* ¶¶ 55, 456, 490.   The Court must assume the allegations in the
4   Complaint are true, which means that the locus of the supposedly negligent
5   misrepresentations occurred in New York.   New York has the largest interest in
6   regulating transactions within its borders, and "seek[ing] to deter the behavior" of
7   defendants like the Underwriter Defendants, most of whom have principal places
8   of business in New York, and the Depositor Defendants, none of whom have
9   connections to Washington, D.C. or Virginia. *UBS Ams.*, 858 F. Supp. 2d at 335.
10  The elements of a negligent misrepresentation claim under New York law are a
11  "special relationship with the defendant which generally implies a closer degree of
12  trust than the ordinary buyer-seller relationship," which "imposes on that defendant
13  a duty to use reasonable care to impart correct information"; "that the information
14  is false or incorrect"; and "that the plaintiff reasonably relied upon the information
15  given." *Pappas v. Harrow Stores, Inc.*, 140 A.D.2d 501, 504 (N.Y. 2d Dep't
16  1988).

17      FHFA sues CSC, CHL and the Depositor Defendants (the "Countrywide
18  Fraud Defendants") for fraud and aiding and abetting fraud.[3]   The elements of
19  fraud under New York law are a misrepresentation of a material fact, which the
20  defendant knew to be false, which the defendant made with the intention of
21  inducing reliance, upon which the plaintiff reasonably relied and which caused
22  injury to the plaintiff. *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).
23  The elements of aiding and abetting fraud are the existence of an underlying fraud,
24  knowledge of the fraud by the aider and abettor and substantial assistance by the
25  aider and abettor in completion of the fraud. *Stanfield Offshore Leveraged Assets,*

26

27  _____
28  [3]     There is no "actual conflict" between the laws of New York, Washington, D.C. or
    Virginia on either cause of action.

8

1   *Ltd. v. Metro. Life Ins. Co.*, 64 A.D.3d 472, 476 (N.Y. 1st Dep't 2009).  Finally,

2   FHFA sues Bank of America as Countrywide's successor, and accuses Bank of

3   America of fraudulently conveying Countrywide's assets.

4       All of the defendants have filed motions to dismiss the Complaint.

**III.**   ***The Complaint Adequately Pleads that the Offering Documents Contained Misrepresentations***

7       An element of each cause of action brought by FHFA is that the Defendants

8   made a material misstatement.[4]  The Amended Complaint includes four types of

9   misrepresentations: that the loan-to-value ratios ("LTV ratios") in the Offering

10   Documents were false; that the Defendants deviated from the listed underwriting

11   guidelines; that the credit ratings on the securities were false, on account of

12   behavior by the Defendants; and that the data about owner residence in the homes

13   was untrue.  The Court must assess whether the FAC includes "sufficient factual

14   material, accepted as true, to state a claim to relief that is plausible on its face."

15   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).[5]  In other words,

---

[4]     Adequate allegations of this element by itself means that Plaintiff's Section 11, 12(a)(2) and state statutory misrepresentation based claims are sufficient to defeat the motion to dismiss.

[5]     The Countrywide Defendants argue that the entire Amended Complaint should be judged against the heightened pleading standards of Rule 9(b) rather than 8(a), which would require that FHFA state with particularity the circumstances constituting the misstatement. Countrywide argues that the Amended Complaint "sounds in fraud" and alleges a "unified course of fraudulent conduct." Countrywide Defs.' Mem. of P. & A. in Supp. of Mot. to Dismiss ("Countrywide MTD") 18-20, ECF No. 180 (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (citations omitted)). In the Complaint, FHFA specifically disclaims fraud allegations for their Section 11, 12(a)(2), 15 and Washington, D.C. and Virginia securities causes of action. FAC ¶¶ 400, 414, 434, 450, 468, 484, 502, 518. The mere disclaimer of fraud does not evade Rule 9(b). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 633 (S.D.N.Y. 2007).

    However, FHFA goes further and specifically distinguishes allegations that support the fraud causes of action from those that support the statutory claims. FAC ¶ 197. FHFA mentions throughout the Complaint statements that were "objectively false," and that Defendants failed to exercise "due diligence and failed conduct a reasonable investigation." *Id.* ¶¶ 134 (emphasis in original), 410. Those are terms of strict liability or negligence, not fraud, which proves that the statutory claims need only meet Rule 8(a). *Refco*, 503 F. Supp. 2d at 633. The remaining fraud

1    the Court must determine whether FHFA plausibly alleges that the Defendants

2    made a false statement for each of the four types of misrepresentations.

3        **A.**      *The Complaint Adequately Pleads that the LTV Ratios in the Offering*

4                          *Documents Were Misstated*

5        The Offering Documents for each of the securitizations stated the

6    certificate's LTV ratio which compares the balance of the mortgage loan to the

7    value of the mortgaged property. FAC ¶ 113. The denominator in the LTV ratio is

8    the value of the property, which is the lower of the purchase price and its appraised

9    value. *Id.* ¶ 114. The LTV ratio is a measure of the default risk of a mortgage

10   loan, because lower ratios mean that a decline in the value of the property will be

11   less likely to wipe out the borrower's equity, and provides a cushion upon

12   foreclosure by increasing the likelihood that the proceeds will cover the unpaid

13   balance of the loan. *Id.* ¶ 117. Therefore, the LTV ratio is material to a reasonable

14   investor. *Id.* ¶ 118.

15        The Amended Complaint describes the automated valuation model

16   ("AVM") FHFA used to test the accuracy of the LTV ratios reported in the

17   Offering Documents. The AVM is an "industry standard" tool that calculates the

18   value of the underlying property at the time the mortgage loan was originated. *Id.*

19   ¶ 129. AVMs rely on the same data as relied upon by appraisers, and produce

20   independent estimates of the value of the properties securing the sampled loans.

21   *Id.* ¶ 129-130.

22        The Complaint lists statements from the Offering Documents of the

23   securitization for CWALT 2007-OA10, that the none of the loans from the

24   supporting pools had an LTV ratio over 100 percent, and that 81.69 percent of the

25

26

27   and negligent misrepresentation claims, though, must meet Rule 9(b). *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003) ("It is well-established in the Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s particularity requirements.")

28

loans had LTV ratios at or below 80 percent. *Id.* ¶ 131. The AVM reveals both statements to be false – 26.25 percent of the sample[6] of loans reviewed had LTV ratios above 100 percent, and only 42.14 percent of the loans had ratios below 80 percent. *Id.* This illustrative example is indicative of data results from "each Securitization" – the Offering Documents misrepresented the percentage of loans with an LTV ratio above 100 percent and the percentage with an LTV ratio below 80 percent at the time of origination. *Id.* ¶ 132. The Offering Documents stated that *none* of the loans for any of the certificates purchased by Fannie Mae or Freddie Mac had an LTV ratio above 100 percent. *Id.* ¶ 133. However, the AVM reveals that at least 2.97 percent of each of the mortgage pools had an LTV ratio over 100 percent. *Id.* ¶ 132. The Offering Documents also overstated the percentage of loans with an LTV ratio of less than 80 percent. *Id.* In other words, the Complaint alleges that the appraisals relayed in the Offering Documents systematically inflated the reported value of the properties, which deflated the LTV ratios.

