1    Brian E. Pastuszenski (*pro hac vice*)
     bpastuszenski@goodwinprocter.com
2    John B. Daukas (*pro hac vice*)
     jdaukas@goodwinprocter.com
3    Brian C. Devine (State Bar No. 222240)
     bdevine@goodwinprocter.com
4    **GOODWIN PROCTER LLP**
     53 State Street
5    Boston, Massachusetts  02109
     Telephone:  617-570-1000
6    Facsimile:   617-523-1231

7    Daniel J. Tyukody (State Bar No. 123323)
     dtyukody@goodwinprocter.com
8    **GOODWIN PROCTER LLP**
     601 S. Figueroa Street, 41st Floor
9    Los Angeles, CA  90017
     Telephone:  213-426-2500
10   Facsimile:  213-623-1673

11   *Attorneys for Defendants*
     Countrywide Financial Corp., Countrywide
12   Home Loans, Inc., Countrywide Capital Markets
     LLC, Countrywide Securities Corp., CWABS,
13   Inc., CWALT, Inc., and CWMBS, Inc.

14              **UNITED STATES DISTRICT COURT**
15              **CENTRAL DISTRICT OF CALIFORNIA**

16   In re COUNTRYWIDE FINANCIAL          Case No. 11-ML-02265-MRP (MANx)
     CORP. MORTGAGE-BACKED
17   SECURITIES LITIGATION               **REPLY IN SUPPORT OF**
                                         **COUNTRYWIDE DEFENDANTS'**
18                                       **MOTION FOR RECONSIDERATION**
                                         **OF OCTOBER 18, 2012 ORDER**
19
                                         Date:        February 27, 2014
20                                       Time:        1:30 p.m.
                                         Courtroom:   12
21                                       Judge:       Hon. Mariana R. Pfaelzer

22   FEDERAL HOUSING FINANCE            Case No. 12-CV-01059-MRP (MANx)
     AGENCY, as conservator for THE
23   FEDERAL NATIONAL
     MORTGAGE ASSOCIATION AND
24   THE FEDERAL HOME LOAN
     MORTGAGE CORPORATION,
25              Plaintiff,
26         v.

27   COUNTRYWIDE FINANCIAL
     CORPORATION, *et al*.,
28              Defendants.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ..................................................................................................... 3

I.      COUNTRYWIDE'S MOTION IS PROCEDURALLY PROPER ................ 3

II.     THE HERA EXTENDER PROVISION DOES NOT PREEMPT THE VIRGINIA AND D.C. SECURITIES ACT STATUTES OF REPOSE ........ 5

      A.     The Presumption Against Preemption Applies Without Limitation .... 6

      B.     FHFA Fails To Show "Clear And Manifest" Intent To Preempt .......... 11

            1.  FHFA Fails To Establish Express Preemption ................................ 11

            2.  FHFA Fails To Establish Implied Preemption ................................ 15

      C.     The *Summerlin* Doctrine Does Not Apply ............................................. 20

III.    THE HERA EXTENDER PROVISION DOES NOT IMPLICITLY AMEND THE 1933 ACT STATUTE OF REPOSE ........................................ 26

      A.     The *Guaranty Bank* Orders Did Not "Reaffirm" That The HERA Extender Provision Applies To The 1933 Act Statute Of Repose ........ 27

      B.     The Legal Framework Used To Analyze Implied Amendments Of Federal Statutes Applies Here .............................................................. 28

      C.     There Is No Evidence Of "Clear And Manifest" Congressional Intent To Implicitly Amend The 1933 Act Statute Of Repose ........................ 30

CONCLUSION................................................................................................. 33

1

2

## <u>TABLE OF AUTHORITIES</u>

3

CASES                                                                                                          PAGE(S)

4

5
*AG Route Seven P'ship v. United States,*
    57 Fed. Cl. 521 (Fed. Cl. 2003)..................................................................20

6

7
*Allied-Bruce Terminix Cos., Inc. v. Dobson,*
    513 U.S. 265 (1995) .................................................................................12

8

9
*Altria Grp. v. Good,*
    555 U.S. 70 (2008)..................................................................................6-7

10

11
*Ameristar Fin. Servicing Co. v. United States,*
    75 Fed. Cl. 807 (Fed. Cl. 2007)..................................................................20

12

13
*Arizona v. InterTribal Council of Ariz., Inc.,*
    133 S. Ct. 2247 (2013)..............................................................................9

14

15
*Biotechnology Indus. Org. v. District of Columbia,*
    496 F.3d 1362 (Fed. Cir. 2007) ...................................................................6

16

17
*Birdville Indep. School Dis. v. Hurst Assocs.,*
    806 F. Supp. 122 (N.D. Tex. 1992)..............................................................13

18

19
*Bresson v. Comm'r of Internal Revenue,*
    213 F.3d 1173 (9th Cir. 2000)....................................................................24

20

21
*Buckman Co. v. Plaintiffs' Legal Comm.,*
    531 U.S. 341 (2001) ...................................................................................9

22

23
*California v. FHFA,*
    2011 WL 3794942 (N.D. Cal. Aug. 26, 2011)...............................................9

24

25
*California Div. Labor Stds. Enforcement v. Dillingham Constr. N.A., Inc.,*
    519 U.S. 316 (1997) .................................................................................14

26

27
*CityFed Fin. Corp. v. OTS,*
    58 F.3d 738 (D.C. Cir. 1995).....................................................................15

28

*In re Countrywide Fin. Corp. MBS Litig.*,
    834 F. Supp. 2d 949 (C.D. Cal. 2012)....................................................4

*In re Countrywide Fin. Corp. MBS Litig.*,
    2012 WL 3578666 (C.D. Cal. Aug. 17, 2012) ....................................4

*In re Countrywide Fin. Corp. MBS Litig.*,
    2013 WL 6706090 (C.D. Cal. Dec. 19, 2013)("*Guaranty Bank II*")..........*passim*

*In re Countrywide Fin. Corp. MBS Litig.*,
    943 F. Supp. 2d 1035 (C.D. Cal. 2013)................................................4

*County of Sonoma v. FHFA*,
    710 F.3d 987 (9th Cir. 2013) .............................................................9

*Courtney v. Halleran*,
    485 F.3d 942 (7th Cir. 2007) ...........................................................16

*Don't Tear It Down, Inc. v. Pa. Ave. Dev. Corp.*,
    642 F.2d 527 (D.C. Cir. 1980)...........................................................6

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
    541 U.S. 246 (2004) ........................................................................14

*FDIC v. Countrywide Sec. Corp.*,
    2013 WL 4536177 (C.D. Cal. Aug. 26, 2013)("*Guaranty Bank I*")...........*passim*

*FDIC v. Glickman*,
    450 F.2d 416 (9th Cir. 1971) ...........................................................20

*FDIC v. Haines*,
    3 F. Supp. 2d 155 (D. Conn. 1997) ..................................................20

*FDIC v. O'Melveny & Myers*,
    61 F.3d 17 (9th Cir. 1995) ...............................................................21

*FHFA v. City of Chicago*,
    2013 WL 4505413 (N.D. Ill. Aug. 23, 2013)........................................13-14, 19

*FHFA v. Countrywide Fin. Corp.*,
    900 F. Supp. 2d 1055 (C.D. Cal. 2012)("*FHFA* Order")............................*passim*

iii

*FHFA v. UBS Ams, Inc.*,
   712 F.3d 136 (2d Cir. 2013) ............................................................... 3

*Fidelity Fed. Sav. & Loan Assoc. v. de la Cuesta*,
   458 U.S. 141 (1982) ......................................................................... 14

*Goudreau v. Standard Fed. Sav. & Loan Ass'n*,
   511 A.2d 386 (D.C. 1986) ................................................................. 6

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ......................................................................... 19

*Herron v. Fannie Mae*,
   857 F. Supp. 2d 87 (D.D.C. 2012) ................................................... 22

*Humpherys v. Nager*,
   962 F. Supp. 347 (E.D.N.Y. 1997) ................................................... 21

*JMM Corp. v. District of Columbia*,
   378 F.3d 1117 (D.C. Cir. 2004) ......................................................... 6

*In re Korean Air Lines Disaster*,
   829 F.2d 1171 (D.C. Cir. 1987) ......................................................... 4

*Ledo Fin. Corp. v. Summers*,
   122 F.3d 825 (9th Cir. 1997) ........................................................... 20

*Marshall v. Intermountain Elec. Co.*,
   614 F.2d 260 (10th Cir. 1980) ......................................................... 25

*McDaniel v. Wells Fargo Invs., LLC*,
   717 F.3d 668 (9th Cir. 2013) ........................................................ 8, 9

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ..................................................................... 7, 19

*Morton v. Mancari*,
   417 U.S. 535 (1974) ......................................................................... 31

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) .................................................................. 29, 31

*NCUA v. Nomura Home Equity Loan, Inc.,*
   727 F.3d 1246 (10th Cir. 2013) ........................................................ 12

*New Hampshire v. Maine,*
   532 U.S. 742 (2001) ........................................................................ 23

*Newman v. Kelly,*
   848 F. Supp. 228 (D.D.C. 1994) ........................................................ 6

*Newton v. Thomason,*
   22 F.3d 1455 (9th Cir. 1994) ......................................................... 3-4

*O'Melveny & Myers v. FDIC,*
   512 U.S. 79 (1994) ................................................................. *passim*

*Perpetual Fin. Corp. v. United States,*
   61 Fed. Cl. 126 (Fed. Cl. 2004) ....................................................... 20

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines,*
   534 F.3d 779 (D.C. Cir. 2008) ......................................................... 21

*Risetto v. Plumbers & Steamfitters Local 343,*
   94 F.3d 597 (9th Cir. 1996) ............................................................. 23

*Rodriguez v. United States,*
   480 U.S. 522 (1987) ........................................................................ 18

*Schock v. FDIC,*
   118 F. Supp. 2d 165 (D.R.I. 2000) ................................................... 20

*SEC v. Calvo,*
   378 F.3d 1211 (11th Cir. 2004) ....................................................... 25

*SEC v. Lorin,*
   869 F. Supp. 1117 (S.D.N.Y. 1994) ............................................ 24-25

*SEC v. Rind,*
   991 F.2d 1486 (9th Cir. 1993) ......................................................... 24

*Silvas v. E*Trade Mortg. Corp.,*
   514 F.3d 1001 (9th Cir. 2008) ........................................................... 9

v

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.,*
    802 F. Supp. 2d 1125 (C.D. Cal. 2011) ............................................................ 19

*United States v. Ajoku,*
    718 F.3d 882 (9th Cir. 2013) ........................................................................... 17

*United States v. Beebe,*
    127 U.S. 338 (1888) .......................................................................................... 25

*United States v. Beszborn,*
    21 F.3d 62 (5th Cir. 1994) ............................................................................... 20

*United States v. California,*
    507 U.S. 746 (1993) .......................................................................................... 20

*United States v. Comprehensive Drug Testing, Inc.,*
    473 F.3d 915 (9th Cir. 2006) .............................................................................. 4

*United States v. Dos Cabezas Corp.,*
    995 F.2d 1486 (9th Cir. 1993) ......................................................................... 10

*United States v. Gen. Dynamics Corp.,*
    19 F.3d 770 (2d Cir. 1994) .............................................................................. 31

*United States v. Ely,*
    142 F.3d 1113 (9th Cir. 1997) ......................................................................... 20

*United States v. Hansen,*
    772 F.2d 940 (D.C. Cir. 1985) ......................................................................... 31

*United States v. Heffner,*
    85 F.3d 435 (9th Cir. 1996) ............................................................................. 20

*United States v. Locke,*
    529 U.S. 89 (2000) .......................................................................................... 7, 9

*United States v. Novak,*
    476 F.3d 1041 (9th Cir. 2007) ......................................................................... 17

*United States v. Summerlin,*
    310 U.S. 414 (1940) ................................................................................... 20, 23

*United States v. Winstar Corp.*,
     518 U.S. 839 (1996) ........................................................................ 15

*Wash. Serv. Contractors Coal v. District of Columbia*,
     54 F.3d 811 (D.C. Cir. 1995) ........................................................... 6

*Whaley v. Belleque*,
     520 F.3d 997 (9th Cir. 2008) .......................................................... 23

*Wyeth v. Levine*,
     555 U.S. 555 (2009) ........................................................................7-8


**STATUTES**

12 U.S.C. § 4617(a)(7) ..................................................................... 12, 13

12 U.S.C. § 4617(b)(2)(A) ...................................................................... 21

12 U.S.C. § 1821(c)(2)(c) ....................................................................... 13

15 U.S.C. § 77m .................................................................................29-30

**RULES**

C.D. Cal., L.R. 7-18(b)(2) ....................................................................... 3

**OTHER AUTHORITIES**

S.Rep. No. 101-19 (1989) ........................................................................ 16

FDIC, *The Banking Crises of the 1980s and Early 1990s: Summary and
Implications*, available at
http://www.fdic.gov/bank/historical/history/3_85.pdf ........................... 16

## <u>PRELIMINARY STATEMENT</u>

FHFA's opposition brief is most noteworthy for what it omits—*i.e.*, *any* mention of whether Congress had "clear and manifest" intent that HERA's statute of limitations extender provision would supplant the statutes of repose found in blue sky laws and Section 13 of the 1933 Act.[1]  FHFA does not even use the phrase "clear and manifest" in its brief (other than to refer to *Countrywide's* arguments), even though "clear and manifest" intent is the standard the Supreme Court requires courts to use when assessing questions of preemption and implied amendment/repeal.  FHFA's avoidance of these words only underscores that *there is no evidence*—let alone "clear and manifest" evidence—of congressional intent here.  This Court's holding in *Guaranty Bank* with respect to the FIRREA extender provision thus applies equally to the identically-worded HERA provision:  "The Court cannot find . . . 'clear and manifest' evidence to overcome the presumption that Congress did not intend to preempt areas of traditional state regulation."  *Guaranty Bank I*, 2013 WL 4536177, at *6 (C.D. Cal. Aug. 26, 2013).  And there is likewise no evidence of "clear and manifest" intent regarding the 1933 Act statute of repose, and as such the FHFA cannot overcome the strong presumption that Congress did not implicitly amend that earlier-enacted Act's repose period through the later-in-time HERA extender provision.  Accordingly, this Court should dismiss FHFA's blue sky and 1933 Act claims as untimely.