The Amended Complaint does not mention the margin of error for the "ValuePoint4" AVM. Countrywide MTD 24. Despite the lack of disclosure of this critical information,[7] the specific factual allegations in the FAC must be accepted as true. *Iqbal*, 556 U.S. at 678. The Court must accept that the AVM revealed that the true LTV ratios were higher than those reported in the Offering

---

[6] The Countrywide Defendants do not, and could not, argue that the sample used for the AVM is unrepresentative. The Offering Documents reported that no loans had LTV ratios exceeding 100%. The AVM alleges that some loans did have LTV ratios over 100%. FAC ¶ 133. Regardless of the sample of loans examined, the statement that *no loans* had such a high LTV ratio is plausibly false. *Bank Hapoalim B.M. v. Countrywide Fin. Corp.*, 2012 WL 6814194, at *5 n.10 (C.D. Cal. Dec. 21, 2012).

[7] If FHFA plans on relying on an AVM or any other statistical study as the litigation proceeds, they must reveal the margin of error. *Cf. MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008, ECF No. 276, slip op. at 10 (finding Plaintiff's methodology for analyzing securitizations acceptable when "Plaintiff has explained its proposed methodology in open court.").

1    Documents, and that the AVM accurately reflects the ultimate sales prices of the

2    homes given its inputs.  The Complaint specifically identifies the misstatements in

3    the Offering Documents and how those statements are false, so the allegations in

4    the FAC are sufficient to state a claim that the LTV ratios were misstated.  *See*

5    *Bank Hapoalim*, 2012 WL 6814194, at *5; *Dexia Holdings, Inc. v. Countrywide*

6    *Fin. Corp.*, 2012 WL 1798997, at *5 (C.D. Cal. Feb. 17, 2012); *Allstate Ins. Co. v.*

7    *Countrywide Fin. Corp.* ("*Allstate I*,") 824 F. Supp. 2d 1164, 1185–86 (C.D. Cal.

8    2011); *Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.* ("*Capital*

9    *Ventures J.P. Morgan*,") No. 12-10085-RWZ, 2013 WL 535320, at *5 (D. Mass.

10   Feb. 13, 2013) (citing to AVM results as supporting the plausibility of a

11   misstatement in offering documents).

12       The Countrywide Defendants make four arguments against the reliance on

13   the AVM.  First, they argue, as they have done before, that the failure to disclose

14   "critical information" about the AVM like the standard deviation or margin of

15   error dooms the claim, because without this "information, it is impossible for the

16   Court to assess whether Plaintiff's AVM results are consistent or inconsistent with

17   the LTV ratios disclosed in the Offering Documents," as the AVM result may be

18   "*entirely consistent*" with the data in the Offering Documents "despite the

19   superficial difference between the two values."  Countrywide MTD 23-24

20   (emphasis in original).  The AVM may be correct, but the conclusions that the

21   FHFA has drawn from those results are erroneous.  Countrywide Reply 8.

22       This argument fails for the same reason it failed in prior cases.  The LTV

23   ratios in the Offering Documents are plausibly false because the Court must accept

24   that the AVM reflects reality given its inputs.  Any questions or challenges to the

25   results reached by the AVM, rather than the choice of inputs, are inappropriate on

26   a motion to dismiss.  *Allstate I*, 824 F. Supp. 2d at 1184–85.  In their Reply Brief,

27   Countrywide decries FHFA's failure to "show that the percentage of loans that fall

28   below the 80% threshold or above the 100% threshold in its AVM results was not

1   simply the result of the normal, symmetrical distribution of the range of results

2   generated by the model." Countrywide Reply 9. In fact, FHFA has *alleged* that

3   the deviations from the Offering Documents were not the result of the normal

4   distribution, but they have not "shown" that, in the sense that they have not *proven*

5   that random variance is excluded. But of course, there is no need to exclude

6   random variance at this stage of the litigation. Even without the margin of error,

7   the Court can assess that the LTV ratios in the Offering Documents and AVM are

8   "inconsistent," though it cannot offer exact statistical confidence in that result.

9   Requiring such confidence would impose an unacceptable "probability

10  requirement" on FHFA. *Iqbal*, 556 U.S. at 678.[8] The difference between the two

11  "could simply reflect the random distribution of the AVM results around the true

12  value," Countrywide Reply 9, but they also could not. That is the very definition

13  of a "plausible" allegation. *Id.*[9]

14        Second, Countrywide argues that the appraisals are subjective opinions, not

15  statements of fact, and so can be legally actionable only if the "appraiser did not

16  truly believe the appraisal at the time it was issued." *In re IndyMac Mortg.-Backed*

17

18  ─────────────────

[8]        Countrywide's Memorandum even argues that the Complaint must meet the "commonly
19  accepted" 95% confidence interval, which means that FHFA must show with 95% confidence
    that the true LTV ratio exceeded that given in the Offering Documents. Countrywide MTD 24.
20  That is exactly the type of probability standard *Iqbal* forbids. Regardless of whether the AVM
    results were two, or one, or one-half, or even lower, standard deviations above that given in the
21  Offering Documents, the Complaint would allege that specific statements in the Offering
    Documents were untrue. That is all the Federal Rules, both 8(a) and 9(b), require.
22
[9]        In the hearing on this motion, counsel for Countrywide argued that the failure to include
23  the margin of error means that the Court cannot determine whether the AVM results
    deviated from the Offering Documents' report of 80% were "79, 78, 81, 82," and "all clustered
24  around 80%" so that "for all practical purposes the same as 80%," or much higher numbers. Tr.
    of Hearing on Motions 19-20, February 20, 2013, ECF No. 212. That is irrelevant. The
25  Complaint alleges that statements in the Offering Documents are false. The magnitude of the
    falsity may bear on other elements of FHFA's claims, but is not relevant to whether the Offering
26  Documents contained misstatements. Indeed, as counsel for FHFA mentioned, highly
    sophisticated parties may rely even more than unsophisticated investors on the precise veracity
27  of any offering documents.

28

13

1   *Sec. Litig.*, 718 F. Supp. 2d 495, 511 (S.D.N.Y. 2010).  According to the

2   Defendants, the Amended Complaint fails to include any such allegations of

3   disbelief.  The Court rejects this argument.  FHFA includes plausible allegations

4   that CHL pressured appraisers to issue inflated appraisals, which means that the

5   appraisers did not believe the appraisals.  FAC ¶¶ 183, 186-188.[10]

6       Third, the Countrywide Defendants argue that the AVM relies too heavily

7   on the estimated appraisal value, because some of the LTV ratios in the Offering

8   Documents were based upon the "purchase price" of the home.  *Id.* ¶ 114.  The true

9   value of the home must equal the purchase price, Countrywide Reply 7 (citing the

10  *Black's Law Dictionary* definition of "fair market value").  The Amended

11  Complaint does not distinguish when the LTV ratios in the Offering Documents

12  were based upon purchase price and when on appraisals.  Countrywide argues that

13  this means the Complaint does not show that the Offering Documents were false.

14  In line with its prior rulings and those of other federal courts, the Court rejects this

15  proposition, because analyzing the exact details of the AVM is better resolved at

16  summary judgment.  *Bank Hapoalim*, 2012 WL 6814194, at *6; *Fed. Hous. Fin.*

17  *Agency v. Morgan Stanley*, No. 11 Civ. 6739(DLC), 2012 WL 5868300, at *3

18  (S.D.N.Y. Nov. 19, 2012).