More specifically, FHFA cannot overcome the strong presumption against preemption, which applies without qualification in fields that states traditionally have occupied—like the regulation of securities transactions.  FHFA does not dispute that state legislatures have long regulated securities transactions through their blue sky laws, as this Court found in *Guaranty Bank*.  Rather, FHFA argues that the presumption against preemption nonetheless can be "outweighed" in areas that the federal government historically has regulated.  Opp. at 16.  This argument borders on the

---

[1] This reply brief uses the opening brief's defined terms, and refers to that opening brief as "Mem." and FHFA's Opposition as "Opp."

frivolous, as controlling Supreme Court and Ninth Circuit cases make clear that the presumption applies in *all* preemption cases, particularly in areas traditionally occupied by the states, regardless of the presence or absence of federal regulation.  Because the presumption applies here, FHFA can overcome it only by establishing that Congress had the "clear and manifest" intent to preempt blue sky statutes of repose.  But this Court has already considered—and rejected—FHFA's only "evidence" of such intent:  (1) the ambiguous statutory text and scant legislative history that FHFA cites do not evidence Congress's intent to expressly preempt blue sky statutes of repose; and (2) HERA's dollar-recovery objectives do not conflict with the enforcement of blue sky statutes of repose such that the requisite congressional intent to preempt may be inferred.  Because HERA's extender provision does not preempt blue sky statutes of repose, FHFA's Virginia and D.C. blue sky claims are time-barred.

FHFA also cannot overcome the strong presumption against implied repeal or amendment of a previously-enacted federal statute by a later-in-time federal statute.  Just as the presumption against preemption applies whenever a federal law displaces state law in an area that states historically have regulated, the presumption against implied amendment/repeal applies whenever a federal law is argued to displace a previously-enacted federal law.  Although FHFA argues that the implied amendment/repeal legal framework does not apply because the HERA extender provision supposedly created a "narrow exception for actions brought by [FHFA]," Opp. at 28-29, this Court rejected that very same argument in *Guaranty Bank II* when it applied the presumption against preemption:  "However characterized, extending the time limitation on Plaintiffs' claim would effectively nullify the [state blue sky] statute of repose.  Such a result is impossible without invoking, even if implicitly, the supremacy of FIRREA as federal law."  2013 WL 6706090, at *7.  Such a result is likewise impossible here without permitting HERA, even if implicitly, to trump Section 13 of the 1933 Act.  Because FHFA provides no evidence of Congress's "clear and manifest" intent to do so, its 1933 Act claims are time-barred.

**ARGUMENT**

## I.   **COUNTRYWIDE'S MOTION IS PROCEDURALLY PROPER.**

FHFA first argues that Countrywide's motion is "procedurally improper," but its arguments are meritless and should be rejected.

<u>First</u>, FHFA argues that Countrywide's motion violates the requirement of Local Rule 7-18 that "[n]o motion for reconsideration shall in any manner repeat any oral or written argument made in support of . . . the original motion." Opp. at 9-10, 26-27. But Countrywide's motion does not "repeat" the same arguments it made in its original motion to dismiss. Rather, it presents new arguments based on "a change in law"—namely, this Court's intervening rulings in *Guaranty Bank I* and *II*—which Local Rule 7-18 expressly authorizes. C.D. Cal. R. 7-18(b); Mem. at 7. In fact, the Court appears to have specifically contemplated the filing of this motion in *Guaranty Bank II*, as it explained: "to the extent *Guaranty Bank* is at odds with prior decisions of this Court, if at all, the pertinent question is not whether those decisions require reconsideration of *Guaranty Bank*, but whether *Guaranty Bank* requires reconsideration of those prior decisions." 2013 WL 6706090, at *10.

<u>Second</u>, FHFA argues that Countrywide's motion seeks "a ruling contradicting the law of the Second Circuit, the jurisdiction from which this action was transferred to the MDL and in which it ultimately will be tried." Opp. at 10-11. This argument fails for two reasons. First, there is no potential for conflict with the Second Circuit's decision in *FHFA v. UBS Ams., Inc.*, 712 F.3d 136 (2d Cir. 2013), because that case did not even discuss, let alone decide, the preemption issues presented here.[2] Second, even if there were a potential for conflict, it is well-settled that when considering questions of federal law, "a transferee court in [the Ninth Circuit] is bound only by [the Ninth Circuit's] precedent," *Newton v. Thomason*, 22 F.3d 1455, 1460 (9th Cir.

---

[2] Like this Court's original motion to dismiss ruling in this case, 900 F. Supp. 2d 1055 (C.D. Cal. 2012), the Second Circuit's decision in *UBS* concluded that FHFA's state blue sky claims were timely under the HERA extender provision without addressing the preemption issues that this Court addressed for the first time in *Guaranty Bank*.

1994), and "the law of a transferor forum on a federal question . . . does not have stare decisis effect in a transferee forum situated in another circuit," *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1176 (D.C. Cir. 1987).[3]  Here, the scope and application of the HERA extender provision is indisputably a question of federal law.  Thus, in deciding this motion, this Court is bound by Supreme Court and Ninth Circuit law only, and the Second Circuit's decision in *UBS* is not controlling.[4]

Third, although FHFA does not dispute the timeliness of Countrywide's motion with respect to FHFA's state blue sky claims, it argues that the motion is untimely as it applies to FHFA's 1933 Act claims.  *See* Opp. at 27-28.  More specifically, FHFA asserts that "Defendants have known since August 26, 2013, when *Guaranty Bank I* was issued, the purported basis for their motion to reconsider."  *Id.* at 27.  But FHFA itself concedes that motions for reconsideration are timely as long as they are brought within "a reasonable time."  *United States v. Comprehensive Drug Testing, Inc.*, 473 F.3d 915, 928-29 (9th Cir. 2006), *superseded on other grounds*, 513 F.3d 1085, 1098 (9th Cir. 2006).  Here, the timing of Countrywide's motion was plainly reasonable.

As FHFA is well aware, the FDIC filed a motion for reconsideration in *Guaranty Bank* on September 10, 2013, just two weeks after the Court's ruling in *Guaranty Bank I*.  *See* Opp. at 7.  While the FDIC's motion was pending, any motion for reconsideration in this case based on *Guaranty Bank I*—regardless of whether it had been directed at FHFA's blue sky claims or its 1933 Act claims—would have been prema-

---

[3] *Accord In re Countrywide Fin. Corp. MBS Litig.*, 2012 WL 3578666, at *3 n.3 (C.D. Cal. Aug. 17, 2012) ("The Ninth Circuit has held that transferee courts apply Ninth Circuit law to any federal claims. . . ."); *In re Countrywide Fin. Corp. MBS Litig.*, 834 F. Supp. 2d 949, 952 (C.D. Cal. 2012) (same); *Korean Air Lines Disaster*, 829 F.2d at 1175 ("Applying divergent interpretations of the governing federal law to plaintiffs, depending solely upon where they initially filed suit, would surely reduce the efficiencies achievable through consolidated preparatory [MDL] proceedings.").

[4] Moreover, the Court has noted more than once in the Countrywide MBS MDL that "it has an obligation to determine each issue of federal law assigned to it," and to do so correctly, even if it reaches a conclusion different from that of other federal courts. *In re Countrywide Fin. Corp. MBS Litig.*, 943 F. Supp. 2d 1035, 1045 (C.D. Cal. 2013); *accord Korean Air Lines Disaster*, 829 F.2d at 1175 ("If a federal court simply accepts the interpretation of another circuit without [independently] addressing the merits, it is not doing its job.").

1  ture.  FHFA also ignores that many of Countrywide's arguments regarding the 1933

2  Act claims are based on the Court's ruling in *Guaranty Bank II*, which denied the

3  FDIC's reconsideration motion, was not issued until December 19, 2013, and further

4  articulated the reasoning behind the Court's decisions.  *See* Mem. at 17-18; *infra* at

5  28-32.[5]  In short, Countrywide could not reasonably have filed its motion for recon-

6  sideration in this case before the Court issued its *Guaranty Bank II* decision.  And

7  once the Court did issue that decision, Countrywide promptly filed this motion, less

8  than 30 days later.  The timing of Countrywide's motion was therefore reasonable,

9  and certainly did not prejudice FHFA in any way.[6]

10 **II.   THE HERA EXTENDER PROVISION DOES NOT PREEMPT THE
       VIRGINIA AND D.C. SECURITIES ACT STATUTES OF REPOSE.**

11

12         The text of the HERA statute of limitations extender provision is identical to

13 that of the FIRREA extender provision, and all the same considerations that led this

14 Court to reach the result it did in *Guaranty Bank* are present here as well.  As in

15 _____

16 [5] Citing a footnote in a Countrywide brief dated October 31, 2013, FHFA argues that
   it is "troubling" that "Defendants represented to this Court that they were planning to
17 seek reconsideration *only* with respect to the Court's ruling denying dismissal of
   FHFA's Blue Sky claims."  Opp. at 27.  But this is a gross mischaracterization of
18 Countrywide's brief.  As the quotation in FHFA's brief shows, the word "only" does
   not appear in Countrywide's footnote, and the possibility of seeking reconsideration
19 as to the 1933 Act claims is not addressed (let alone foreclosed).  *See id*.  Rather, the
   text in question—"[t]he Countrywide Defendants intend shortly to file a motion seek-
20 ing the dismissal of FHFA's blue sky claims based on application of the Court's
   *Guaranty Bank [I]* ruling to this case"—was true at the time it was said and remains
21 true today.  In any event, that brief was filed nearly two months *before* the Court's rul-
   ing in *Guaranty Bank II*, which served in significant part as the grounds for Country-
22 wide's motion as to the 1933 Act claims.  *See infra* at 28.  It is thus not surprising that
   a brief dated October 31, 2013 would not mention the 1933 Act claims in this context.
23 [6] FHFA suggests that Countrywide "purposefully concealed [its] intention to pursue
   dismissal of [the 1933 Act] claims so that [it] could invoke the claims as justification
24 for [its] expansive [Single Family] discovery demands."  Opp. at 27-28.  This asser-
   tion is groundless.  As Countrywide has repeatedly made clear, documents from Fan-
25 nie and Freddie's Single Family businesses are relevant to *all* of FHFA's claims—
   including its fraud claims, which are not being challenged by this motion.  *See* Dkt.
26 No. 310 at 25-34 (arguing that Single Family discovery is relevant to show GSEs'
   knowledge of misstatements and refute allegations of reliance, falsity, materiality, loss
27 causation, scienter); Dkt. No. 341 at 25-40.  Countrywide would have sought to com-
   pel the production of the Single Family discovery regardless of when this motion was
28 filed, regardless of which claims it targeted, and regardless of its ultimate outcome.

1    *Guaranty Bank*, the text of the HERA extender provision is ambiguous.  As in *Guar-*

2    *anty Bank*, the legislative history is silent.  As in *Guaranty Bank*, there is no irrecon-

3    cilable conflict between the federal objectives of HERA and the interests of Virginia

4    and D.C. in enforcing their repose periods.  Thus, as in *Guaranty Bank*, this Court

5    should conclude that the HERA extender provision does not preempt state blue sky

6    statutes of repose and FHFA's Virginia and D.C. Securities Act claims should be dis-

7    missed as time-barred.  *See* Mem. at 7-16.  All of FHFA's attempts to distinguish this

8    case from *Guaranty Bank* are without merit and should be rejected.