19      Finally, Countrywide argues that unlike other plaintiffs in this MDL, FHFA

20  cannot rely on the AVM, because the GSEs each warned of the limited usefulness

21  of the automated model.  Countrywide Defs.' Notice of and Request for Judicial

22  Notice ("Countrywide RJN") Ex. 21, ECF No. 180 (excerpt from Fannie Mae

23

24  _____

25  [10]    Some courts have rejected the conclusion of *IndyMac*, and do not require plaintiff to
    plead that appraisers did not subjectively believe the appraisals. *Mass. Mut. Life Ins. Co. v. Res.*

26  *Funding Co., LLC*, ("*RFC*,") 843 F. Supp. 2d 191, 204 (D. Mass. 2012) (interpreting a state law
    identical to the federal 1933 Securities Act); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d

27  326, 377–78 n.48 (S.D.N.Y. 2011) (regardless of whether the appraisals made by the defendants
    are "opinions," the "alleged appraisal misconduct surely distorted the resulting LTV ratios,

28  which were then featured in the Offering Documents.").

1   website) (Fannie believes that "AVMs have generally not evolved sufficiently to
2   fully replace traditional appraisals and human judgment for the origination of first
3   lien mortgages" and "AVMs have generally not evolved sufficiently to fully
4   replace traditional appraisals and human judgment for the origination of first lien
5   mortgages."); Countrywide RJN Ex. 20 (excerpt from Freddie Mac website)
6   ("AVMs cannot replace the depth and breadth of knowledge of a competent
7   appraiser.").  Though this may open the Plaintiff to a justifiable charge of
8   hypocrisy, it does not undermine the documented statistical evidence in the
9   Amended Complaint.  Countrywide offers no legal reason that plaintiff's prior
10   statements should bar the use of a statistical method, and the Court can think of
11   none.

12        The Amended Complaint plausibly alleges that an automated valuation
13   model reveals that the loan-to-value ratios in the Offering Documents were
14   misstated.  The Court must accept that the AVM reflects reality given its inputs, so
15   the Amended Complaint properly alleges a misstatement as to LTV ratios.

     *B.*    *The Complaint Pleads that the Stated Underwriting Guidelines in the
Offering Documents were False*

18        The Amended Complaint alleges that Countrywide misstated their
19   compliance with the underwriting standards listed in the Offering Documents,
20   instead using a "matching strategy" to create the most aggressive guidelines in the
21   origination market, making excessive and wholesale use of "exceptions" to its
22   normal underwriting standards, and that "Countrywide's only criterion for
23   approving a loan was whether the loan could be sold into the secondary market,"
24   despite the more stringent standards listed in the Offering Documents.  FAC ¶¶
25   143-144, 146-147.  The FHFA alleges that underwriting standards were
26   disregarded wholesale, and that "all of the loans were issued by deviating from the
27   underwriting guidelines."  *Me. State Ret. Sys. v. Countrywide Fin. Corp.* ("*Me.
28   State III,*") 2011 WL 4389689, at *17 (C.D. Cal. May 5, 2011).  That claim,

supported as here with specific examples of the underwriting culture at
Countrywide, and its use of exceptions, adequately alleges that a large percentage
of loans did not meet the standards given in the Offering Documents. *Id.*

Countrywide offers a number of arguments in response.  First, the
Defendants argue that the Complaint does not allege that the Offering Documents
included materially false statements, because the information FHFA complains of
was either true or immaterial.  Second, the Offering Documents included detailed
disclosures of the credit risk characteristics of the underlying mortgage loans.
Third, the Amended Complaint fails to link the allegedly false underwriting
standards to the specific loans and securities that are the subject of this litigation.
Finally, Countrywide argues that the substitute or repurchase provisions in the
Offering Documents constitute the only remedy for defective loans in the RMBS.

This Court has previously considered and rejected each argument.  The
Amended Complaint alleges that Countrywide expanded its underwriting
guidelines through the "matching strategy," but did not disclose that information to
investors.  The mere expansion of underwriting guidelines does not support a claim
under the securities laws, but failing to disclose that expansion to investors
constitutes a viable misstatement. *Allstate I*, 824 F. Supp. 2d at 1189.  FHFA has
alleged exactly that.  FAC ¶¶ 194, 214.  For purposes of a motion to dismiss, the
Court cannot assess whether the public utterances Countrywide claims were made
to investors alerted them to Countrywide's deviations from stated underwriting
guidelines, and made the misstatements in the Offering Documents immaterial.[11]
*See SEC v. Mozilo*, No. 09-CV-3994-JFW, 2010 WL 3656068, at *11 (C.D. Cal.
Sept. 16, 2010) (deciding, for purposes of summary judgment, that "although
Countrywide repeatedly disclosed that its strategy was to offer the 'broadest'

---

[11]    Indeed, FHFA includes the testimony of a former Countrywide employee stating he "did
not think investors were aware of Countrywide's internal 'matching' strategy."  FAC ¶ 214.

1   product menu in the mortgage industry, Countrywide never disclosed that it

2   employed the strategy in such a way to make its underwriting guidelines a

3   composite of the most aggressive guidelines in the industry.")

4           Countrywide also argues that the percentage of loans extended using the

5   "exception" policy is too low to constitute "systematic abandonment" of the

6   underwriting guidelines. Countrywide MTD 29-30; FAC ¶ 183. The Court finds

7   this argument bewildering. Countrywide seems to argue that if only 3%, or 20%,

8   of the loans were issued through exceptions, then as a matter of law, they could not

9   have "abandoned" or "disregarded" the underwriting standards. The opposite is

10  true: *any* deviation from information in the Offering Documents could constitute a

11  misstatement. Resolving the exact percentage of loans issued under the exception

12  policy is a fact question appropriate for a later stage of litigation, at which time, the

13  Court may also determine the legal and mathematical definition of the word

14  "abandon." Further, the exception policy is used in the Amended Complaint as

15  just "one aspect of the near total breakdown of" Countrywide's underwriting

16  standards. Opp. to Countrywide 24.

17          Countrywide's broad risk disclosures about underwriting standards are not

18  sufficient to inoculate the Defendants from liability, because none of the

19  disclosures contradict the statement in the Offering Documents that underwriting

20  was performed "in accordance with its credit, appraisal and underwriting process."

21  FAC ¶ 96. Disclosures that do not directly and clearly contradict that assurance

22  cannot undermine the plaintiffs' claims. *Me. State III*, 2011 WL 4389689, at *17;

23  *UBS Ams.*, 858 F. Supp. 2d at 332 ("Nor are plaintiff's claims defeated by the

24  disclosure in seven of the prospectus supplements that a 'substantial' number of

25  the loans deviated from the underwriting standards. These prospectus supplements

26  also represented that any deviations would be warranted based on 'compensating

27

28

1  factors.' By plausibly alleging a widespread failure to conduct any underwriting,
2  the plaintiff has adequately pleaded the falsity of this representation.").[12]

3   Third, this Court again rejects the proposition that plaintiffs must allege that
4  Countrywide's abandonment of underwriting guidelines affected the mortgage
5  pools underlying the RMBS that FHFA purchased. *See Bank Hapoalim*, 2012 WL
6  6814194, at *7; *Strategic Capital Bank*, 2012 WL 5900973, at *6; *Allstate I*, 824 F.
7  Supp. 2d at 1184 n.23 ("The Court adopts its earlier logic here; representations
8  relating to Countrywide's underwriting practices are sufficiently pleaded as
9  applying to Countrywide's entire operation and therefore to the specific Offerings
10 purchased by [plaintiff]."). FHFA alleges that Countrywide systematically
11 abandoned its underwriting standards, which gives "rise to the inference that the
12 mortgage originators deviated from stated underwriting guidelines in large
13 numbers of cases," including in the mortgage pools backing FHFA's RMBS. *Bank*
14 *Hapoalim*, 2012 WL 6814194, at *7. Nothing more is required to plead FHFA's
15 claim, though it may not be enough to prove that claim.