9         A.      **The Presumption Against Preemption Applies Without Limitation**.

10        FHFA concedes that preemption is the proper legal framework under which this

11   Court should analyze whether HERA's statute of limitations extender provision dis-

12   places state blue sky statutes of repose.  *See* Opp. at 12-23.[7]  And as this Court has ex-

13   plained, courts must "address[] claims of pre-emption with the starting presumption

14   that Congress does not intend to supplant state law."  *Guaranty Bank I*, 2013 WL

15   4536177, at *5.  This strong presumption against preemption "is grounded in concerns

16   for state sovereignty" and "respect for the states as independent sovereigns in our fed-

17   eral system," *id*. at *5 n.5, and it "applies with particular force when Congress has leg-

18   _____

19   [7] FHFA halfheartedly suggests in a footnote that preemption analysis does not apply
     to FHFA's D.C. Securities Act claims because the District of Columbia is not a state.
20   *See* Opp. at 12 n.6.  But FHFA ignores myriad cases holding that preemption analysis
     governs the relationship between federal law and D.C. law.  Indeed, as the D.C. Court
21   of Appeals explained in *Goudreau v. Standard Fed. Sav. & Loan Ass'n*, 511 A.2d
     386, 389 (D.C. 1986), "[i]t has been repeatedly recognized that the preemption doc-
22   trine is applicable to District of Columbia legislation."  *Accord Biotechnology Indus.*
     *Org. v. Dist. of Columbia*, 496 F.3d 1362, 1371 (Fed. Cir. 2007) ("[A]s between Dis-
23   trict statutes and superior enactments by Congress, the general principles of preemp-
     tion from Supremacy Clause law apply."); *Don't Tear It Down, Inc. v. Pa. Ave. Dev.*
24   *Corp.*, 642 F.2d 527, 534 n.65 (D.C. Cir. 1980) ("We need not undertake precise defi-
     nition of the governmental status of the District of Columbia . . . for surely the
25   preemption doctrine [a]ffects District of Columbia legislation no less than state en-
     actments."); *Wash. Serv. Contractors Coal. v. Dist. of Columbia*, 54 F.3d 811, 815-16
26   (D.C. Cir. 1995) (considering whether National Labor Relations Act preempted D.C.
     Displaced Workers Protection Act); *Newman v. Kelly*, 848 F. Supp. 228, 236 (D.D.C.
27   1994) (considering whether federal Nursing Home Reform Law of 1987 preempted
     D.C. nursing-home regulations).  Not surprisingly, the lone case that FHFA cites was
28   not even a preemption case.  *See JMM Corp. v. Dist. of Columbia*, 378 F.3d 1117,
     1122 (D.C. Cir. 2004) (discussing *Younger* abstention doctrine).

islated in a field traditionally occupied by the States," *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)—such as the regulation of securities transactions, *see Guaranty Bank I*, 2013 WL 4536177, at *4. To overcome the presumption against preemption, FHFA must show that it was "the clear and manifest purpose of Congress" for the HERA extender provision to displace the Virginia and D.C. Securities Act statutes of repose. *Guaranty Bank I*, 2013 WL 4536177, at *4-5; *accord Guaranty Bank II*, 2013 WL 6706090, at *2, *10; *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

In its Opposition, FHFA does not dispute the existence of the presumption against preemption or the federalism concerns that underlie the presumption. And FHFA does not deny that it must show "clear and manifest" congressional intent to preempt to overcome the presumption. Instead, FHFA argues that the presumption is "outweighed" by three so-called "rules of construction" that supposedly cut in FHFA's favor. Opp. at 16-19. But each of these arguments was rejected by this Court in *Guaranty Bank*, and should be rejected again here.

<u>First</u>, citing *United States v. Locke*, 529 U.S. 89, 108 (2000), FHFA argues that "the presumption against preemption is at its weakest where . . . 'the State regulates in an area where there has been a history of significant federal presence.'" Opp. at 16-18. But this Court considered *Locke* in *Guaranty Bank I*, and explained that *Locke* and cases citing it for that proposition were superseded by subsequent Supreme Court precedent holding that the presumption applies in *all* preemption cases—regardless of whether there has been any federal regulation in the area:

> Citing the Supreme Court's decision in *United States v. Locke*, 529 U.S. 89, 108 (2000), several Ninth Circuit cases have broadly held that the presumption is inapplicable in the area of national banking because Congress has long regulated such banks. *The Supreme Court has since clarified that the presumption applies "in all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied," even when "the Federal Government has regulated [in that field] for more than a*

1   *century.* . . .  The presumption thus accounts for the historic presence of state

2   law but does not rely on the absence of federal regulation."  The Court therefore

3   finds that the presumption against preemption applies when analyzing FIRREA.

4   *Guaranty Bank I*, 2013 WL 4536177, at *5 n.5 (quoting *Wyeth v. Levine*, 555 U.S.

5   555, 565 n.3 (2009)) (emphasis added); *accord Guaranty Bank II*, 2013 WL 6706090,

6   at *9 (presumption applies "[i]n all pre-emption cases").

7        The Court's holding in *Guaranty Bank* is also squarely in accord with more re-

8   cent Ninth Circuit precedent post-dating *Locke*.  In *McDaniel v. Wells Fargo Invs.,*

9   *LLC*—which FHFA itself cites—the Ninth Circuit reaffirmed that the presumption

10  applies "in all pre-emption cases," especially where "Congress has legislated . . . in a

11  field which the states have traditionally occupied," even if "the Federal Government

12  has regulated [in that field] for more than a century."  717 F.3d 668, 674-75 (9th Cir.

13  2013).  Thus, it does not matter if there has been "a history of significant federal pres-

14  ence" in the field at issue.  As the Ninth Circuit further explained:

15       [W]hether Congress has regulated the securities industry comprehensively for

16       fifty years or only interstitially for five is irrelevant.  *So long as Congress has*

17       *set foot in a field which the States have traditionally occupied, the presumption*

18       *[against preemption] applies.*

19  *Id.* at 675 (emphasis added) (quoting *Wyeth*, 555 U.S. at 565).

20        Here, it is beyond dispute that "the States have historically regulated the sale of

21  securities under various 'blue-sky' laws."  *Guaranty Bank I*, 2013 WL 4536177, at *4.

22  Indeed, as this Court observed in *Guaranty Bank*, "forty-nine states had already

23  passed their own blue sky laws by the time Congress passed the Securities Act of

24  1933."  *Id.*; *accord Guaranty Bank II*, 2013 WL 6706090, at *9 ("states have histori-

25  cally regulated securities transactions within their borders").  The first Virginia blue

26  sky statute was enacted in 1916 and the D.C. Securities Act was enacted 50 years ago.

27  *See* Mem. at 10-11.  In effect, FHFA has it backwards.  This is not a situation where

28  state law seeks to impose new obligations on FHFA or "intrude" into areas that are

1   exclusively federal (Opp. at 17).[8]  Rather, FHFA is arguing that the HERA extender

2   provision displaced longstanding state law repose periods that define and limit the

3   substantive rights available under the Virginia and D.C. blue sky laws.  Thus, because

4   FHFA's argument is based on the premise that "Congress has set foot in a field which

5   the States have traditionally occupied," the presumption against preemption applies,

6   and FHFA must show "clear and manifest" congressional intent to preempt.  *McDan-*

7   *iel*, 717 F.3d at 675.[9]  But FHFA has not even tried to do so here.

8        <u>Second</u>, FHFA argues that "to the extent there is any ambiguity in HERA's

9   plain language . . . , it is equally well-settled that the Court should interpret [the limita-

10  tions period] in a light most favorable to the government."  Opp. at 18.  But this asser-

11  tion ignores the Court's ruling in *Guaranty Bank I*, which explicitly rejected this very

12  argument.  In *Guaranty Bank I*, the Court held:  "because the presumption against

13  preemption is grounded in concerns for state sovereignty, . . . the presumption super-

14  sedes the notion that ambiguous statutes of limitation will be interpreted in a light

15  most favorable to the government."  2013 WL 4536177, at *5 n.5.  Moreover, the

16  ───────────────────────
    [8] *Cf. California v. FHFA*, 2011 WL 3794942, at *16 (N.D. Cal. Aug. 26, 2011)

17  ("[e]xposure to state law claims would undermine the FHFA's ability to establish uni-
    form and consistent standards for the regulated entities"); *McDaniel*, 717 F.3d at 675

18  ("[w]here . . . federal law grants an actor a choice, and state law would restrict that
    choice, state law is preempted if preserving that choice was a significant federal regu-
    latory objective"); *County of Sonoma v. FHFA*, 710 F.3d 987, 993 (9th Cir. 2013)

19  (plaintiffs could not prevent FHFA from directing the GSEs to cease purchasing cer-
    tain mortgages, because "the ability to decide which mortgages to buy is an inherent

20  component of FHFA's charge to preserve and conserve the Enterprises' assets").

21  [9] The cases cited by FHFA are also factually inapposite, as they concern areas where
    states traditionally did not regulate or where Congress preempted the entire field.  *See*

22  *Locke*, 529 U.S. at 108 ("[t]he state laws now in question bear upon national and in-
    ternational maritime commerce, and in this area there is no beginning assumption that

23  concurrent regulation by the State is a valid exercise of its police powers"); *Buckman
    Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001) (declining to apply pre-

24  sumption to state law "fraud-on-the-FDA" claims because of uniquely federal nature
    of claims, "in contrast to situations implicating federalism concerns and the historic

25  primacy of state regulation of matters of health and safety"); *Arizona v. Inter Tribal
    Council of Ariz., Inc.*, 133 S. Ct. 2247, 2256 (2013) (declining to apply presumption to

26  Elections Clause legislation, an area in which States did not have "historic police
    powers" but had a role that "always requires subject to the express qualification that it

27  terminates according to federal law"); *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001,
    1004 (9th Cir. 2008) (declining to apply presumption where "state law claims provide

28  remedies for violations of federal law in a field preempted entirely by federal law").

1   Ninth Circuit has made clear that the canon of interpreting ambiguous statutes of limi-

2   tations in favor of the government is designed to protect "*public rights*."  *United*

3   *States v. Dos Cabezas Corp.*, 995 F.2d 1486, 1490 (9th Cir. 1993) (emphasis added).

4   As such, it should not apply here, where FHFA is merely asserting the *private rights*

5   of Fannie Mae and Freddie Mac in its capacity as their conservator.[10]

6         <u>Third</u>, FHFA argues that "[l]egislation enacted to alleviate grave conditions

7   which result from economic disaster and public calamity deserves a generous interpre-

8   tation so its remedial purpose may be accomplished."  Opp. at 19.  But this argument

9   rests on the false premise that HERA alone was enacted to address "grave conditions."

10  FHFA ignores that FIRREA (like HERA) was also "emergency" legislation that Con-

11  gress enacted to address a severe financial crisis in the federal banking system.  In-

12  deed, the Senate Committee report on FIRREA stated that "the proposed bill consti-

13  tutes *emergency* legislation, presented to and considered by the Committee at a time of

14  *crisis* in the Federal deposit insurance system and the thrift industry."  S. Rep. No.

15  101-19, at 3 (1989) (emphasis added); *see also infra*, at 14-15.

16        What is more, FHFA itself *agrees* that both FIRREA and HERA were emer-

17  gency legislation.  In an *amicus* brief it filed just this week with the Ninth Circuit (in

18  connection with an interlocutory appeal of Judge Wu's rulings concerning the

19  FIRREA extender provision), FHFA argued that "FIRREA, like HERA, is . . . emer-

20  gency legislation."  Devine Decl. Ex. G at 19.  FHFA likewise argued that "FIRREA

21  and HERA were enacted to alleviate two of America's most serious financial crises

22

_____

23  [10] FHFA questions "why a canon based on state sovereignty . . . should outweigh a
    canon with roots in federal supremacy."  Opp. at 18-19.  But this misunderstands the
24  difference between the two canons.  The notion that ambiguous statutes of limitations
    may be interpreted favorably to the government is used only to resolve ambiguities
25  appearing *within a single statute*.  It does *not* address potential conflicts between one
    statute and a *different* state or federal statute, and offers courts no guidance in this
26  more complex circumstance, where additional policy concerns are implicated.  When
    such conflicts occur, that is when the presumption against preemption (for feder-
27  al/state conflicts) and the presumption against implied amendment/repeal (for feder-
    al/federal conflicts) apply.  Thus, where (as here) the interpretation of a federal statute
28  could displace state law, only the presumption against preemption is relevant.

1   since the Great Depression." *Id*.  FHFA is thus talking out of both sides of its mouth.

2   Having just two days ago argued to the Court of Appeals that *both* FIRREA and HE-

3   RA are "emergency legislation," it cannot also argue to this Court that the asserted

4   "emergency" nature of HERA distinguishes it from FIRREA, or is any basis to argue

5   that this Court's rulings in *Guaranty Bank* should not apply here.  *See* Opp. at 19.