16  Finally, Countrywide argues that it promised only that "any non-compliant
17 loans would be repurchased or substituted," and did not make an "absolute,
18 unqualified representation that the each [sic] of the underlying loans complied with
19 all applicable underwriting guidelines." Countrywide MTD 38 (citing *Lone Star*
20 *Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383 (5th Cir. 2010)). The
21 Court rejects this argument again. *See Bank Hapoalim*, 2012 WL 6814194, at *6.
22 Unlike in *Lone Star*, FHFA claims there was mass abandonment of underwriting

---

[12]  Language in this Court's ruling in *Strategic Capital Bank* is not to the contrary. The Court mentioned that in claims under Section 11 like those here "[t]he actual underwriting standards . . . are irrelevant." 2012 WL 5900973, at *11. The next sentence continues "[w]hat matters for RMBS litigation alleging misstatements . . . is what the defendants said about those standards." *Id.* That is the subject of this litigation – not the substance of the underwriting standards themselves, but whether Countrywide told the truth about their conformance to those standards.

1   standards, not just a "limited number of loans that failed to conform to the
2   representation regarding their default status." *Emps.' Ret. Sys. of the Gov't of the*
3   *Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 154–55
4   (S.D.N.Y. 2011) (distinguishing *Lone Star*).  Further, a contractual provision
5   cannot force the holder of a security to forego its rights. *Id.*

6          Therefore, the Amended Complaint sufficiently alleges that the Offering
7   Documents misstated the underwriting guidelines used to issue loans, because
8   FHFA pleads that Countrywide "abandoned" the listed guidelines, which creates
9   the plausible inference that such abandonment affected the RMBS that FHFA
10  purchased.

11  C.     *The Amended Complaint Sufficiently Alleges that the Defendants Reported*
12         *Credit Ratings They Knew Were Based on False Information*

13         The Amended Complaint alleges that the "Defendants reported the credit
14  ratings for each tranche in the Prospectus Supplements," and that those "ratings . . .
15  were inflated as a result of Defendants' provision of incorrect data concerning the
16  attributes of the underlying mortgage collateral to the ratings agencies."  FAC ¶
17  122.  That allegation is adequate under Rule 8, because it alleges that the ratings
18  were misstated as a result of Countrywide's provision of false information
19  regarding the loan population to the credit rating agencies. *Fed. Hous. Fin. Agency*
20  *v. Merrill Lynch & Co.*, No. 11 Civ. 6202(DLC), 2012 WL 5451188, at *1 n.2
21  (S.D.N.Y. Nov. 8, 2012); *Allstate I*, 824 F. Supp. 2d at 1184–85; *Assured Guar.*
22  *Mun. Corp. v. UBS Real Estate Sec., Inc.*, No. 12 CV 1579(HB), 2012 WL
23  3525613, at *5 (S.D.N.Y. Aug. 15, 2012) (credit ratings supported claim where
24  defendant "procured the ratings by providing false and misleading information to
25  the agencies").[13]

26

27  [13]    The parties argue over whether the credit ratings are third party opinions.  Regardless, the
28  Complaint states a claim as to those ratings.  Opinion statements "can give rise to a claim under
    section 11 only if the complaint alleges with particularity that the statements were both

1    Countrywide's arguments to the contrary are unconvincing.  Countrywide

2  asserts that "Plaintiff's allegation that Countrywide provided false information to

3  the rating agencies is entirely conclusory and boilerplate . . . To the extent that

4  Plaintiff is alleging that Countrywide provided false owner-occupancy data or LTV

5  ratios, that allegation is derivative of Plaintiff's other claims and fails for the

6  reasons specified above."  Countrywide Reply 17-18.  Of course, this Court

7  rejected Countrywide's arguments about LTV ratios and underwriting standards,

8  and the widespread abandonment of underwriting guidelines infected the credit

9  ratings for all of the MBS.  Finally, this argument is distinct from the owner-

10  occupancy allegations this Court has previously resolved, because the initial

11  misstatements were made by Countrywide, not a third party.

12  **D.**    *The Amended Complaint does not Allege that the Owner-Occupancy Data in*

13         *the Offering Documents was False*

14    Countrywide included data regarding how the borrowers used the mortgaged

15  home in the Offering Documents.  The documents explain how many loans were

16  used as investment properties or primary or secondary residences.  *See, e.g.,*

17  Countrywide RJN Ex. 15 S-41.  This data was a useful factor for an investor to

18  assess credit risk, because borrowers who live in the mortgaged properties are less

19  likely to default.  FAC ¶ 111.  According to the Amend Complaint, that data was

20  routinely misstated.  *Id.* ¶¶ 124-128.

21

22

23  objectively and subjectively false or misleading."  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d
    1156, 1162 (9th Cir. 2009).  The Amended Complaint does not allege that the rating agencies
24  "did not accurately communicate their subjective views regarding the" ratings at issue.  *UBS
    Ams.*, 858 F. Supp. 2d at 326.  However, as described below, FHFA does plead that Countrywide
25  knew the representations in the Offering Documents and provided to the ratings agencies were
    false.  Accurately reporting a credit rating that Countrywide knew was based on false
26  information is a misstatement for purposes of Section 11.  *Plumbers' Union Local No. 12
    Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 775 (1st Cir. 2011) ("Liability
27  may on this theory [if it does not represent the actual belief] also extend to one who accurately
    described the opinion.").
28

20

1   This Court has previously rejected the assertion that this information was

2   actionable when the defendants report, as they did here, that the occupancy data

3   was "[b]ased upon representations of the related borrowers at the time of

4   origination." Countrywide RJN Ex. 15 at S-41; *id.* Ex. 16 at A-6. The Offering

5   Documents do not include misstatements, since Countrywide merely "accurately

6   repeat[ed] information about occupancy provided by borrowers." *Mass. Mut. v.*

7   *Countrywide Fin. Corp.* ("*Mass Mut. II,*") 2012 WL 3578666, at *2 (C.D. Cal.

8   Aug. 17, 2012).

9       FHFA cites case law from other district and state courts that find owner-

10  occupancy information like this to be actionable. Opp. to Countrywide 35 (citing

11  cases). The Court is unconvinced.   First, there is no plausible allegation[14] that

12  Countrywide did not accurately represent the information provided by the

13  borrowers, which means that Countrywide itself did not make a misrepresentation.