6   FHFA's argument is disingenuous and should be rejected.

7        **B.**    **FHFA Fails To Show "Clear And Manifest" Intent To Preempt.**

8       With the presumption against preemption entirely applicable here, FHFA must

9   show that it was "the clear and manifest purpose of Congress" for the HERA extender

10  provision to displace the Virginia Securities Act and D.C. Securities Act statutes of

11  repose.  *Guaranty Bank I*, 2013 WL 4536177, at *5.  Yet FHFA does not even attempt

12  to apply this standard, let alone demonstrate that it is satisfied here.  In fact, FHFA

13  fails even to use the phrase "clear and manifest" in support of its arguments.[11]

14       **1.**    **FHFA Fails To Establish Express Preemption.**

15      FHFA makes three arguments in an attempt to show that the text and legislative

16  history of the HERA extender provision expressly preempted state blue sky statutes of

17  repose.  *See* Opp. at 12-16.  None of these arguments is persuasive.

18      First, FHFA argues that the text of the extender provision is "unambiguous" and

19  "supplants all state law limitations periods, whether denominated as 'statutes of limi-

20  tations' or periods of 'repose.'"  Opp. at 12-13.  But in several decisions this Court has

21  consistently held otherwise.  After undertaking an exhaustive review of the statutory

22  text, relevant case law, and other congressional statutes, the Court held—in its original

23  *FHFA* Order, in *Guaranty Bank I*, and in *Guaranty Bank II*—that the term "statute of

24  limitations" as used in both the FIRREA and HERA extender provisions is "ambigu-

25  ous with respect to whether [it] included statutes of repose."  *Guaranty Bank I*, 2013

26  WL 4536177, at *5; *accord Guaranty Bank II*, 2013 WL 6706090, at *4, 6; *FHFA*

27  
_____
[11] The phrase "clear and manifest" appears only twice in FHFA's Opposition, and
28  both times is used to reference *Countrywide's* arguments.  Opp. at 5, 10.

Order, 900 F. Supp. 2d at 1063-66.  FHFA fails to acknowledge this Court's prior rulings, and fails to cite any authority that this Court has not already considered.  For instance, FHFA relies heavily on the Tenth Circuit's decision in *NCUA Bd. v. Nomura Home Equity Loan, Inc.*, 727 F.3d 1246 (10th Cir. 2013), *see* Opp. at 3-4, 13, but ignores the Court's ruling in *Guaranty Bank II* that addressed *NCUA*:

> [A]fter reviewing *NCUA/Nomura*, the Court is unconvinced that the question is as clear cut as the Tenth Circuit suggests.  The Court still believes, as first articulated in *FHFA/Countrywide*, that whether the term "statute of limitations" includes periods of repose is ambiguous.  This view is underscored by the current landscape of judicial interpretation on the issue....  The fact that respected federal judges have reached widely divergent interpretations of identical extender statutes suggests that at least some degree of ambiguity surrounds this question.

*Guaranty Bank II*, 2013 WL 6706090, at *4.  The reason FHFA ignores the Court's rulings is obvious:  "ambiguous" is the polar opposite of "clear and manifest," and the ambiguity of the HERA extender provision by definition precludes a finding of "clear and manifest" intent to preempt.  As the Supreme Court held in *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 292 (1995), "[t]o the extent that federal statutes are ambiguous, we do not read them to displace state law."

Second, FHFA argues that HERA contains a "preemption provision" that provides:  "[w]hen acting as conservator or receiver, the Agency shall not be subject to the direction or supervision of . . . any State in the exercise of the rights, powers, and privileges of the Agency."  12 U.S.C. § 4617(a)(7).  According to FHFA, this provision expressly preempts state law repose periods because they "provide an 'order' or 'oversight' to FHFA regarding the existence of the GSEs' claims."  Opp. at 13-14.  This argument lacks any merit.

Here, the state law repose periods applicable to FHFA's blue sky claims do not "direct" or "supervise" FHFA's conservatorship of Fannie Mae and Freddie Mac in any way.  Rather, they define and limit the substantive rights that the state legislatures

1   created and that FHFA chose to sue on.  *See* Mem. at 8-10.  Neither Virginia nor the

2   District of Columbia is "directing" or "supervising" how FHFA conducts this lawsuit,

3   or how it seeks more generally to preserve the assets of Fannie and Freddie.  Instead,

4   these blue sky repose periods merely reflect the fact that the rights FHFA chose to sue

5   on were created under state law, and are extinguished after a fixed period of time set

6   by the state legislature.  Just as FHFA is not free to disregard other substantive ele-

7   ments of its state law claims (such as the requirement to prove a material misstate-

8   ment, or to prove scienter for its fraud claims), it is not free to disregard state law re-

9   pose periods.  Like FIRREA, HERA "empowers [FHFA] to sue on any state right it

10  obtained from the failed institution," but "does not manifest Congress's intent to alter

11  the very nature of [those] state claims."  *Guaranty Bank I*, 2013 WL 4536177, at *8.[12]

12       Indeed, in *Birdville Indep. Sch. Dis. v. Hurst Assocs.*, 806 F. Supp. 122, 128

13  (N.D. Tex. 1992), the district court rejected a similar preemption argument that the

14  Resolution Trust Corporation tried to ground on the identically-worded provision in

15  FIRREA.[13]  Like the FIRREA provision, the HERA provision is "too indefinite" to

16  provide evidence of Congress's intent to preempt.  *Birdville*, 806 F. Supp. at 128.  If

17  Congress had intended such a general provision to supplant state law repose periods,

18  "Congress surely would have been more specific."  *Id.*  In short, FHFA "reads more

19  into th[is] provision[] than was intended," *id.*, and state blue sky statutes of repose are

20  not expressly preempted by 12 U.S.C. § 4617(a)(7).[14]

21  ─────────────────

[12] If FHFA's reading of 12 U.S.C. § 4617(a)(7) were correct, then FHFA would never be subject to any state law requirements whatsoever.  That is certainly not the law.

22  *See id.* at *6 (extender provision "clearly leaves room for the operation of state law");

23  *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87 (1994) (FIRREA "places the FDIC in the shoes of the insolvent [institution] to work out its claims under state law").

[13] *Compare* 12 U.S.C. § 4617(a)(7) *with* 12 U.S.C. § 1821(c)(2)(c).

24

[14] The lone case cited by FHFA—*FHFA v. City of Chicago*, 2013 WL 4505413 (N.D.

25  Ill. Aug. 23, 2013)—does not suggest otherwise.  Contrary to what FHFA argues, *City of Chicago* did not hold that 12 U.S.C. § 4617(a)(7) "expressly preempts state laws."

26  Opp. at 13-14.  Rather, *City of Chicago* analyzed whether § 4617(a)(7) expressly preempted a city ordinance requiring FHFA to register and monitor vacant buildings

27  as to which it owned the mortgages—and concluded that it did not.  2013 WL 4505413, at *9.  Although the court did find implied preemption, that was because the

28  ordinance "impose[d] obligations on FHFA with respect to its assets and security in-

1    <u>Third</u>, although FHFA concedes that the legislative history of HERA nowhere

2    even mentions the statute of limitations extender provision, FHFA argues that "the ab-

3    sence of legislative history discussing the HERA extender provision . . . only reflects

4    the [] extraordinary circumstances" under which HERA was passed.  Opp. at 15-16.

5    In other words, FHFA tries to spin this "paucity" of legislative history into affirmative

6    evidence "that Congress's clear intent was to ensure adequate time for FHFA to pur-

7    sue its claims."  *Id*.  That is nonsense.  By definition, the *absence* of legislative history

8    concerning preemption simply cannot be evidence of "clear and manifest" intent to

9    preempt.  *See, e.g.*, *Cal. Div. Labor Stds. Enforcement v. Dillingham Constr. N.A.,*

10   *Inc.*, 519 U.S. 316, 331 (1997) (declining to find preemption given "paucity" of evi-

11   dence in text and legislative history regarding intent to preempt state law).[15]  Indeed,

12   in *Guaranty Bank*, this Court held that the legislative history of FIRREA—which also

13   was "emergency" legislation, and actually *did* include a brief reference to the extender

14   provision—was "insufficient to overcome the presumption against preemption" be-

15   cause it "neither mentions statutes of repose nor implies a concern for their effects."

16   *Guaranty Bank I*, 2013 WL 4536177, at *6.  The same is true here, as HERA's legis-

17   lative history is entirely silent on all of these issues.[16]

18       In short, FHFA fails to identify any evidence in HERA's text or legislative his-

19   ───────────────────────────────

20   terests" and interfered with its "exclusive authority over Fannie and Freddie's busi-
     ness operations" (*id*. at *12)—concerns that are clearly not implicated here.

21   [15] FHFA cites two cases to support its argument (Opp. at 16 n.7), but neither found
     that the absence of legislative history supported a finding of preemption.  Rather, the

22   Court in each case found congressional intent to preempt based on evidence *other
     than the legislative history*.  *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt.*

23   *Dist.*, 541 U.S. 246, 256 (2004) (finding preemption based on a "categorical" and "ex-
     press pre-emption provision" without having to "delve[] into legislative history"); *Fid.*

24   *Fed. Sav. & Loan Assoc. v. de la Cuesta*, 458 U.S. 141, 163-67 (1982) (reviewing
     available legislative history to "confirm our reading of the statutory language").

25   FHFA has identified no such evidence here.

26   [16] FHFA also points to a generic congressional finding stating that "more effective
     federal regulation is needed to reduce the risk of failure of the enterprises."  Opp. at

27   15-16.  But that is just a general statement of HERA's purpose.  It says nothing about
     FHFA, the time limits applicable to claims brought by FHFA, or the possibility of

28   preempting state law.  As such, it does not even remotely provide evidence of "clear
     and manifest" congressional intent to preempt state blue sky statutes of repose.

tory suggesting that Congress had the requisite "clear and manifest" intent to preempt blue sky statutes of repose.  FHFA thus cannot establish express preemption.

## 2.   FHFA Fails To Establish Implied Preemption.

With respect to the two forms of implied preemption, FHFA concedes that field preemption does not apply but argues that conflict preemption does, contending that there is a "sharp conflict" between the HERA extender provision and the state law repose periods.  Opp. at 19-23.  But FHFA's arguments lack merit, ignoring what this Court already held in *Guaranty Bank*.

First, FHFA attempts to distinguish this case from *Guaranty Bank* by arguing that HERA and FIRREA "were addressed to different economic situations," and that Congress had "less weighty objectives . . . in enacting FIRREA."  Opp. at 20, 22 n.10. Once again, FHFA is talking out of both sides of its mouth.  As noted above, FHFA argued in its recent Ninth Circuit brief that "FIRREA and HERA were enacted to alleviate two of America's most serious financial crises since the Great Depression." Devine Decl. Ex. G at 19.  It further argued that Congress enacted FIRREA to "prevent[] the collapse of the [savings and loan] industry, attack[] the root causes of the crisis, and restor[e] public confidence."  *Id.* (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 856 (1996)).[17]  Here, however, because it is trying to distinguish this Court's rulings in *Guaranty Bank*, FHFA claims that FIRREA had "less weighty objectives."  Opp. at 22 n.10.  FHFA may not argue diametrically different things to the Court of Appeals and this Court simultaneously.  FHFA's wholly inconsistent—and specious—argument should be rejected out of hand.

As FHFA itself argues in its Ninth Circuit brief, FIRREA was also "emergency" legislation, enacted by Congress to address the widespread problems arising from the savings and loan crisis.  As the Senate Committee report explained:

---

[17] *Accord CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 740 (D.C. Cir. 1995) ("In response to the lax regulation and loose capital requirements that it perceived at the root of the savings and loan crisis, Congress enacted [FIRREA].").

[T]he proposed bill constitutes *emergency legislation*, presented to and consid-
ered by the Committee at a time of *crisis in the Federal deposit insurance sys-
tem and the thrift industry*.  President Bush has made reform and recapitaliza-
tion of the deposit insurance system a top priority of his new administration.
On February 6, the President announced a plan to reform and recapitalize the
system.  This plan formed the basis of legislation presented to Congress on Feb-
ruary 22, 1989.  Despite the *monumental scale and complexity of the problems
this legislation is intended to address*, the Committee has expedited its consid-
eration of the bill in view of the high priority attached to it by the President and
the *urgent need to staunch massive losses* in the thrift industry.