14  *RFC*, 843 F. Supp. 2d at 205. Second, the Amended Complaint does not even

15  plausibly allege that Countrywide "passed on information that they knew was

16  false," a different rule that some Massachusetts courts[15] have applied. *Capital*

17  *Ventures Int'l v. UBS Secs. LLC* ("*Capital Ventures UBS*",) No. 11-11937-DJC,

18  2012 WL 4469101, at *8 (D. Mass. Sept. 28, 2012); *Capital Ventures J.P. Morgan,*

19  2013 WL 535320, at *5 (denying the motion to dismiss because plaintiff

20  "specifically and plausibly alleges that defendants knew borrowers were

21  misrepresenting their intent to live at the mortgaged properties."). FHFA alleges

22  that a study showing discrepancies between the true and reported owner-occupancy

23

24  [14]   The Amended Complaint mentions that former borrowers accused Countrywide loan officers of completing the loan "application with misrepresentations without the borrowers'

25  knowledge." FAC ¶ 199. There is no allegation that those misrepresentations included false

26  information of owner-occupancy. *See id.* ¶ 220-227.
    [15]   Those courts are interpreting the Massachusetts Uniform Securities Act section 410,

27  which "is modeled after section 12(a)(2) of the Securities Act of 1933 . . . and courts have interpreted [the act] in conformity with the federal act." *Capital Ventures UBS*, 2012 WL

28  4469101, at *3.

1    data for all of the securitizations "is clear and compelling proof" that Countrywide

2    knew the data was misstated, but never claims that the discrepancy alerted

3    Countrywide that the specific statements about owner-occupancy were false.  FAC

4    ¶ 199.  The Complaint describes Countrywide's internal documents, revealing that

5    high level officials knew that representations in the Offering Documents were

6    false, but the internal reports do not mention owner-occupancy data.  *Id.* ¶¶ 205-

7    219.  Finally, this Court rejects any interpretation of the Securities Act that ignores

8    its text, which imposes liability when "any part of the registration statement . . .

9    contained an untrue statement of a material fact or omitted to state a material fact."

10   15 U.S.C. § 77k(a).  Countrywide did not make an untrue statement or omission.

11   Countrywide told investors that owner-occupancy data was self-reported by

12   borrowers, and FHFA fails to allege that Countrywide did not accurately repeat the

13   information they received.  Therefore, the owner-occupancy data was not

14   materially misstated.[16]

15   ## IV.    *The Complaint Adequately Alleges that FHFA was Defrauded, but not*

16   *that Defendants are Liable for Negligent Misrepresentation or Aiding and*

17   *Abetting the Fraud of Others*

18        FHFA sues CSC, CHL and the Depositor Defendants for fraud and aiding

19   and abetting fraud, and sues CSC and the Depositor Defendants for negligent

20   misrepresentation.  Those defendants argue that the FAC does not include

21   sufficient allegations[17] of justifiable reliance, *scienter*, loss causation, the "special

22

23   [16]    FHFA argues that this Court allowed claims based on owner-occupancy to proceed in
*Allstate I.*  824 F. Supp. 2d at 1184–85.  However, FHFA has failed even to plead that

24   Countrywide made a misrepresentation as to owner-occupancy data, which means this is *not* a
"mixed question[] of law and fact . . . more appropriately considered at summary judgment," *id.*,

25   but instead a simple question of law.

26   [17]    The Court determines that the Complaint includes facts that plead with particularity that
the Offering Documents contained misrepresentations, so the Complaint meets Rule 9(b).

27   *Allstate I,* 824 F. Supp. 2d at 1185–86.  The Complaint meets the heightened standard, so the
statutory claims based upon those misrepresentations are well-pled, regardless of whether Rule

28   8(a) or 9(b) applies.  *See supra* n. 5.

1  relationship" needed to plead negligent misrepresentation under New York law, or
2  the elements of aiding and abetting fraud.

3      A.    *The Amended Complaint Alleges that FHFA Justifiably Relied on the*
4                            *Offering Documents*

5          The Amended Complaint alleges that Fannie Mae and Freddie Mac required
6  compliance with certain investment standards, which included specific information
7  found in the Offering Documents.  FAC ¶ 242.  Countrywide knew of these
8  compliance standards, and intended that the GSEs rely on the Offering Documents.
9  *Id.* ¶¶ 243-244.  The GSEs allege that they did rely on those representations, and
10 specifically decided to purchase the RMBS based on their belief that the
11 certificates met their requirements.  *Id.* ¶ 250-251.  Therefore, the Amended
12 Complaint sufficiently alleges that Fannie Mae and Freddie Mac justifiably relied
13 upon the Offering Documents, because the Court cannot resolve as a matter of law
14 whether reasonable diligence would have revealed the misstatements.  *Allstate I*,
15 824 F. Supp. 2d at 1187-88; *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*,
16 No. 11 Civ. 6188(DLC), 2012 WL 5395646, at *16 (S.D.N.Y. Nov. 5, 2012).

17         In response, the Countrywide Fraud Defendants argues that the GSEs, as
18 dominant forces in the mortgage market, must be considered so sophisticated that
19 they are different from plaintiffs like Allstate, and could not have justifiably relied
20 on any misstatements in the Offering Documents.  But the Court cannot conclude
21 that as a matter of law.  The defendants may be correct that reliance by the GSEs
22 was unjustified, or that the GSEs did not actually rely on the Offering Documents.
23 That determination cannot be made on a motion to dismiss, especially when based
24 solely on broad statements about Fannie Mae and Freddie Mac's sophistication, or
25 general warnings from government regulators about risky securities.[18]

26

27 [18]      The sole case cited by the Defendants does not hold otherwise.  *N.J. Carpenters Health*
28 *Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 169 (S.D.N.Y. 2011) ("Freddie and Fannie
   issued trillions of dollars of residential mortgage backed securities," which "gives rise to a

1    The Court similarly rejects the assertion that because the GSEs purchased
2  the certificates before the relevant prospectus supplements were filed, they did not
3  rely upon statements in the Offering Documents.  The preliminary materials that
4  FHFA reviewed, like the term sheets and free writing prospectuses, FAC ¶ 243,
5  contained the same misstatements and false data as the prospectus supplements.
6  *Fed. Hous. Fin. Agency v. Deutsche Bank AG*, No. 11 Civ. 6192(DLC), 2012 WL
7  5471864, at *3 (S.D.N.Y. Nov. 12, 2012).

8    B.    *The Amended Complaint Adequately Pleads that the Defendants Knew the*
9          *Offering Documents Contained Misrepresentations*

10    FHFA has sufficiently pled that the Countrywide Fraud Defendants knew
11  the representation in the Offering Documents were false.  *Allstate I*, 824 F. Supp.
12  2d at 1186–87.  As described above, the Amended Complaint plausibly alleges that
13  the Offering Documents contained misstatements.  The Complaint further includes
14  the same type of information as in *Allstate I* about Countrywide's knowledge:
15  "statistical analyses purporting to demonstrate that that appraisals and owner-
16  occupancy statistics were overstated," FAC ¶¶ 124-135, "third party reports
17  purporting to show the same," *id.* ¶¶ 233-239, "internal documents purporting to
18  show that Countrywide was aware that it had sacrificed underwriting standards for
19  market share," *id.* ¶¶ 200-219, "statements by Countrywide insiders and customers
20  purporting to show that it was company policy to circumvent the underwriting
21  guidelines," *id.* ¶¶ 228-232, "and statements by appraisal companies and customers
22  who claim Countrywide acted to inflate appraisal values," *id.* ¶¶ 220-227.  *Allstate*
23  *I*, 824 F. Supp. 2d at 1186–87.