S. Rep. No. 101-19, at 3 (1989) (emphases added).

Indeed, "[d]uring the latter part of the 1980s, more than a thousand savings and
loan associations in the United States failed." *Courtney v. Halleran*, 485 F.3d 942,
943-44 (7th Cir. 2007).  This "rate of failure was so great that the General Accounting
Office (GAO) declared the Federal Savings & Loan Insurance Corporation (FSLIC)
fund insolvent by at least $3.8 billion in January 1987," threatening the stability of the
entire federal deposit insurance system.  *Id*.  Similarly, throughout the 1980s there was
an "extraordinary upsurge in the number of bank failures."  FDIC, *The Banking Crises
of the 1980s and Early 1990s: Summary and Implications*, at 3-4.[18]  According to the
FDIC, "[m]ore than 1,600 banks insured by the [FDIC] were closed or received FDIC
financial assistance—far more than in any other period since the advent of federal de-
posit insurance in the 1930s."  *Id*.  The magnitude of these bank failures "put severe . .
. strains on the FDIC insurance fund; raised basic questions about the effectiveness of
the bank regulatory and deposit insurance systems; and led to far-reaching legislative
and regulatory actions," and in 1988 "the FDIC sustained the first operating loss in its
history."  *Id*. at 3-4, 16.  For FHFA to suggest that the events leading to FIRREA's

---

[18] *Available at* http://www.fdic.gov/bank/historical/history/3_85.pdf.

enactment were somehow less dire than those that led to HERA is specious.  And the premise of FHFA's argument—that the failure of Fannie and Freddie would be more "catastrophic" than "the failure of a single bank or credit union" (Opp. at 21)—ignores the actual historical context in which FIRREA was enacted, which involved the failure of *thousands* of S&Ls and banks across the country.

Viewed in proper context, the fact that HERA was enacted at a time of economic turmoil does not create any unique tension with state law different from that which this Court previously considered in *Guaranty Bank* with respect to FIRREA.  Even if there *were* significant differences in the circumstances under which HERA and FIRREA were enacted, FHFA ignores that *the text of the HERA and FIRREA extender provisions is virtually identical*.  That strongly suggests that Congress intended both provisions to be interpreted the same way.[19]

Second, FHFA argues that the application of state law repose periods would conflict with the purpose of the HERA extender provision, which "was to grant FHFA more time to decide whether and how to pursue any claims it inherited as [the GSEs] newly-appointed conservator, in order to put the regulated entities in a sound and solvent condition."  Opp. at 21-22 (quoting *FHFA Order*, 900 F. Supp. 2d at 1066-67).  Once again, however, FHFA ignores this Court's rulings in *Guaranty Bank*.  As this Court explained in *Guaranty Bank I*, the purpose of the FIRREA extender provision is effectively the same as the asserted purpose of HERA's extender provision:  to grant the FDIC more time to decide whether and how to pursue claims it inherited as receiver for failed banks, in order to replenish the deposit insurance fund.  2013 WL 4536177, at *7.  And as this Court further explained, while there may be "a degree of tension" between these objectives and state statutes of repose—in that state law repose

---

[19] *See United States v. Ajoku*, 718 F.3d 882, 890 (9th Cir. 2013) ("[w]here two statutes use similar language and were enacted for the same purpose, it is appropriate to interpret the language of the statutes *pari passu*"); *United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) ("courts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter").

1  periods may extinguish claims that might have resulted in the recovery of additional
2  funds by the conservator or receiver—such tension "does not present the kind of sharp
3  conflict needed to preempt state law." *Id*.  To the contrary, it is well-settled that these
4  kinds of "cost-recovery objective[s]" and "'more money arguments' will not suffice to
5  preempt state law." *Id*.[20]  FHFA nowhere mentions this holding in *Guaranty Bank*, let
6  alone explains why the Court should reach a different result here when the purpose of
7  both the HERA and FIRREA extender provisions was effectively the same.

8      FHFA's argument that it needed additional time to investigate and assert its
9  claims (Opp. at 23 n.11) also fails because it ignores the fundamentally different pur-
10  poses of statutes of limitations and statutes of repose.  Unlike statutes of limitations,
11  statutes of repose are not concerned with how much time a plaintiff has to identify or
12  investigate its claims.  Rather, "[t]he purpose of a statute of repose is to give a defend-
13  ant peace in the form of an absolute time limit on potential liability." *FHFA* Order,
14  900 F. Supp. 2d at 1062.  Because a statute of repose is "focused on the defendant's
15  interests rather than the plaintiff's," it "bars suit regardless of when the plaintiff was
16  injured or first discovered their rights." *Id*.; *accord Guaranty Bank I*, 2013 WL
17  4536177, at *3 (repose periods run "usually independent of any variable, such as
18  claimant's awareness of a violation").  Thus, there is no "sharp conflict" between the
19  objective of the HERA extender provision (granting FHFA additional time to investi-
20  gate and assert its claims) and the objective of state blue sky statutes of repose (grant-
21  ing defendants the right to be free from liability after a fixed time period, regardless of
22  whether plaintiffs were aware of their claims).  By reading the HERA extender provi-
23  sion as not preempting state law repose periods, both statutes can co-exist and be read
24  together.  And that is precisely what the Supreme Court has directed courts to do in

---

[20] *Accord O'Melveny*, 512 U.S. at 88 ("[T]here is no federal policy that the fund should always win."); *Rodriguez v. United States*, 480 U.S. 522, 525-56 (1987) ("[N]o legislation pursues its purposes at all costs . . . . and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law").

the absence of clear and manifest congressional intent to the contrary.  *See Medtronic*, 518 U.S. at 485; *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).[21]

Third, FHFA argues that it would be "irrational" and "invite chaos" if FHFA were required to "monitor, review, and apply 50 States' statutes of repose."  Opp. at 22-23.  This argument is meritless.  FHFA chose to assert rights under Virginia and D.C. law; it is hardly "irrational" to expect a litigant asserting state law claims to "monitor, review, and apply" the state law repose periods associated with the claims on which it decided to sue (particularly since Fannie and Freddie reside in Virginia and D.C.).[22]  This is not even remotely similar to the concern raised in the *City of Chicago* case cited by FHFA, which warned against "permit[ting] thousands of municipalities all over the country to impose varying ordinances and obligations on FHFA."  *City of Chicago*, 2013 WL 4505413, at *12-13.  Here, enforcing state blue sky statutes of repose would not impose any new obligations or restrictions on FHFA or the business operations of the GSEs.  Rather, FHFA would have the same rights the state legislatures afforded to all other litigants that assert those states' blue sky claims—rights that those legislatures created and that those legislatures determined would cease to exist after a defined period of time.

---

[21] In any event, FHFA's complaint that it did not have enough time to investigate its claims is simply not true.  For 40 of the 76 MBS subject to blue sky claims, FHFA had *over one year* (and in many cases, closer to *two years*) between its appointment as conservator and the expiration of the applicable blue sky repose period.  *See* Apps. A-B.  The same is true for many of FHFA's 1933 Act claims.  *See id.*  More importantly, FHFA nowhere mentions that *Fannie and Freddie* had ample opportunity to investigate their potential claims *before* FHFA was ever appointed conservator.  Indeed, this Court in numerous opinions has explained that both publicly-available lawsuits and media publications by no later than 2007 began to allege that Countrywide had abandoned its underwriting guidelines.  *See, e.g., Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125 (C.D. Cal. 2011).

[22] *See O'Melveny*, 512 U.S. at 88 (holding that "[u]niformity of law [that] might facilitate the FDIC's nationwide litigation of [claims on behalf of failed banks], [by] eliminating state-by-state research and reducing uncertainty," was insufficient to justify displacement of state law with federal common law rule).

1

C.     **The *Summerlin* Doctrine Does Not Apply.**

2      FHFA next argues that it is not bound by state statutes of limitations or repose

3  at all, citing *United States v. Summerlin*, 310 U.S. 414 (1940).  *See* Opp. at 23-25.

4  Although the Court did not reach this argument when FHFA first raised it in opposing

5  Countrywide's initial motion to dismiss, *see FHFA*, 900 F. Supp. 2d at 1066 n.9, it

6  was wrong at that time and is still wrong now.

7      As FHFA concedes, the *Summerlin* doctrine applies only where the United

8  States government or one of its agencies is "proceeding in its sovereign capacity."

9  Opp. at 24 (quoting *United States v. California*, 507 U.S. 746, 757 (1993)).  But it is

10  well-settled that a federal agency acting as conservator or receiver for a private institu-

11  tion "is *not* the United States."  *O'Melveny*, 512 U.S. at 85-86 (emphasis added).

12  When an agency acts as conservator or receiver (as FHFA is doing here), it merely

13  "steps into the shoes" of the failed private institution and "obtain[s] the rights of the

14  [institution] that existed prior to [conservatorship or] receivership."  *Id*.  Thus, when

15  acting "[i]n its capacity as [conservator or] receiver," a federal agency "stands as a

16  private, non-governmental entity and is not the Government."  *United States v.*

17  *Beszborn*, 21 F.3d 62, 68 (5th Cir. 1994).[23]  When the agency brings a lawsuit in its

18  [23] *Accord United States v. Ely*, 142 F.3d 1113, 1121 (9th Cir. 1997) ("the FDIC did

19  not sue the defendants as the United States," but "only as the receiver of a failed insti-
tution"); *Ledo Fin. Corp. v. Summers*, 122 F.3d 825, 829 (9th Cir. 1997) ("[T]he

20  FDIC is simply acting as receiver of the failed [savings and loan].  It is not pursuing
the interest of the United States."); *United States v. Heffner*, 85 F.3d 435, 439 (9th Cir.

21  1996) ("[t]he RTC in its corporate character as receiver is not the federal sovereign");
*FDIC v. Glickman*, 450 F.2d 416, 418 (9th Cir. 1971) (as receiver, "FDIC stands in

22  the shoes of the insolvent bank," and is not acting as the government); *Perpetual Fin.
Corp. v. United States*, 61 Fed. Cl. 126, 145 (Fed. Cl. 2004) ("When acting in its cor-

23  porate capacity, the FDIC is an agency of the United States.  When acting in its re-
ceivership capacity, the FDIC is not an agency of the United States."); *AG Route Sev-*

24  *en P'ship v. United States*, 57 Fed. Cl. 521, 534 (Fed. Cl. 2003) ("In its capacity as re-
ceiver," "the FDIC's attendant role herein is tantamount to that of a private party, and

25  not the government *per se*."); *Ameristar Fin. Servicing, Co. v. United States*, 75 Fed.
Cl. 807, 812 (Fed. Cl. 2007) ("as its conservator, the FDIC 'stepped into the shoes' of

26  Superior Federal . . . and was not acting as the United States"); *Schock v. FDIC*, 118
F. Supp. 2d 165, 169-70 (D.R.I. 2000) ("As a receiver, the FDIC does not act on be-

27  half of the United States government. . . .  Instead, it acts on behalf of the failed
bank. . . ."); *FDIC v. Haines*, 3 F. Supp. 2d 155, 165 (D. Conn. 1997) ("The FDIC as

28  receiver 'steps into the shoes' of the failed institution.  It is not pursuing the interest of
the Federal Government.").

capacity as conservator, it does not assert its sovereign rights as an arm of the U.S. government.  Rather, it asserts the rights of the private institution.  It thus "occupies no better position than that which was occupied by the person or party for whom he acts . . . and any defense good against the original party is good against the [conservator]"—including statutes of limitations and repose.  *FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995); *accord O'Melveny*, 512 U.S. at 86 ("any defense good against the original party is good against the [conservator or] receiver").

Here, HERA provides that upon being appointed as conservator, FHFA "shall, . . . by operation of law, immediately succeed to all rights, titles, powers, and privileges of [Fannie Mae and Freddie Mac]."  12 U.S.C. § 4617(b)(2)(A).  Although their formation was "sponsored" by the government, Fannie and Freddie are private corporations, owned by investors in the public market.[24]  As the Supreme Court explained in *O'Melveny*, this means that FHFA merely "step[ped] into the shoes" of Fannie and Freddie—*i.e.*, FHFA obtained only the rights of these private institutions that existed prior to conservatorship.  512 U.S. at 86.  And it is those rights that FHFA is asserting in this lawsuit.  Indeed, the Amended Complaint makes this clear, stating that FHFA brings this action "as Conservator of Fannie Mae and Freddie Mac" and that each "claim . . . is asserted on behalf of Fannie Mae and Freddie Mac."  Am. Compl. ¶¶ 12, 401, 415, 451, 469, 485, 503.  In short, because FHFA filed this lawsuit solely in its capacity as conservator for two private entities, it is not "proceeding in its sovereign capacity."  The *Summerlin* doctrine thus does not apply here.

Indeed, *FHFA itself* has argued that it is *not* a "government actor" when acting in its capacity as conservator for Fannie and Freddie.  In *Herron v. Fannie Mae*, No.

---

[24] It is well-settled that Fannie Mae and Freddie Mac are private entities.  *See, e.g.*, *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*, 534 F.3d 779, 783, 787 n.4 (D.C. Cir. 2008) ("[i]nitially established as a public entity, Fannie Mae was privatized in 1968," and "has shareholders, directors, and officers like other non-governmental corporations"); *Humpherys v. Nager*, 962 F. Supp. 347, 351 n.5 (E.D.N.Y. 1997) ("[s]ince 1989, Freddie Mac has had the attributes of a private corporation not a governmental entity").