24

25

26

---

27  reasonably reliable inference that they possessed at least some knowledge of underwriting practices.")  The fact that Freddie and Fannie possessed "some knowledge" of underwriting practices, which distinguished them from other plaintiffs for purposes of class certification, does
28  not undermine the inference that the GSEs relied upon the Offering Documents.

1    The Court has rejected each of the responses offered by Countrywide.[19]   At

2    this point, FHFA does not need to tie its allegations of Countrywide's underwriting

3    culture directly to the securities they purchased. *Allstate I*, 824 F. Supp. 2d at 1184

4    n.23.  Nor is the AVM "fraud-by-hindsight," which would not support the

5    allegation that the Defendants knew of misstatements at the time. *Bank Hapoalim*,

6    2012 WL 6814194, at *6 ("The Complaints do not constitute 'fraud-by-

7    hindsight'").  Countrywide's risk disclosures cannot shield them from liability, and

8    do not, as a matter of law, undermine the inference that Countrywide acted with

9    scienter.  *JPMorgan Chase*, 2012 WL 5395646, at *17.

10   C.    *The Complaint Adequately Alleges that FHFA's Securities Lost Value as a*

11         *Result of the Defendants' Misrepresentations*

12         Plaintiff must show "loss causation" under New York fraud law, which

13   requires plaintiff to show that "a defendant's misrepresentations were the direct

14   and proximate cause of the claimed losses." *MBIA Ins. Corp. v. Countrywide*

15   *Home Loans, Inc.*, 87 A.D.3d 287, 295 (N.Y. 1st Dep't 2011).  A complaint meets

16   that standard when there is an "adequate causal nexus between misrepresentation

17   and damage." *Dexia*, 2012 WL 1798997, at *6.  Just like in *Dexia* and *Thrivent*,

18   2012 WL 1799028, at *2 (C.D. Cal. Feb. 17, 2012), the Plaintiffs allege that "the

19   underlying loans had a higher-than-advertised risk of default, and that they were

20   therefore worth less than Plaintiffs paid for them," FAC ¶ 256, and that the

21   certificates "have experienced higher-than-anticipated rates of default and that they

22   are now worth less than Plaintiffs paid for them," *id.* ¶¶ 193, 195. *Dexia*, 2012 WL

23   1798997, at *6.

24         Countrywide responds that the losses suffered by the RMBS are attributable

25   to the general credit crisis of 2008, not the misstatements in the Offering

26

27   [19]   There is no need to determine whether Countrywide acted with scienter as to

28   misstatements as to owner-occupancy, since the Offering Documents did not contain a
misstatement. *See supra*.

1    Documents.   This argument fails because determining "which losses were
2    proximately caused by Countrywide's misrepresentation and which are due to
3    extrinsic or insufficiently linked forces" is a question for the fact-finder. *In re*
4    *Countrywide Fin. Corp. Secs. Litig.*, 588 F. Supp. 2d 1132, 1174 (C.D. Cal. 2008).
5    Separating the source of the losses requires a full factual record.

6         Countrywide attempts to buttress its argument by pointing to statements and
7    court filings made by the GSEs that any losses suffered were caused by the "worst
8    housing crisis since the Great Depression." Countrywide RJN Ex. 43 (Mem. Supp.
9    Freddie Mac's Mot. to Dismiss 21-22, *Kuriakose v. Fed. Home Loan Mortg. Corp.*,
10   et. al., No. 08-cv-7281 (JFK) (S.D.N.Y. Feb. 24, 2010)). The Court declines to
11   exercise judicial estoppel against FHFA, especially because FHFA alleges that
12   Countrywide may have contributed to that housing crisis. *In re Countrywide*, 588
13   F. Supp. 2d at 1174. FHFA has adequately alleged that the misrepresentations the
14   value of the RMBS to decline, and resolving the relative culpability of different
15   actors, including the GSEs themselves, must await discovery.[20]

16        *D.     The Complaint Does not Plead Negligent Misrepresentation*
17        Under New York law, a plaintiff must show that they had a "special
18   relationship" with the defendant in order to recover for negligent
19   misrepresentation. *Schaefer*, 89 N.Y.2d at 264. An arms-length commercial
20   transaction is not usually the predicate for such a relationship. *Id.* at 263 ("liability
21   for negligent misrepresentation has been imposed only on those persons who
22   possess unique or specialized expertise, or who are in a special position of
23   confidence and trust with the injured party such that reliance on the negligent
24   misrepresentation is justified."). The defendants sued for negligent
25

26   ---
     [20]    Given the allegations in the Complaint that Plaintiffs have suffered damage, the Court
27   declines to rule as a matter of law that FHFA have not incurred legally cognizable damage with
     respect to certificates that make all required payments. *Allstate I*, 824 F. Supp. 2d at 1188
28   ("damages . . . present[] complicated questions of fact ... best reserved for summary judgment").

1   misrepresentation were not "in a special position of confidence and trust with" the
2   GSEs, because the RMBS were sold in public offerings to numerous investors.
3   The Amended Complaint must show instead that Countrywide possessed "unique
4   or specialized expertise." Since the GSEs were not "so unequally situated vis-à-vis
5   the defendants," and "were highly sophisticated players in the mortgage-backed
6   securities market, which they participated in not only as purchasers but also as
7   packagers and marketers of securities," the mere fact that Countrywide had
8   "greater knowledge of the underlying loan files . . . is not sufficient to establish a
9   'special relationship.'" *UBS Ams.*, 858 F. Supp. 2d at 335; *Thrivent*, 2012 WL
10   1799028, at *6.

11   E.    *The Complaint does not Allege that Any Defendants Aided and Abetted the*
12                                *Fraud of Others*

13          The Amended Complaint fails to properly allege that the Countrywide Fraud
14   Defendants aided and abetted the fraud of others, because a party cannot aid and
15   abet its own fraud, and FHFA does sufficiently allege that the defendants knew of
16   any independent fraud. *Bank Hapoalim*, 2012 WL 6814194, at *9.

17   V.    ***The Depositor Defendants Cannot be Liable under Section 12(a)(2) or the***
18                                ***D.C. Blue Sky Laws***

19          Any person who "offers or sells a security" by means of a prospectus or oral
20   communication that includes a misstatement is liable under Section 12(a)(2) of the
21   Securities Act. 15 U.S.C.A. § 77l(a)(2). The Supreme Court has interpreted that
22   language to contemplate a "buyer-seller relationship not unlike traditional
23   contractual privity." *Pinter v. Dahl*, 486 U.S. 622, 642 (1988). Liability extends
24   only to the "immediate sellers" of securities and "those who solicit purchasers to
25   serve their own financial interests or those of the securities owner." *Me. State III*,
26   2011 WL 4389689, at *9 (citations omitted). The Depositor Defendants did not
27   pass title directly to Fannie Mae or Freddie Mac, because the title passed to the
28   Underwriter Defendants before passing to the ultimate purchasers. *Id.* The

1   Amended Complaint alleges that the Depositor Defendants registered the
2   certificates with the SEC, and "targeted" the GSEs by sending offering materials,
3   FAC ¶¶ 55, 421, but does not include any allegations that the Depositor
4   Defendants directly solicited or communicated with the plaintiff regarding the
5   security purchases. *Id.*; *RFC*, 843 F. Supp. 2d at 207.  Therefore, the Depositor
6   Defendants cannot be liable under Section 12(a)(2).