10-00943 (RMC) (D.D.C. 2010), a lawsuit alleging violations of constitutional rights by Fannie Mae (known as a "*Bivens*" claim), FHFA intervened in its capacity as conservator for Fannie Mae and argued that the case should be dismissed because neither it nor Fannie Mae were governmental actors:

> Fannie Mae is a *private entity*, and appointment of a Conservator to oversee it has not transformed Fannie Mae into a government actor. . . .  A conservator or receiver . . . *steps into the shoes of the private institution* for the duration of the conservatorship. . . .  [It] does not transform the private financial institution into a government actor for the duration of conservatorship. . . .  Likewise, upon the inception of the Fannie Mae conservatorship, *the FHFA Conservator assumed Fannie Mae's private attributes*.  Fannie Mae did not thereby become a government actor for purposes of constitutional claims, and *when FHFA acted in its capacity as Conservator it was not functioning as a government actor for such purposes*.  Indeed, *courts have repeatedly held that when a conservator or receiver acts in such capacity it is not a government actor. . . .*

Devine Decl. Ex. A at 1-2, 18-19 (emphases added); *accord id.* at 19-21, 26 (same).  Thus, even according to FHFA itself, "FHFA as Conservator—like the FDIC as Receiver—is *not* the United States," and does not act in a sovereign capacity.  Devine Decl. Ex. B at 7.[25]

FHFA's arguments in *Herron* were successful.  In *Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 94-96 (D.D.C. 2012) (emphasis added), Judge Collyer adopted FHFA's position in its entirety:

> Thus, like the FDIC when it serves as a conservator or receiver of a private enti-

---

[25] *Accord id.* at 1 (arguing "conservators and receivers succeed to the private status of the entity," and "'step[] into the shoes' of the pre-existing institution"), 4 (same), 5 (Plaintiff "makes no attempt to refute the established legal principle that conservators and receivers are *not* the United States"), 6 ("Dispositive Case Law Confirms That the Conservator Adopts the Role of a Non-Governmental Actor"), 11 ("many cases hold[] that the acts of a federal conservator . . . simply are not properly considered acts of the federal government"); 20 ("the Conservator succeeded to the private attributes of Fannie Mae"), 21 ("the Conservator does not act in a governmental capacity").

ty, *FHFA when it serves as conservator "steps into the shoes" of the private corporation*, Fannie Mae. . . .  Fannie Mae was not converted into a government entity when it was placed into conservatorship; instead, FHFA stepped into the shoes of Fannie Mae.  *FHFA as conservator for Fannie Mae is not a government actor*. . . .  Fannie Mae was a private entity; when FHFA took over as conservator of Fannie Mae, *it stepped into Fannie Mae's private role*.  In sum, *FHFA as conservator of Fannie Mae is not a government actor*, and Ms. Herron's *Bivens* claim will be dismissed.

Having asserted and prevailed on this argument before one federal court, FHFA should be judicially estopped from arguing exactly the opposite in this Court—*i.e.*, that FHFA acts in a *sovereign* capacity when it acts as conservator for Fannie and Freddie.  As the Supreme Court has held, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, [it] may not thereafter, simply because [its] interests have changed, assume a contrary position."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).[26]

Just as it nowhere addresses the controlling "clear and manifest intent" test, FHFA does not mention *Herron* anywhere in its Opposition.[27]  Instead, it argues that a federal agency acts in its sovereign capacity for purposes of the *Summerlin* doctrine whenever "public policies are served and the public interest is advanced by the litigation."  Opp. at 24-25.  But none of the cases FHFA cites involved a government agency acting as *conservator of a private entity*.  Rather, in each of the cases FHFA cites, the government was asserting *its own rights*, in its sovereign capacity, not standing in

---

[26] The Ninth Circuit has held that judicial estoppel applies regardless of whether the inconsistent position was taken in the same proceeding or in a different proceeding.  *See, e.g.*, *Whaley v. Belleque*, 520 F.3d 997, 1002 (9th Cir. 2008) (state government estopped from taking position in federal court contrary to that it took in state court); *Risetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 605 (9th Cir. 1996) ("judicial estoppel is not confined to inconsistent positions taken in the same litigation").

[27] FHFA's failure to acknowledge *Herron* in its Opposition is all the more surprising given that Countrywide raised FHFA's position in *Herron* in its initial motion to dismiss briefing in this case.  *See* Dkt. No. 162 at 8-10.

the shoes of a private corporation and pursuing claims on its behalf:

- In *Summerlin*, the government was asserting its own claim against the estate of a decedent, and thus was "acting in its governmental capacity." 310 U.S. at 414-17.

- *Bresson v. Comm'r of Internal Revenue*, 213 F.3d 1173, 1178 (9th Cir. 2000), involved the IRS's "efforts to collect taxes," which is "among the most basic attributes of sovereignty." As such, the IRS "unquestionably [wa]s acting in its sovereign capacity."

- In *SEC v. Rind*, 991 F.2d 1486, 1491-92 (9th Cir. 1993), an enforcement action brought by the SEC, the court held that "[w]hen the Commission sues to enforce the securities laws, it vindicates public rights and furthers the public interest." Such enforcement proceedings are clearly within the sovereign capacity of the government.

- In *SEC v. Lorin*, 869 F. Supp. 1117, 1130 (S.D.N.Y. 1994), another SEC enforcement proceeding, the court concluded that *Summerlin* applied because it was possible "for the United States to itself obtain a monetary benefit." But no such possibility exists in the conservatorship context, as any recovery here would go to Fannie and Freddie, not FHFA.[28]

In fact, *Lorin* affirmatively refutes FHFA's argument here. FHFA fails to mention that the *Lorin* court held that the *Summerlin* doctrine does *not* apply where a government agency seeks to enforce *private* rights belonging to *private* parties:

An action on behalf of the United States in its governmental capacity . . . is sub-

---

[28] Although FHFA makes the conclusory assertion that its recoveries "benefit both the GSEs and the American taxpayer," Opp. at 25 & n.13, its only support for that assertion is a self-serving press release issued by FHFA itself. Other press releases issued by FHFA make clear that the settlements reached to date in the SDNY actions have resulted in payments made "to Fannie Mae" and "to Freddie Mac," not to the U.S. Treasury. Devine Decl. Exs. C-F. To the extent that Fannie and Freddie subsequently use these funds to pay dividends or debts owed to the federal government, that does not convert this action from one involving the private rights of the GSEs into one involving the sovereign rights of the government.

REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION

24

1    ject to no time limitation, in the absence of congressional enactment clearly im-

2    posing it. . . . *The [*Summerlin*] doctrine does not apply, however, when the*

3    *government is functioning merely as a conduit for the enforcement of private*

4    *rights which could have been enforced by the private parties themselves.*

5    *Lorin*, 869 F. Supp. at 1127 (emphasis added).[29]  That is exactly the case here:  FHFA

6    is asserting "private rights" belonging to Fannie and Freddie, solely in its capacity as

7    their conservator, "which could have been enforced by [Fannie and Freddie] them-

8    selves." *Id.*  FHFA itself, in its sovereign capacity as regulator, "has no interest in the

9    suit, [] has nothing to gain from the relief prayed for, and nothing to lose if the relief is

10    denied." *Beebe*, 127 U.S. at 346.  *Summerlin* is therefore inapplicable.

11       In any event, it is not enough that this action (as FHFA contends) vaguely im-

12    plicates "the public interest" because Fannie and Freddie "have important public mis-

13    sions" relating to the U.S. housing market.  Opp. at 24-25.  Fannie and Freddie are

14    still private entities, and FHFA is still asserting their private rights.  Likewise, FHFA

15    is not acting in a sovereign capacity simply because it contends that its conserva-

16    torship has a "public purpose."  *See id.*  As FHFA itself argued in *Herron*, the "asser-

17    tion that the Fannie Mae conservatorship has a public mission is irrelevant because all

18    federal . . . conservatorships and receiverships have public missions," yet courts have

19    repeatedly declined to treat other federal conservators as government actors.  Devine

20    Decl. Ex. B at 9 (capitalization omitted).

21       FHFA also ignores that its argument would render the HERA extender provi-

22    sion itself superfluous.  If *Summerlin* applied to actions filed by FHFA in its capacity

23

[29] *Accord Marshall v. Intermountain Elec. Co.*, 614 F.2d 260, 262 n.3 (10th Cir. 1980) ("An action which, although brought in the name of the United States, involves no public rights or interests may be subject to a state statute of limitations.  In such a case the federal government functions as a mere conduit for the enforcement of private rights. . . ."); *United States v. Beebe*, 127 U.S. 338, 346 (1888) ("the rule that the stat- ute of limitations does not run against the state has no application . . . when the state, though a nominal party on the record, has no real interest in the litigation . . . . and the right asserted is a private right"); *SEC v. Calvo*, 378 F.3d 1211, 1218 (11th Cir. 2004) ("[w]here, however, the government's action vindicates a private interest, the [statute of limitations] defense is typically available").

1    as conservator for Fannie and Freddie, and FHFA were not bound by any state statutes

2    of limitations or repose at all, there would have been no need for Congress to enact a

3    statute *extending* any state law time limit for FHFA's benefit.  Thus, the very exist-

4    ence of the extender provision proves that *Summerlin* does not apply here.

5        Moreover, the text of the extender provision clearly contemplates the continued

6    application of state law limitations periods to claims brought by FHFA.  As this Court

7    explained in *Guaranty Bank I*, the "extender provision clearly leaves room for the op-

8    eration of state law," as it "saves state statutes of limitations from preemption to the

9    extent they exceed the prescribed federal limitations period."  2013 WL 4536177, at

10   *6.  If *Summerlin* applied here, there would have been no need to address, much less

11   "save," state law limitations periods—because they would have been inapplicable to

12   FHFA in the first place.

13   **III.    THE HERA EXTENDER PROVISION DOES NOT IMPLICITLY**
14   **AMEND THE 1933 ACT STATUTE OF REPOSE.**

15       The reasoning of the *Guaranty Bank* Orders applies equally to the issue of

16   whether the HERA extender provision operates as an implied amendment of the 1933

17   Act statute of repose with respect to FHFA's federal claims.  *See* Mem. at 17-23.  This

18   is because the legal framework used to determine whether a later-in-time federal stat-

19   ute displaces an earlier federal statute is *exactly the same* as the legal framework used

20   to determine whether a federal statute displaces a state statute—*i.e.*, there is a strong

21   presumption against overriding an earlier act of Congress, and that presumption may

22   be overcome only by a showing of "clear and manifest" intent by Congress to displace

23   the earlier statute.  *See id*.  Because there is no evidence of such "clear and manifest"

24   intent here, the HERA extender provision cannot be read as implicitly amending the

25   1933 Act statute of repose.

26

27

28

**A.    The *Guaranty Bank* Orders Did Not "Reaffirm" That The HERA Extender Provision Applies To The 1933 Act Statute Of Repose.**

FHFA first argues that this Court's *Guaranty Bank* decisions "*reaffirmed* its ruling that FHFA's Federal Securities Act claims are timely."  Opp. at 26.  To support this argument, FHFA cites one passage from *Guaranty Bank I*, 2013 WL 4536177, at *4, and one passage from *Guaranty Bank II*, 2013 WL 6706090, at *8.  *See* Opp. at 26-27.  But these passages provide no support for FHFA's argument.

First, the passage FHFA cites from *Guaranty Bank I* merely acknowledged that the Court's *FHFA* Order existed:  "In [*FHFA v. Countrywide*], this Court held that a nearly identical extender provision in [HERA] applies to the statute of repose contained in Section 13 of the federal Securities Act."  2013 WL 4536177, at *4.  It then went on to discuss other prior rulings the Court had made regarding the FIRREA extender provision, and concluded that none of those rulings controlled the question presented in *Guaranty Bank* (*i.e.*, whether state statutes of repose are preempted).  *See id.*

Second, citing a passage from *Guaranty Bank II* out of context, FHFA argues that the Court "'disagree[d]' with the same [implied amendment] argument Defendants are making here."  Opp. at 26.  But FHFA badly misstates what this Court actually said.  The only argument the Court "disagree[d]" with in that passage was the FDIC's argument that the implied amendment/repeal doctrine (which analyzes whether a later-in-time federal statute displaces an earlier *federal* statute) could be used to analyze whether the FIRREA extender provision displaced *state* statutes of repose:

> As an alternative to preemption, Plaintiffs suggest that the proper template for analysis is the statutory canon disfavoring repeal by implication.  *The Court disagrees.* . . .  This and other courts have considered repeal by implication . . . in determining whether Congress intended to effectuate an implied repeal of another *federal* statute.  But Plaintiffs never cite, and the Court cannot find, examples of purported conflicts between *state* and federal law that were resolved within the framework of repeal by implication.

1   *Guaranty Bank II*, 2013 WL 6706090, at *8 (emphasis added).

2       In short, because no 1933 Act claims were at issue in *Guaranty Bank II*,[30] the

3   Court did not address (much less reject) any arguments as to whether the extender

4   provision operates as an implied amendment of the 1933 Act statute of repose.  What

5   the Court *did* do, however, was apply the presumption against preemption and con-

6   clude that there was no "clear and manifest" congressional intent to preempt state

7   statutes of repose.  That same legal framework applies equally when analyzing wheth-

8   er the extender provision was intended to supplant the 1933 Act statute of repose.