7          FHFA argues in response that SEC Rule 159A, which was promulgated in
8   2005, trumps the Supreme Court's earlier decision in *Pinter*. *See* 17 C.F.R. §
9   230.159A (for purposes of section 12(a)(2), "seller shall include the issuer of the
10  securities sold . . . and the issuer shall be considered to offer or sell the securities").
11  As a general matter, "it is for agencies, not courts, to fill statutory gaps." *Nat'l*
12  *Cable Telecom. Ass'n v. Brand X Internet Servs.* ("*Brand X,*"), 545 U.S. 967, 982
13  (2005) (citing the Supreme Court's foundational decision in *Chevron, U.S.A., Inc.*
14  *v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984,) which created a
15  two-step test in granting deference to agency interpretations of a statute whenever
16  the statute was ambiguous and the agency interpretation was reasonable).  An
17  agency construction of a statute will trump a court's prior interpretation unless "the
18  prior court decision holds that its construction follows from the unambiguous terms
19  of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at
20  982.  In this case, the interpretation of "offers or sells" in SEC Rule 159A applies
21  unless the decision in *Pinter* interpreted the statute as "unambiguously
22  foreclose[ing] the agency's interpretation," because then there would be "no gaps
23  for the agency to fill." *Id.* at 982–83.

24         *Pinter* was unambiguous.  "At the very least, however, the language of
25  ["offers or sells"] contemplates a buyer-seller relationship not unlike traditional
26  contractual privity." *Pinter*, 486 U.S. at 642.  The Supreme Court continued that
27  "[t]here is no support in the statutory language or legislative history for expansion
28  of [the "offers or sells" language] beyond persons who pass title and persons who

1  'offer,' including those who 'solicit' offers." *Id.* at 650. This focus on the

2  statutory language means that the *Pinter* court resolved the issue "under the first

3  step of *Chevron* by examining the text of the relevant statutes and their legislative

4  histories." *Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1238 (9th Cir.

5  2007). Therefore, *Pinter* was unambiguous, and there were no statutory gaps for

6  the SEC to fill. The SEC's rule exceeded the statutory language of Section

7  12(a)(2) and cannot apply. The Section 12(a)(2) claims against the Depositor

8  Defendants must be dismissed. *Capital Ventures UBS*, 2012 WL 4469101, at *14

9  n.9; *RFC*, 843 F. Supp. 2d at 207. The D.C. blue sky law claims against the

10  Depositor Defendants are also dismissed[21] because that section is "nearly-

11  identical" to section 12(a)(2), so "case law interpreting that statute should apply" to

12  the blue sky law as well. *Hite*, 429 F. Supp. 2d at 114.

13  **VI.     *The Individual Defendants Cannot be Liable for Misstatements that Post-***

14  ***Date the Registration Statements they Signed***

15         The Individual Defendants move to dismiss the Section 11 claims, because

16  the registration statements they signed did not contain any information alleged to

17  be false and misleading. Under Section 11, liability extends to the signers of

18  registration statements whenever "any part of the registration statement, when such

19  part became effective, contained an untrue statement of a material fact or

20  [omission]." 15 U.S.C. § 77k(a). In this case, the registration statements

21  themselves "contained only an illustrative form of a prospectus supplement. It was

22  the final prospectus supplement filed with the SEC . . . that contained 'a

23  description of the mortgage pool underlying the Certificates and the underwriting

24  standards by which the mortgages were originated.'" *Me. State Ret. Sys. v.*

25

26  ---
    21      FHFA has already dismissed the Virginia law claims against the Depositor Defendants,

27  since Virginia law uses statutory language that makes clear that issuers cannot be liable.
    *Barclays Bank PLC*, 2012 WL 5844189, at *3; Joint Stip. Dismissing Certain of Pl.'s Virginia

28  Blue Sky Claim, ECF No. 195.

*Countrywide Fin. Corp.* ("*Me. State I*,") 722 F. Supp. 2d 1157, 1164 (C.D. Cal. 2010) (citing the complaint in that case); FHFA Opp. to Indiv. Defs.' Mot. to Dismiss 10, ECF No. 191 ("each Registration Statement was filed on SEC Form S-3 and included a 'base prospectus' containing only generic information about future offerings. Each base prospectus contained 'blanks' for virtually all details that would be relevant to an investor assessing the worth of the underlying collateral and structure of the Certificates."). The Amended Complaint relies on misrepresentations and misstatements in the prospectus supplements, which were filed after the registration statements signed by the Individual Defendants. FAC IV.A. ("Statistical Data Provided in the Prospectus Supplements Concerning Owner Occupancy and LTV Ratios Was Materially False or Misleading"), ¶ 51, Table 3 ("filing dates of the Shelf Registration Statements and Amendments"), ¶ 53 ("The dates on which the Prospectus Supplement . . . were filed for each Securitization").

Under SEC regulations, information in a prospectus supplement "shall be deemed to be part of and included in the registration statement on the earlier of the date such subsequent form of prospectus is first used or the date and time of the first contract of sale of securities in the offering to which such subsequent form of prospectus relates." 17 C.F.R. § 230.430B(f)(1). That date (when the prospectus supplement is first "used" or the date of the first sale of securities occurs) becomes "the new effective date" "for purpose of liability under section 11 of the Act of the issuer and any underwriter at the time only." *Id.* § 230.430B(f)(2). However, that date "shall not be an effective date . . . as to [a]ny director . . . of the issuer [or] [a]ny person signing any report or document incorporated by reference into the registration statement," except under two exceptions. *Id.* § 230.430B(f)(4). The first exception requires issuers to update the financial information in a registration statement after its effective date. 15 U.S.C. § 77j(a)(3). The rule does not apply to registration statements filed by issuers of asset-backed securities. SEC Release

1   Nos. 33-8591, 34-52056, 76 Fed. Reg. 47948-01, 47961 n. 102 (Aug. 5, 2011).

2   The other exception requires an entity to file a post-effective amendment to a

3   registration statement when facts or events arise that "represent a fundamental

4   change in the information set forth in the registration statement." 17 C.F.R. §

5   229.512(a)(1)(ii). A "fundamental change" does not occur "if the registration

6   statement is on Form S-3 . . . and the information required to be included in a post-

7   effective amendment . . . is contained in a form of prospectus filed pursuant to

8   Rule 424(b)." *Id.* § 229.512(a)(1)(B). Countrywide's registration statements were

9   filed on Form S-3 and the prospectus supplements were filed "pursuant to Rule

10  424(b)(5)." Spector Request for Jud. Notice Ex. I, ECF No. 177. The second

11  exception also does not apply.

12          Neither exception applies. Therefore, the date the prospectus supplements

13  become part of the registration statement is *not* a new "effective date" for directors

14  or signers of the registration statement. The only effective date, then, is the filing

15  date of the registration statements. On that date, the registration statements were

16  "blank," in the words of FHFA, and did not contain any of the misstatements

17  described in the Complaint. For the Individual Defendants, the registration

18  statements did not contain misstatements on their effective dates. The Individual

19  Defendants cannot be held liable under Section 11.

20          SEC guidance documents support this conclusion. "The prospectus filing

21  will not create a new effective date for directors or signing officers of the issuer,"

22  except when the two exceptions listed above occur. SEC Release ("SEC 2005

23  Release") Nos. 33-8591, 34-52056, 70 Fed. Reg. 44722, 44774 (Aug. 3, 2005).

24  That "published interpretation of its own regulations" must be treated as

25  "controlling if it is not 'plainly erroneous or inconsistent with the regulations.'"