9   **B.    The Legal Framework Used To Analyze Implied Amendments
        Of Federal Statutes Applies Here.**

10

11      According to FHFA, the HERA extender provision does not implicate the Su-

12  preme Court's implied amendment/repeal analysis because (it contends) HERA mere-

13  ly "creates a separate limitations framework that functions as a narrow exception for

14  actions brought by [FHFA]."  Opp. at 28-29.  Rather than amending or repealing Sec-

15  tion 13 of the 1933 Act, FHFA argues that "HERA presupposes the validity of Section

16  13 . . . by setting new periods provided that the underlying periods are still open as of

17  the date of conservatorship."  *Id*. at 29.  But this is the same argument that the FDIC

18  made about the identically-worded FIRREA extender provision and that this Court re-

19  jected in *Guaranty Bank II*.

20      Like FHFA argues here, the FDIC argued in *Guaranty Bank* that preemption

21  analysis was not implicated because the FIRREA extender provision is merely a "dis-

22  crete statutory exception limited to the FDIC."  *Guaranty Bank II*, 2013 WL 6706090,

23  at *7.  This Court disagreed:

24      According to Plaintiffs, preemption is not implicated because the extender pro-

25      vision constitutes a *discrete statutory exception limited to the FDIC*.  However

26      characterized, extending the time limitation on Plaintiffs' claim *would effective-*

27  _____

28  [30] The Court dismissed the FDIC's 1933 Act claims as untimely in *Guaranty Bank I*,
    2013 WL 4536177, at *2, and the FDIC did not seek reconsideration of that holding.

*ly nullify the TSA's five-year statute of repose.*  Such a result is impossible without invoking, even if implicitly, the supremacy of FIRREA as federal law.  *Id.* (emphasis added).  In other words, the Court held that it does not matter whether the extender provision is labeled as a "preemption" or an "exception" because the outcome is the same:  extending the time limit for the FDIC's blue sky claims beyond the state law repose period would "effectively nullify" the time limit imposed by the state legislature.  *Id.*  As a result, the legal framework of preemption applies, requiring evidence of "clear and manifest" congressional intent to preempt in order to overcome the strong presumption against preemption.

The same reasoning applies with equal force here to implied amendment/repeal analysis, which requires the same "clear and manifest" intent to overcome the strong presumption against implied amendment/repeal.  Whether the HERA extender provision is characterized as a "separate limitations framework," a "narrow exception," a "new period," a "repeal," or an "amendment," the practical outcome is the same.  Just as in *Guaranty Bank*, extending the time limit for FHFA's 1933 Act claims would "effectively nullify" the three-year repose period imposed by Section 13 of the 1933 Act in each and every suit under the 1933 Act that FHFA brings as conservator for Fannie and Freddie.  That necessarily triggers the legal framework that the Supreme Court has articulated for analysis of whether a later-in-time federal statute implicitly amended or repealed earlier-enacted federal legislation.  *See, e.g., Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662-63 (2007).

Setting aside the parties' disagreement over labels and characterizations, there is *no real dispute* about how the HERA extender provision would actually operate if FHFA's proposed interpretation were adopted.  By its express terms, Section 13 of the 1933 Act applies to *all* plaintiffs and *all* lawsuits asserting 1933 Act claims.  Thus, absent amendment by HERA, FHFA would be required to bring its claims no more than three years after the date of the offering or sale of the securities.  *See* 15 U.S.C. § 77m ("*[i]n no event* shall *any such action*" be brought more than three years after offering

or sale) (emphasis added).  If the extender provision displaced the 1933 Act statute of repose, however, FHFA could bring its claims up to three years after the date on which it was appointed conservator of Fannie and Freddie, and the repose period provided by Section 13 would be superseded in its entirety.  Whether this proposed interpretation is characterized as an "exception," an "amendment," or something else, it must be analyzed under the legal framework of implied amendment/repeal.[31]

Thus, just as the Court applied the Supreme Court's preemption analysis in *Guaranty Bank* to determine whether the FIRREA extender provision displaces *state* repose periods, the Court should apply implied amendment analysis here to determine whether the HERA extender provision displaces the *federal* 1933 Act repose period.

### C.    There Is No Evidence Of "Clear And Manifest" Congressional Intent To Implicitly Amend The 1933 Act Statute Of Repose.

Nearly all of FHFA's arguments regarding its 1933 Act claims concern whether the legal framework of implied amendment/repeal applies to the HERA extender provision in the first instance.  *See* Opp. at 28-30.  FHFA does not dispute that if this legal framework does apply, then it will require the conclusion that HERA does not displace the 1933 Act repose period.  More specifically:

- FHFA does not dispute that, just as there is a longstanding presumption against preemption of state law, there is also a strong presumption against finding that a previously-enacted federal statute was implicitly amended or repealed by a later-in-time federal statute.  *See* Mem. at 19-20.

---

[31] As the Court held in *Guaranty Bank II*, FHFA is also wrong to suggest that its proposed "exception" to the 1933 Act statute of repose is a "narrow" one.  FHFA has already asserted 1933 Act claims against virtually every major global financial institution, seeking the recovery of tens of billions of dollars.  Moreover, in light of the identical extender provisions in FIRREA and the Federal Credit Union Act, the "concerns implicated here go beyond [FHFA's] immediate and future litigation endeavors," and would apply to all 1933 Act claims asserted by the FDIC and NCUA on behalf of hundreds of failed banks and credit unions.  *Guaranty Bank II*, 2013 6706090, at *9.  Thus, FHFA's proposed displacement of the 1933 Act repose period "has not been, and likely will not continue to be, a periodic, narrowly tailored occurrence."  *Id.*

1   • FHFA does not dispute that, just as the presumption against preemption

2   is rooted in considerations of state sovereignty, the presumption against

3   implied amendment/repeal is rooted in equally important public poli-

4   cies—namely, concern for the stability and harmonious enforcement of

5   Congress's legislative judgments, which enables Congress to perform its

6   legislative function by providing "fundamental ground rules" for deter-

7   mining the effect of a proposed bill on existing law.  Mem. at 20-22;

8   *United States v. Hansen*, 772 F.2d 940, 944 (D.C. Cir. 1985).

9   • FHFA does not dispute that, just as the presumption against preemption

10   may be overcome only by a showing of "clear and manifest" congres-

11   sional intent to preempt state law, the presumption against implied

12   amendment/repeal likewise may be overcome only by a showing of

13   "clear and manifest" congressional intent to override the previously-

14   enacted federal statute.  *See Nat'l Ass'n of Home Builders*, 551 U.S. at

15   662 ("repeals by implication are not favored and will not be presumed

16   unless the intention of the legislature to repeal [is] clear and manifest").[32]

17   • Nor does FHFA dispute that "courts are not at liberty to pick and choose

18   among congressional enactments, and when two statutes are capable of

19   co-existence, it is the duty of the courts, *absent a clearly expressed con-*

20   *gressional intention to the contrary*, to regard each as effective."  *Morton*

21   *v. Mancari*, 417 U.S. 535, 551 (1974) (emphasis added).

22   • And FHFA does not even attempt to show that it was the "clear and man-

23   ifest" intent of Congress that the HERA extender provision supplant the

24   1933 Act statute of repose.  To the contrary, the phrase "clear and mani-

25

26   ───────────────────

27   [32] *Accord Guaranty Bank II*, 2013 6706090, at *8 ("well established jurisprudence [] strongly disfavors preemption of federal statutory law by another federal statute *absent express manifestations of a preemptive intent*") (quoting *United States v. Gen. Dynamics Corp.*, 19 F.3d 770, 774 (2d Cir. 1994)) (emphasis added); Mem. at 19-20.

28

1    fest intent" does not appear at all in the 1933 Act section of FHFA's Op-

2    position.  *See* Opp. at 25-30.

3         FHFA does make a conclusory argument that the HERA extender provision un-

4    ambiguously displaces the 1933 Act statute of repose.  *See* Opp. at 29-30.  But this ig-

5    nores the fact that this Court has repeatedly held that the term "statute of limitations"

6    as used "[i]n the context of HERA's extender provision" is "ambiguous with respect

7    to whether [it] included statutes of repose."  *Guaranty Bank I*, 2013 WL 4536177, at

8    *5; *accord Guaranty Bank II*, 2013 WL 6706090, at *4-6; *FHFA* Order, 900 F. Supp.

9    2d at 1063-66.  By definition, "ambiguous" intent is the polar opposite of "clear and

10   manifest" intent.[33]

11        Against this backdrop, there is simply no basis for concluding that the HERA

12   extender provision was intended to operate as an implied amendment of the 1933 Act

13   statute of repose.  Just as the ambiguous text and legislative history of the FIRREA

14   extender provision precluded a finding of "clear and manifest" congressional intent to

15   supplant state law repose periods in *Guaranty Bank*, the ambiguous text and non-

16   existent legislative history of the HERA extender provision similarly preclude a find-

17   ing of "clear and manifest" congressional intent to supplant the 1933 Act statute of re-

18   pose.  As such, FHFA has not overcome the strong presumption against implied

19   amendment that the Supreme Court has articulated in a long line of controlling deci-

20   sions on this issue, the 1933 Act statute of repose remains in effect for cases brought

21   by FHFA, and the three-year repose period of Section 13 expired as to all MBS at is-

22

23   _____

     [33] Citing the title of Section 13, "Limitations of Actions," FHFA argues that this use
24   of the term "limitations" embraces both the limitations and repose periods found in
     Section 13.  Opp. at 29-30.  But how Congress used the term "limitations" in the title
25   to a section in the Securities Act is not the issue here.  Rather, the issue is whether
     Congress's use of the term "limitations" in the *extender provision* was intended to
26   supplant repose periods, regardless of how those repose periods are labeled in the un-
     derlying statutes.  If anything, the title of Section 13 merely underscores the ambiguity
27   of the extender provision, as it is just one of many examples identified by the Court in
     which Congress has confused the terms "limitations" and "repose."  *See FHFA* Order,
28   900 F. Supp. 2d at 1063-66; *Guaranty Bank II*, 2013 WL 6706090, at *4-6.

1    sue before FHFA filed its Complaint in this action.  Thus, FHFA's 1933 Act claims

2    are time-barred and must be dismissed.

3                              <u>**CONCLUSION**</u>

4         For all of the foregoing reasons, the Countrywide Defendants respectfully re-

5    quest that the Court reconsider its *FHFA* Order and dismiss as time-barred FHFA's

6    claims under the Virginia Securities Act, D.C. Securities Act, and 1933 Act.

7    Dated:  February 14, 2014          **GOODWIN PROCTER LLP**

8                                       /s/ Brian E. Pastuszenski_____

9                                       Brian E. Pastuszenski (*pro hac vice*)
                                        Daniel J. Tyukody (State Bar No. 123323)

10                                      John B. Daukas (*pro hac vice*)
                                        Brian C. Devine (State Bar No. 222240)

11                                      *Counsel for the Countrywide Defendants*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## APPENDIX A
## FHFA HAD AMPLE TIME TO BRING CLAIMS AS TO MBS PURCHASED BY FREDDIE MAC

| Offering[1] | Tranche | 1933 Act SOR Trigger Dates[2] | 1933 Act SOR Expiration Dates | Time Left on 1933 Act SORs as of Sept. 6, 2008[3] | VA Blue Sky SOR Trigger Date[4] | VA Blue Sky SOR Expiration Date | Time Left on VA Blue Sky SOR as of Sept. 6, 2008[5] |
|---|---|---|---|---|---|---|---|
| CWALT 2005-73CB | 2A2 | § 11: 7/25/2005<br>§ 12: 10/15/2007 | § 11: 7/25/2008<br>§ 12: 10/15/2010 | § 11: *Already Dismissed*<br>§ 12: *2 years, 1 month, 9 days* | 10/15/2007 | 10/15/2009 | *1 year, 1 month, 9 days* |
| CWALT 2005-73CB | 2A2 | § 11: 7/25/2005<br>§ 12: 10/31/2007 | § 11: 7/25/2008<br>§ 12: 10/31/2010 | § 11: *Already Dismissed*<br>§ 12: *2 years, 1 month, 25 days* | 10/31/2007 | 10/31/2009 | *1 year, 1 month, 25 days* |
| CWALT 2006-11CB | 1A1 | § 11: 3/30/2006<br>§ 12: 9/10/2007 | § 11: 3/30/2009<br>§ 12: 9/10/2010 | § 11: *6 months, 24 days*<br>§ 12: *2 years, 4 days* | 9/10/2007 | 9/10/2009 | *1 year, 4 days* |
| CWALT 2006-23CB | 1A7 | § 11: 6/30/2006<br>§ 12: 9/28/2007 | § 11: 6/30/2009<br>§ 12: 9/28/2010 | § 11: *9 months, 24 days*<br>§ 12: *2 years, 22 days* | 9/28/2007 | 9/28/2009 | *1 year, 22 days* |
| CWALT 2006-23CB | 2A1 | § 11: 6/30/2006<br>§ 12: 9/14/2007 | § 11: 6/30/2009<br>§ 12: 9/14/2010 | § 11: *9 months, 24 days*<br>§ 12: *2 years, 8 days* | 9/14/2007 | 9/14/2009 | *1 year, 8 days* |
| CWALT 2006-33CB | 2A1 | § 11: 10/3/2007<br>§ 12: 9/28/2007 | § 11: 10/3/2010<br>§ 12: 9/28/2010 | § 11: *1 year, 27 days*<br>§ 12: *2 years, 22 days* | 9/28/2007 | 9/28/2009 | *1 year, 22 days* |
| CWALT 2007-5CB | 2A3 | § 11: 3/1/2007<br>§ 12: 9/14/2007 | § 11: 3/1/2010<br>§ 12: 9/14/2010 | § 11: *1 year, 5 months, 23 days*<br>§ 12: *2 years, 8 days* | 9/14/2007 | 9/14/2009 | *1 year, 8 days* |
| CWALT 2007-OA3 | 2A1 | § 11: 3/5/2007<br>§ 12: 1/23/2008 | § 11: 3/5/2010<br>§ 12: 1/23/2011 | § 11: *1 year, 5 months, 27 days*<br>§ 12: *2 years, 4 months, 17 days* | 1/23/2008 | 1/23/2010 | *1 year, 4 months, 17 days* |
| CWALT 2007-OA8 | 1A1 | § 11: 7/2/2007<br>§ 12: 1/23/2008 | § 11: 7/2/2010<br>§ 12: 1/23/2011 | § 11: *1 year, 9 months, 26 days*<br>§ 12: *2 years, 4 months, 17 days* | 1/23/2008 | 1/23/2010 | *1 year, 4 months, 17 days* |

---

[1] *See* Amended Complaint ("AC") ¶ 257 & tbl. 11.