26  *Strom v. United States*, 641 F.3d 1051, 1063 (9th Cir. 2011) (applying that

27  treatment to an SEC Release and citing *Auer v. Robbins*, 519 U.S. 452, 461

28  (1997)). The SEC guidance is not plainly erroneous and must be treated as

1   controlling.  Therefore, the prospectus supplement does not alter the effective date

2   for directors and signing officers.

3       FHFA argues that the term "effective date" in Rule 430B(f)(2) and (f)(4) is

4   actually the date of the initial *bona fide* offering, which commences the statute of

5   repose.  Under FHFA's interpretation, the statute of repose begins to run for issuers

6   and underwriters on the date each prospectus supplement is filed, but begins to run

7   for directors and signers on the earlier filing date of the registration statement.

8   This interpretation is wrong.  There is no mention of the "initial *bona fide* offering"

9   date in Rule 430B(f)(4) or the SEC guidance documents.  The SEC Release is clear

10  that the "liability of auditors, other experts, and outside directors"[22] are treated

11  similarly, and that the 2005 regulations "should provide clarity for auditors, among

12  others, that a new effective date for them is not created."  SEC 2005 Release, 70

13  Fed. Reg. at 44774.

14      FHFA cites unconvincing case law in support of its position.  *In re Marsh &*

15  *McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006); *Fed. Hous. Fin.*

16  *Agency v. Bank of Am. Corp.*, No. 11 Civ. 6195(DLC), 2012 WL 6592251

17  (S.D.N.Y. Dec. 18, 2012).  In *Marsh & McLennan*, the prospectus supplement

18  incorporated by reference company filings signed by the individual defendants.

19  *Marsh & McLennan*, 501 F. Supp. 2d at 491–92.  In *Bank of America*, the court

20  does not clearly distinguish the directors and signers, who are governed by Rule

21  430B(f)(4), from other defendants.  The other arguments offered by FHFA are

22  similarly flawed.  Though it may be "axiomatic" that the content of a prospectus

23  supplement is part of the registration statement, and general SEC regulations

24  support that position, SEC 2005 Release, 70 Fed. Reg. at 44771, specific SEC

25  regulations clearly limit the Section 11 liability of directors and signers.

26

27

28

---

[22]   The Court recognizes that the Individual Defendants are not outsider directors, but the actual SEC regulations at issue do not make a distinction between inside and outside directors.

## VII.   The Complaint Adequately Pleads Control Liability Where a Primary Violation has Been Alleged

The Individual Defendants, CFC, CHL and CCM (collectively, the "Control Person Defendants") move to dismiss the control person claims.  The first element of a control person claim under federal, D.C. or Virginia law is that a primary violation is adequately pled.  As described above, the Amended Complaint does adequately plead primary violations against the Underwriter Defendants, including CSC, for violations of Sections 11 and 12(a)(2), and CWALT and CWABS for violations of Section 11.[23]

The Individual Defendants argue that they did not control CWALT and CWABS.  At the motion to dismiss stage, allegations that "go no farther than listing the defendant's name, title, and listing which registration statements that defendant signed . . . are marginally sufficient to support a Section 15 claim." *Dexia*, 2012 WL 1798997, at *4.  "It is a plausible inference that a director or high-level officer of an entity exercised control over that entity." *Id.*  The Amended Complaint contains allegations that Kripalani, Kurland, Sandefur, Sieracki, Adler and Spector were high-ranking officers and directors of CWALT and CWABS. FAC ¶¶ 76-81.  Each Individual Defendant signed at least two registration statements. *Id.* ¶ 51.  The Individual Defendants "participated in the operation and management of the Depositor Defendants [including CWALT and CWABS] and their related subsidiaries, and conducted and culpably participated, directly and indirectly, in the conduct of the Depositor Defendants' business affairs." *Id.* ¶ 436. That is sufficient to plead that the Individual Defendants controlled CWALT and CWABS.

---

[23]   Since the Depositor Defendants cannot be liable under Section 12(a)(2) or the D.C. analogue to that statute, the control claims proceed only against the Individual Defendants for their control of CWALT and CWABS' breaches of Section 11.

1      The Individual Defendants offer two arguments in response. First, they
2  argue that the Amended Complaint is contradictory, because it alleges that CHL
3  "controlled all aspects of the business of the Depositor Defendants." *Id.* ¶ 279.
4  There is no contradiction, because "multiple persons can exercise control
5  simultaneously." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1088 (9th
6  Cir. 2010). FHFA has alleged such "dual control" here. Second, the Individual
7  Defendants argue that because CWALT and CWABS were merely special purpose
8  entities with a limited and temporary purpose, control does not plausibly apply to
9  directors or officers. This is a factual question that must be resolved at a later stage
10  of the litigation. *Mass. Mut. II*, 2012 WL 3578666, at *4.[24]

11      The Complaint also plausibly alleges that the CFC and CCM controlled CSC
12  for the Sections 11 and 12(a)(2) violations, and CFC and CHL controlled CWALT
13  and CWABS for their violation of Section 11. CHL "controlled all aspects of the
14  business of the Depositor Defendants" and "was able to, and did in fact, control the
15  contents of the nine Registration Statements filed by the Depositor Defendants."
16  FAC ¶¶ 279, 439. CCM "controlled the business operations of Defendant
17  Countrywide Securities," by virtue of its status as "sole owner" of CSC, and had
18  the practical ability to direct and control the actions of [CSC] in issuing and selling
19  the Certificates, and in fact exercised such direction and control." *Id.* ¶ 440. The
20  Complaint offers specific allegations as to the "high level of day-to-day control"
21  CCM exercised over CSC, and details how information passed from CFC, to CCM,
22  to ensure that CSC followed the priorities established by CFC and CCM, including
23  "the manner in which Countrywide Securities and the trusts selected and sold the
24  securitized loans through certificate offerings, and controlled the disclosures made
25  in connection with each securitization." *Id.* ¶¶ 293-294. CFC "controlled the

26

27  _____

28  [24]   Neither Stanford Kurland nor David Spector can be held liable for securities that were issued after they left Countrywide.

1    does not support a claim for *de facto* merger in these circumstances. *Allstate Ins.*

2    *Co. v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1231 (C.D. Cal. 2012). The

3    facts in the Amended Complaint fail to plead assumption of liabilities or fraudulent

4    conveyance. *Id.* at 1223–31.

5    
### IX.    Conclusion

6        The Court dismisses allegations in the Amended Complaint involving

7    owner-occupancy data. The Court dismisses the negligent misrepresentation and

8    aiding and abetting claims. The Court dismisses the Section 12(a)(2) and D.C.

9    blue sky law claims as to the Depositor Defendants. The Court dismisses Section

10   11 claims filed against the Individual Defendants. Each dismissal is with

11   prejudice. The Court dismisses all successor liability claims against the Bank of

12   America Defendants with prejudice, except those of intentional and constructive

13   fraudulent conveyance. The Plaintiff has indicated its intention to file a motion to

14   amend as to those claims, and the Court will permit such a motion to be filed.

15

16   IT IS SO ORDERED.

17   DATED:  March 15, 2013

     Hon. Mariana R. Pfaelzer
     United States District Judge