[2] For offerings pursuant to a shelf registration statement filed prior to December 1, 2005, the three-year statute of repose for Section 11 claims begins to run on the effective date of the shelf registration statement. For offerings pursuant to shelf registration statements after December 1, 2005, the three-year repose period for Section 11 claims runs from the date of the prospectus supplement for issuers and underwriters, but still the effective date of the shelf registration statement for directors and signing officers. The three-year repose period for Section 12(a)(2) claims runs from the date of purchase by Freddie Mac. *See* 15 U.S.C. § 77m; *FHFA* Order, 900 F. Supp. 2d 1055, 1060 & n.2 (C.D. Cal. 2012).

[3] As calculated using http://www.timeanddate.com/date/durationresult.html.

[4] *See* AC ¶ 257 & tbl. 11 (alleged dates of Freddie Mac's purchases). For Virginia Blue Sky claims, the two-year statute of repose begins to run at the date of the sale in the initial offering. *See* Va. Code Ann. § 13.1-522(D).

[5] As calculated using http://www.timeanddate.com/date/durationresult.html. As the Court's prior October 18, 2012 Order acknowledges, FHFA abandoned any Virginia Securities Act claims with respect to certain MBS because Freddie Mac's purchases thereof were made before September 6, 2006—more than two years before FHFA was appointed as conservator. *See* 900 F. Supp. 2d at 1061 n.4. Only claims that are presently before the court are analyzed here.

APPENDIX B
FHFA HAD AMPLE TIME TO BRING CLAIMS AS TO MBS PURCHASED BY FANNIE MAE

| Offering[1] | Tranche | 1933 Act (§ 11) SOR Trigger Date[2] | 1933 Act (§ 11) SOR Expiration Date | Time Left on 1933 Act (§ 11) SOR as of Sept. 6, 2008[3] | 1933 Act (§ 12) and D.C. Blue Sky SOR Trigger Date[4] | 1933 Act (§ 12) and D.C. Blue Sky SOR Expiration Date | Time Left on 1933 Act (§ 12) and D.C. Blue Sky SOR as of Sept. 6, 2008[5] |
|---|---|---|---|---|---|---|---|
| CWALT 2006-OA14 | 1A1 | 10/4/2006 | 10/4/2009 | *1 year, 28 days* | 10/3/2006 | 10/3/2009 | *1 year, 27 days* |
| CWALT 2007-OA10 | 1A1 | 8/1/2007 | 8/1/2010 | *1 year, 10 months, 26 days* | 7/30/2007 | 7/30/2010 | *1 year, 10 months, 24 days* |
| CWALT 2007-OA10 | 1A2 | 8/1/2007 | 8/1/2010 | *1 year, 10 months, 26 days* | 7/30/2007 | 7/30/2010 | *1 year, 10 months, 24 days* |
| CWHL 2006-HYB1 | 1A1 | 7/25/2005 | 7/25/2008 | *Already Dismissed[6]* | 6/29/2007 | 6/29/2010 | *1 year, 9 months, 23 days* |
| CWL 2006-14 | 1A | 9/12/2006 | 9/12/2009 | *1 year, 6 days* | 9/8/2006 | 9/8/2009 | *1 year, 2 days* |
| CWL 2006-17 | 1A | 9/28/2006 | 9/28/2009 | *1 year, 22 days* | 9/25/2006 | 9/25/2009 | *1 year, 19 days* |
| CWL 2006-18 | 1A | 10/2/2006 | 10/2/2009 | *1 year, 26 days* | 9/28/2006 | 9/28/2009 | *1 year, 22 days* |
| CWL 2006-21 | 1A | 12/4/2006 | 12/4/2009 | *1 year, 2 months, 28 days* | 11/30/2006 | 11/30/2009 | *1 year, 2 months, 24 days* |

---

[1] *See* Amended Complaint ("AC") ¶ 258 & tbl. 12.

[2] For offerings pursuant to a shelf registration statement filed prior to December 1, 2005, the three-year statute of repose begins to run on the effective date of the shelf registration statement. For offerings pursuant to shelf registration statements after December 1, 2005, the relevant date is the prospectus supplement for issuers and underwriters, but still the effective date of the shelf registration statement for directors and signing officers. *See FHFA* Order, 900 F. Supp. 2d 1055, 1060 & n.2 (C.D. Cal. 2012).

[3] As calculated using http://www.timeanddate.com/date/durationresult.html.

[4] *See* AC ¶ 258 & tbl. 12 (alleged dates of Fannie Mae's purchases). For both Section 12(a)(2) and District of Columbia Blue Sky claims, the three-year statute of repose begins to run at the date of the sale in the initial offering. *See* 15 U.S.C. § 77m; D.C. Code § 31-5606.05(f).

[5] As calculated using http://www.timeanddate.com/date/durationresult.html.

[6] Section 11 claims as to certain MBS were dismissed under the Court's October 18, 2012 Order because the MBS were "bona fide offered to the public" before September 6, 2005—more than three years before FHFA was appointed as conservator. *See* 900 F. Supp. 2d 1055, 1060 n.2 (C.D. Cal. 2012). As these claims are not before the Court, they are not analyzed herein.

| Offering[1] | Tranche | 1933 Act (§ 11) SOR Trigger Date[2] | 1933 Act (§ 11) SOR Expiration Date | Time Left on 1933 Act (§ 11) SOR as of Sept. 6, 2008[3] | 1933 Act (§ 12) and D.C. Blue Sky SOR Trigger Date[4] | 1933 Act (§ 12) and D.C. Blue Sky SOR Expiration Date | Time Left on 1933 Act (§ 12) and D.C. Blue Sky SOR as of Sept. 6, 2008[5] |
|---|---|---|---|---|---|---|---|
| CWL 2006-23 | 1A | 12/13/2006 | 12/13/2009 | *1 year, 3 months, 7 days* | 12/8/2006 | 12/8/2009 | *1 year, 3 months, 2 days* |
| CWL 2006-25 | 1A | 1/4/2007 | 1/4/2010 | *1 year, 3 months, 29 days* | 12/29/2006 | 12/29/2009 | *1 year, 3 months, 23 days* |
| CWL 2007-1 | 1A | 2/12/2007 | 2/12/2010 | *1 year, 5 months, 6 days* | 2/9/2007 | 2/9/2010 | *1 year, 5 months, 3 days* |
| CWL 2007-10 | 1A1 | 7/3/2007 | 7/3/2010 | *1 year, 9 months, 27 days* | 6/29/2007 | 6/29/2010 | *1 year, 9 months, 23 days* |
| CWL 2007-10 | 1A2 | 7/3/2007 | 7/3/2010 | *1 year, 9 months, 27 days* | 6/29/2007 | 6/29/2010 | *1 year, 9 months, 23 days* |
| CWL 2007-10 | 1M1 | 7/3/2007 | 7/3/2010 | *1 year, 9 months, 27 days* | 6/29/2007 | 6/29/2010 | *1 year, 9 months, 23 days* |
| CWL 2007-10 | 1M2 | 7/3/2007 | 7/3/2010 | *1 year, 9 months, 27 days* | 6/29/2007 | 6/29/2010 | *1 year, 9 months, 23 days* |
| CWL 2007-10 | 1M3 | 7/3/2007 | 7/3/2010 | *1 year, 9 months, 27 days* | 6/29/2007 | 6/29/2010 | *1 year, 9 months, 23 days* |
| CWL 2007-11 | 1M1 | 7/3/2007 | 7/3/2010 | *1 year, 9 months, 27 days* | 6/29/2007 | 6/29/2010 | *1 year, 9 months, 23 days* |
| CWL 2007-11 | 1M2 | 7/3/2007 | 7/3/2010 | *1 year, 9 months, 27 days* | 6/29/2007 | 6/29/2010 | *1 year, 9 months, 23 days* |
| CWL 2007-11 | 1M3 | 7/3/2007 | 7/3/2010 | *1 year, 9 months, 27 days* | 6/29/2007 | 6/29/2010 | *1 year, 9 months, 23 days* |
| CWL 2007-11 | 1A1 | 7/3/2007 | 7/3/2010 | *1 year, 9 months, 27 days* | 6/29/2007 | 6/29/2010 | *1 year, 9 months, 23 days* |
| CWL 2007-11 | 1A2 | 7/3/2007 | 7/3/2010 | *1 year, 9 months, 27 days* | 6/29/2007 | 6/29/2010 | *1 year, 9 months, 23 days* |
| CWL 2007-12 | 1A1 | 8/15/2007 | 8/15/2010 | *1 year, 11 months, 9 days* | 8/16/2007 | 8/16/2010 | *1 year, 11 months, 10 days* |
| CWL 2007-12 | 1A2 | 8/15/2007 | 8/15/2010 | *1 year, 11 months, 9 days* | 8/16/2007 | 8/16/2010 | *1 year, 11 months, 10 days* |

ACTIVE/71561983.2

| Offering[1] | Tranche | 1933 Act (§ 11) SOR Trigger Date[2] | 1933 Act (§ 11) SOR Expiration Date | Time Left on 1933 Act (§ 11) SOR as of Sept. 6, 2008[3] | 1933 Act (§ 12) and D.C. Blue Sky SOR Trigger Date[4] | 1933 Act (§ 12) and D.C. Blue Sky SOR Expiration Date | Time Left on 1933 Act (§ 12) and D.C. Blue Sky SOR as of Sept. 6, 2008[5] |
|---|---|---|---|---|---|---|---|
| CWL 2007-12 | 1M1 | 8/15/2007 | 8/15/2010 | *1 year, 11 months, 9 days* | 8/29/2007 | 8/29/2010 | *1 year, 11 months, 23 days* |
| CWL 2007-12 | 1M1 | 8/15/2007 | 8/15/2010 | *1 year, 11 months, 9 days* | 9/7/2007 | 9/7/2010 | *2 years, 1 day* |
| CWL 2007-13 | 1A | 11/1/2007 | 11/1/2010 | *2 years, 1 month, 26 days* | 10/30/2007 | 10/30/2010 | *2 years, 1 month, 24 days* |
| CWL 2007-13 | 1M1 | 11/1/2007 | 11/1/2010 | *2 years, 1 month, 26 days* | 10/30/2007 | 10/30/2010 | *2 years, 1 month, 24 days* |
| CWL 2007-3 | 1A | 4/2/2007 | 4/2/2010 | *1 year, 6 months, 27 days* | 3/29/2007 | 3/29/2010 | *1 year, 6 months, 23 days* |
| CWL 2007-6 | 1A | 4/3/2007 | 4/3/2010 | *1 year, 6 months, 28 days* | 3/30/2007 | 3/30/2010 | *1 year, 6 months, 24 days* |
| CWL 2007-8 | 1A1 | 6/4/2007 | 6/4/2010 | *1 year, 8 months, 29 days* | 5/31/2007 | 5/31/2010 | *1 year, 8 months, 25 days* |
| CWL 2007-8 | 1A2 | 6/4/2007 | 6/4/2010 | *1 year, 8 months, 29 days* | 5/31/2007 | 5/31/2010 | *1 year, 8 months, 25 days* |

ACTIVE/71561983.2